**EXHIBIT 1**

341 Meeting
August 18, 2021

```
 1                UNITED STATES BANKRUPTCY COURT
 2                CENTRAL DISTRICT OF CALIFORNIA
 3                     SANTA ANA DIVISION
 4
 5   In Re:                         Case No.: 8:21-bk-11710-ES
 6
 7   JAMIE LYNN GALLIAN,
 8                                   Chapter 7
 9
10        Debtor.
11   _____/
12
13
14
15         TRANSCRIPT OF REMOTE AUDIO-RECORDED
16              341 MEETING OF CREDITORS
17                     BEFORE
18            JEFFREY I. GOLDEN, Trustee
19                 August 18, 2021
20
21
22
23
24   Transcribed By:
     TERRI NESTORE
25   CSR No. 5614, RPR, CRR
```

Case 8:23-cv-00001-DSF   Document 19-1   Filed 05/25/23   Page 3 of 16   Page ID #:3529

Case 8:21-ap-01096-SC   Doc 90-6   Filed 12/30/22   Entered 12/30/22 15:22:08   Desc
Exhibits 65-72   Page 284 of 298

341 Meeting
August 18, 2021

2 to 5

Page 2

1  APPEARANCES:
2  ED HAYS, ESQ., MARSHACK HAYS, Plaintiff/Creditor Houser
   Bros. Co.
3
   MICHAEL POOLE, ESQ., Feldsott & Lee, Creditor The
4  Huntington Beach Gables Homeowners Association
5  JEFFORD DAVIS, ESQ., Creditor Lisa Ryan
6  CHRIS HOUSER, Creditor Houser Bros. Co.
7  JAMIE LYNN GALLIAN, Debtor-Defendant

Page 3

1       THE TRUSTEE:  Thank you.  Is anybody else on the
2  phone for the Jamie Gallian matter?  Are you ready?
3       MR. HAYS:  Yes, I am.
4       THE TRUSTEE:  Ms. Gallian, could you please raise
5  your right hand.
6
7                  JAMIE LYNN GALLIAN,
8           having been first duly sworn,
9       was examined and testified further as follows:
10
11      THE TRUSTEE:  Will you state your name.
12      Can you speak up a little bit.
13      MS. GALLIAN:  Sure.  Jamie Lynn Gallian.
14      THE TRUSTEE:  Did you upload original ID and
15 Social Security documents?
16      MS. GALLIAN:  Yes, I did.
17      THE TRUSTEE:  And are you represented by a lawyer
18 on the phone?
19      MS. GALLIAN:  No.  I tried -- I'm trying but it's
20 -- it's difficult because I've already filed the petition.
21      THE TRUSTEE:  I understand.
22      I'm going to make sure that we take care of one
23 technical thing.  Thank you, I understand.
24      So why don't we go around who is on the phone,
25 first of all, could you make an appearance on the phone,

Page 4

1  please.  Who is on the phone?  State your name, please.
2       Who is on the phone?  State your name, please.
3       MR. POOLE:  Good morning.  This is Michael Poole
4  of the firm Feldsott & Lee.  We're counsel for creditor
5  Huntington Beach Gables Homeowners Association.
6       THE TRUSTEE:  Thank you.
7       And who else is on the phone, please?
8       MR. DAVIS:  Good morning.  This is Jefford Davis.
9       I'm the attorney for Lisa Ryan.
10      THE TRUSTEE:  Thank you.  And on the Zoom, can
11 you make appearances, please.
12      MR. HAYS:  Good morning.  For creditor Houser
13 Bros. dba Rancho Delray Mobile Home Estates, my name is
14 Ed Hays of Marshack Hays.
15      THE TRUSTEE:  Thank you.
16      MR. HOUSER:  Houser Bros. Co.
17      I'm here to observe.
18      THE TRUSTEE:  Thank you.
19      Ms. Gallian, please raise -- we did it already.
20   Q. Did you upload original identification and Social
21 Security documents to me?
22   A. Yes, sir.
23   Q. And did you get any help with any lawyer or
24 paraprofessional, in connection with your petition?
25   A. No, I have not.

Page 5

1    Q. I need you to speak up a little bit.
2    A. No, I have not.
3    Q. Did you pay anybody in connection with the
4  preparation of this petition?
5    A. No, I did not.
6    Q. And is your address correct on the schedules?
7    A. Yes, it is.
8    Q. Did you do an information sheet?
9    A. Yes, I did.
10   Q. Have you filed bankruptcy before?
11   A. Twenty years ago.
12   Q. And did you review everything before you signed
13 the petition?
14   A. Yes, I did.
15   Q. And did you list all of your assets and all of
16 your liabilities?
17   A. Yes, I did, for the exception of the new
18 Certificate of Title that I received a few days ago.
19   Q. Are you going to amend accordingly for that?
20   A. Yes, sir.
21   Q. And is your Social Security number correct on the
22 bankruptcy papers?
23   A. Yes, it is.
24   Q. And other than what you've said, you've listed
25 all your assets and liabilities, correct?

Case 8:23-cv-00001-DSF   Document 19-1   Filed 05/25/23   Page 4 of 16   Page ID #:3530

Case 8:21-ap-01096-SC   Doc 90-6   Filed 12/30/22   Entered 12/30/22 15:22:08   Desc
Exhibits 65-72   Page 285 of 298

341 Meeting
August 18, 2021

6 to 9

### Page 6

1  A. Yes, I did.
2  Q. Everything is otherwise true and correct?
3  A. Yes, sir.
4  Q. No other errors or omissions?
5  A. No, I don't believe so. I've been trying to
6 study it and make sure that it's correct, other than make
7 amendments if I have to choose the right exemption code.
8  Q. Do you pay any alimony or support?
9  A. No, I do not.
10  Q. Speak up, please.
11  A. No, I do not.
12  Q. Are you employed?
13  A. No, not at this time.
14  Q. Were you employed when the petition was filed?
15  A. No.
16  Q. Is 2020 the last year in which you filed a tax
17 return?
18  A. Yes, sir.
19  THE TRUSTEE: And one of the things -- I'm going
20 to let people ask questions in a minute and I may have
21 more questions afterwards, but one of the things on your
22 schedules -- and I do have your pro se declaration -- but
23 on your schedules, you list certain assets that are in
24 unknown amounts, various claims and the like.
25  Do you know what I'm referring to?

### Page 7

1  THE WITNESS: Yes, sir.
2  THE TRUSTEE: And I'm going to ask you, not now
3 but afterwards, to try and put some ranges on what you
4 think those claims are worth so I can better evaluate
5 them, and also to get me any documentation that you have
6 regarding each of those claims as well.
7  THE WITNESS: Yes, sir.
8  THE TRUSTEE: We'll do that offline, but I'll be
9 asking for all of the claims that are there.
10  THE WITNESS: Yes, sir.
11  THE TRUSTEE: And all the unknown amounts.
12  With that said -- and I'll reserve some other
13 questions -- I'll turn the questioning over to --
14 Mr. Hays, do you want to start?
15  MR. HAYS: Sure. That would be great, thank you.
16  Q. Good morning, Ms. Gallian. My name is Ed Hays.
17  I'm an attorney representing Houser Bros.
18  In reviewing your bankruptcy schedules, on your
19 Schedule A/B you list a 2014 Skyline Custom Villa
20 manufactured home located on Monterey Lane, Space 376.
21  Is that your home?
22  A. Yes, it is.
23  Q. And you put a value of $235,000.
24  How did you arrive at that value?
25  A. I did -- I paid for the NADA evaluation and then

### Page 8

1 I added $20,000. And the second way I did it was I
2 checked about 20 of the last sold units here in the park
3 and I did an average.
4  Q. And how long have you owned this home?
5  Since November of 2018?
6  A. November 1st, 2018.
7  Q. And from whom did you acquire it?
8  A. Ms. Ryan, Lisa Ryan.
9  Q. And was the home already in Space 376?
10  A. Yes, it was.
11  Q. And what was the purchase price?
12  A. 175.
13  Q. And how did you pay for the purchase price?
14  A. With the day before I sold my home right across
15 the street on the same parcel of land at the Gables.
16  Q. And who did you sell that home to?
17  A. Mr. Randy L. Nickel.
18  Q. And how did Mr. Nickel pay you?
19  A. In checks, cashier's checks, two cashier's
20 checks.
21  Q. And how much was the sales price?
22  A. 379,000.
23  Q. And what happened to that $379,000?
24  A. Um, probably about a hundred -- now under a
25 140,000 has been absorbed in ongoing litigation,

### Page 9

1 attorneys' fees, and then the purchase of a home.
2  Q. And so 175 of the 379 went into the purchase of
3 your existing home?
4  A. Yes.
5  Q. And what was the flow of money?
6  It went from Mr. Nickel, and was it deposited
7 into an account in your name?
8  A. I believe it was.
9  Q. And then what happened to the funds?
10  A. They...
11  Q. Did you take the funds out of an account in your
12 name and transfer them to Ms. Ryan?
13  A. Yes. She got cashier's checks for the purchase
14 of the home.
15  Q. I see that title, according to your schedules, is
16 held in the name of J-Sandcastle Company, LLC, correct?
17  A. That is incorrect at this time.
18  Q. On the schedules, on the petition date it was
19 held in J-Sandcastle; is that correct?
20  A. Yes, it is.
21  Q. Okay. And did you ever transfer money to
22 J-Sandcastle for it to purchase the property or did you
23 pay Ms. Ryan directly and just put title in the name of
24 J-Sandcastle?
25  A. No, I did transfer money to J-Sandcastle.

Case 8:23-cv-00001-DSF   Document 19-1   Filed 05/25/23   Page 5 of 16   Page ID #:3531

Case 8:21-ap-01096-SC   Doc 90-6   Filed 12/30/22   Entered 12/30/22 15:22:08   Desc
Exhibits 65-72   Page 286 of 298

341 Meeting
August 18, 2021

10 to 13

Page 10

1  Q. And then it was the one that purchased the
2  cashier's check from Ms. Ryan?
3  A. I don't recall at this time. I wasn't prepared
4  to answer that question. I'd have to go back. I do have
5  records of the cashier's checks that were given to
6  Ms. Ryan for the purchase of her home.
7  Q. We would ask that you produce those records to
8  the trustee that show the flow of funds of the $379,000.
9  You said the Certificate of Title has now been
10 changed. Who is the new owner?
11 A. The park will not issue a lease in the name of
12 J-Sandcastle and we participated in a mandatory settlement
13 conference and I was asked to put the home in my name, and
14 so that's how it got to be in my name, so that I could
15 hopefully get a lease.
16 Q. And what's the date the new certificate of title
17 was issued?
18 A. 2/25 -- February 25th, 2021.
19 Q. But that was before you filed bankruptcy,
20 correct?
21 A. Yes, it was.
22 Q. So on the day of bankruptcy, the title was in
23 your individual name and not J-Sandcastle?
24 A. No, the HCD, I just received the actual paperwork
25 in the mail. It takes several months.

Page 11

1  Once you send paperwork to HCD, it's a very long
2  process. And I have the envelope that I have forwarded to
3  the trustee when I got the paperwork.
4  Q. So you requested the new title in February but
5  the new title wasn't issued until after the bankruptcy?
6  A. Right.
7  Q. Okay. Why did you put title in the name of
8  J-Sandcastle?
9  A. I don't recall. That was three years ago.
10 I don't recall.
11 Q. Other than the home, did J-Sandcastle have any
12 assets on the day you filed bankruptcy?
13 A. Just a small bank account.
14 Q. That held about $8,000, if I recall?
15 A. That's correct.
16 Q. And does J-Sandcastle have any other business or
17 income or was it only to hold title to the home?
18 A. That's correct.
19 Q. And do you have any contracts or ground lease
20 that permits you to live in Space 376?
21 A. It's under litigation at this point. I believe
22 that I do. I have lived on the property since 2009.
23 Q. So which contracts or leases do you have that you
24 believe support your right to be in Space 376?
25 A. I have the original ground lease that was

Page 12

1  recorded back in 1980 and on the left-hand corner the APN
2  No. 178-011-01 is written on the contract from 40 years
3  ago, and that is exactly where my home sits.
4  I believe that it was the same property.
5  Q. But how is it that you have rights under this
6  1980 contract, when you weren't living there in 1980?
7  Can you please explain that?
8  A. The home in the Gables right across the street is
9  a ground leasehold. I read the contract and believed that
10 when I purchased the home, after I sold the home to
11 Mr. Nickel when I went across the street after I turned
12 55, I believed it was the same contract because it had the
13 same APN number on the contract.
14 Q. And we'd ask that you produce a copy of the
15 contract to the trustee.
16 Does anyone else live in the home with you?
17 A. We have a person who his permanent residence is
18 in Torrance but he works here in Huntington Beach and I
19 have known him for -- he used to live over here -- he used
20 to rent a room from me over there at the Gables and then
21 he left for a short time and now he's back here in
22 Huntington Beach, and so he does stay in my extra room
23 when he doesn't feel like driving all the way back to
24 Torrance, yes. It's just a friendship.
25 There's not -- we're not a couple or anything.

Page 13

1  Q. What's this individual's name?
2  A. Mr. McLelland.
3  Q. Is that Rob McLelland?
4  A. Robert, yes.
5  Q. Does he pay rent for staying at the home?
6  A. No.
7  Q. On your Schedule I, there's a thousand dollars of
8  income per month reflected.
9  What's the source of that thousand dollars?
10 A. And that will also be amended. It is from the
11 EDD and it is in the wrong location.
12 Q. Are you married, Ms. Gallian?
13 A. No, I am not.
14 Q. Have you been married at any point in the last
15 eight years?
16 A. I was divorced in 2016, so that was over five
17 years ago.
18 Q. And I believe on your schedules there's
19 indication that you were not married at any point in the
20 last eight years, so I think you'll also probably need to
21 amend that, for the record to be correct.
22 A. Okay.
23 Q. Who is Ron Pierpont?
24 A. That is my ex-husband.
25 Q. What is J-Pad, LLC?

Case 8:23-cv-00001-DSF   Document 19-1   Filed 05/25/23   Page 6 of 16   Page ID #:3532
Case 8:21-ap-01096-SC   Doc 90-6   Filed 12/30/22   Entered 12/30/22 15:22:08   Desc
Exhibits 65-72   Page 287 of 298

341 Meeting
August 18, 2021

14 to 17

Page 14

1  A. That is a LLC that myself, Ron, Anthony, my two
2  older sons and Rob, back in February it was established.
3  Q. Do you own one-third of this LLC?
4  A. I do.
5  Q. And who owns the other two-thirds?
6  A. Well, depending on who you ask today, it's Ron,
7  myself, and Robert. My sons just want me to get my life
8  under order and they don't want anything.
9  Q. And when you say "Robert," you're referring to
10 Mr. McLelland?
11 A. Yes.
12 Q. And when you say "Ron" you're referring to
13 Mr. Pierpont, correct?
14 A. Yes, sir.
15 Q. And are these one-third interests for each of the
16 three of you?
17 A. Yes.
18 Q. And what assets does J-Pad LLC own?
19 A. Just the note, the UCC note.
20 Q. And when you say a note, how much is owed on the
21 note?
22 A. I don't have the exact balance at this time
23 because there have been a lot of payments and then I've
24 had to borrow the money back for.
25 Q. What was the face amount of the original loan?

Page 15

1  A. 225.
2  Q. And who is the obligor required to make payments
3  on that 225,000-dollar note?
4  A. Say that again.
5  Q. Who is the obligor required to make payments?
6  A. What is that? What is that?
7  Q. Who is required to make the payments under the
8  225,000-dollar note?
9  A. Myself and J-Sandcastle.
10 Q. And then the payments are made and owed to J-Pad,
11 correct?
12 A. That's correct.
13 Q. And what did J-Pad give in exchange for getting
14 this 225,000-dollar note?
15    Did it transfer $225,000 of cash to anyone?
16 A. Can you ask the question again, and be more
17 specific?
18 Q. So you sign a promissory note that requires you
19 to pay $225,000 to J-Pad. What did J-Pad give you in
20 exchange for your promise to pay it $225,000? Did it
21 actually loan you that amount of money?
22 A. I will have to get -- I have a file. This was
23 way in the beginning of February 2018 when the products
24 were developed. J-Pad has products and I invested in the
25 company. We all did. And my investment was the home from

Page 16

1  the sale of Alderport, so I'm the one that has been kind
2  of funding J-Pad.
3  Q. But then why are you paying money to J-Pad, if
4  you were the one putting money into J-Pad?
5  A. Because it was my portion for them to be able to
6  use. I put the money in. I have to pay back my portion.
7  Q. I'm totally confused, I'm sorry.
8  A. Okay.
9  Q. You individually fund money into J-Pad, correct?
10 A. Um, fund money into J-Pad. Fund money...
11 Q. Did you make transfers of property, cash?
12 A. I apologize, it's not that difficult of a
13 question; however, it was back in February and with all of
14 the time that has gone by, I'm trying to think of how much
15 -- I know what I put in because I know what my portion --
16 I know what my portion is.
17 Q. So how much did you put into J-Pad?
18 A. Well, originally I was putting the whole purchase
19 price of my home. Originally I transferred my home in
20 Alderport. Before Mr. Nickel bought it, I transferred it
21 to J-Pad. It was going to be an asset of J-Pad so that
22 they could borrow money against it, to get financing.
23    Well, that didn't end up going through because of
24 issues over at the Gables that happened with these
25 lawsuits, so I didn't ever record it.

Page 17

1     And then several months later Mr. Nickel
2  contacted me, I had my home listed for sale and I sold the
3  property and so I never was able to do anything with
4  helping J-Pad get off with the products.
5  Q. So you sell the home to Mr. Nickel, you get the
6  $379,000. Did any of that money go into J-Pad?
7  A. Just about I would say... I'm going to have to
8  say yes, because that's what I did with it. The 175,000
9  purchase -- we purchased the home, okay?
10    So maybe it's because the UCC -- because I know
11 that there are two UCC filings.
12    One of them was -- originally it was me loaning
13 the money to J-Sandcastle for 175,000, then something
14 happened -- maybe it had to do with the Houser Bros.
15 situation -- and so then either I assigned that note over
16 to J-Pad, but then I took money out of my 401(k) and it's
17 like I just feel like that's what I'm living on.
18 Q. I would ask that you provide information to the
19 trustee showing --
20 A. Absolutely.
21 Q. -- what J-Pad gave to you in exchange for your
22 promise to pay J-Pad $225,000.
23 A. Sure.
24 Q. How much are the monthly payments on this loan?
25 A. The loan is set up for -- well, it's already

Case 8:23-cv-00001-DSF   Document 19-1   Filed 05/25/23   Page 7 of 16   Page ID #:3533
Case 8:21-ap-01096-SC   Doc 90-6   Filed 12/30/22   Entered 12/30/22 15:22:08   Desc
Exhibits 65-72   Page 288 of 298

341 Meeting
August 18, 2021

18 to 21

Page 18
1  amortized out.  It has an interest rate on it that -- at
2  the time when it was -- when it was drawn up, it was drawn
3  up on November 16th, 2018, the interest rate back then was
4  five percent, but we've all pretty much because of the
5  situation that has happened and the litigation that is and
6  COVID and a myriad of things, it's like the plans have
7  changed.  The products aren't even being developed.
8      Q.  My question was how much is the monthly payment
9  you were required to make to J-Pad under this law?
10     A.  That's what I said, is that we haven't done
11 anything -- we have the actual document but it's -- right
12 now it's 1278, if it's amortized out.
13     Q.  So it's 1278 per month but you're not actually
14 making the payments; is that correct?
15     A.  Not making a payment of $1,278.  It sounds kind
16 of confusing and I'm actually confused myself.  It's
17 because I've had to borrow money from the other two
18 people, Ron and Bob, because of -- and I listed them on my
19 bankruptcy -- because of certain debt that I had to pay.
20     Q.  So how much in payments are you making to J-Pad?
21     A.  I'm not making anything.
22     Q.  Okay.  When was the last time you made a payment
23 to J-Pad?
24     A.  The last?  It's listed on my bankruptcy.
25         The last time that I made a payment to -- I've

Page 19
1  made no payments.  No payment.  No payments.
2      Q.  Okay.  Thank you.
3          What other assets does J-Pad own, other than this
4  note?
5      A.  Just the note and probably 4 or $5,000 in a bank
6  account.
7      Q.  You mentioned something about developing
8  products.  It doesn't have any inventory or work in
9  process or anything?
10     A.  No, COVID happened.  I mean they're made, but
11 COVID happened and everything stopped.  The product comes
12 from Japan.  It's a melamine product.
13     Q.  So it does have some inventory of melamine
14 product?
15     A.  I don't know.  I'm not connected with that part
16 of the business.
17     Q.  Can you please explain your contention for why
18 you think you have rights on a ground lease?
19         Is it because you purchased from Ms. Ryan or is
20 it something else?
21     A.  I've lived on the property since 2009 and never
22 knew that the manufactured home park next door -- I never
23 knew who the Housers were until I went to the office one
24 day, the park office after receiving a letter from a
25 person named Katherine Curtis, that I wasn't allowed to

Page 20
1  hold an open house and it was in April of 2018.
2          I went to the office, she introduced herself.
3          I told her that my house was for sale and I asked
4  her why I could not hold an open house.  Because of the
5  ongoing litigation with the park -- not the park -- but
6  the Gables, I had agreed to sell the property.
7          And she explained it to me, we had a very nice
8  conversation, and I said to her that what is going to
9  happen to the 80-year ground lease?  And we both kind of
10 laughed a little bit because we'll both be dead when 2059
11 gets here and she thought that it would just be continued.
12         And that's the first time that I realized that it
13 was the same ground.  I didn't know before.
14     Q.  You included in your schedules that you have
15 rights to your late father's probate estate.
16         What are those rights?
17     A.  I don't know what they are.  My father died
18 20 years ago and my stepmother never opened probate.
19         So I, in 2017, opened up probate myself.  She
20 challenged me, she had priority, so the probate was -- she
21 was -- she's the administrator and she has not done any
22 schedules, she hasn't done any inventory, she hasn't done
23 anything.  So I don't even know if it's too late, if the
24 statute of limitations has run out.  I have no idea.
25         I listed it just as a potential.

Page 21
1      Q.  And when you opened the probate in 2017, was your
2  understanding that your rights would stem from a will or a
3  trust or something else?
4      A.  When I opened the petition, it was because I have
5  learned that my stepmother put my father's will in a paper
6  shredder and destroyed all of the documents.
7          Well, I didn't know that back in 2000 when he
8  died.  I learned it in 2017 and that's what prompted me to
9  file the probate, because she refused to file it.
10         My father has -- his sister and brother are still
11 alive, so it's not just me.
12     Q.  Do you have any siblings from your father?
13     A.  No.
14     Q.  Okay.  In your schedules you indicated you were
15 injured as a flight attendant for United Airlines in
16 August of 2018?
17     A.  No, I did not.  I did not.  I did not.  I did not
18 indicate that I was injured as a flight attendant.
19         I was injured in my yard when I came home from a
20 trip, after flying.  I was attacked in my yard by one of
21 the HOA board member's husband's.
22     Q.  I appreciate the clarification.
23         I wasn't trying to misstate everything, so
24 obviously I didn't understand the comments in the
25 schedules.  Thank you for clearing that up.

Case 8:23-cv-00001-DSF   Document 19-1   Filed 05/25/23   Page 8 of 16   Page ID #:3534
Case 8:21-ap-01096-SC   Doc 90-6   Filed 12/30/22   Entered 12/30/22 15:22:08   Desc
Exhibits 65-72   Page 289 of 298
341 Meeting
August 18, 2021
22 to 25

Page 22

1  In your schedule you indicated that you received
2 about $32,000 in retirement income in the last year or
3 two. What was the source of that money?
4  A. That is another amendment on the schedule. So
5 what that is, is a 1099 that I received from Fidelity and
6 I was on the phone in fact yesterday with them. It's kind
7 of misleading because it is a distribution that I had
8 taken but half of it, what it is is if when you're off of
9 work and you can't pay back a loan that you have borrowed
10 against your 401(k), when you're defaulted, it's added as
11 a distribution and that's how I got that 1099.
12  Q. Which retirement account is this?
13  A. It's the retirement account, it's a 401(k) from
14 United that I had initially borrowed against since I have
15 been off work because of injury.
16  Q. Do you still have any monies on deposit in the
17 United 401(k)?
18  A. No, I do not. It's completely gone.
19  Q. And your schedules also indicate that you've paid
20 about $113,000 to various attorneys from 2018 to 2020.
21  Were these the proceeds from the sale of your
22 prior home?
23  A. Yes, it is.
24  Q. And do you have any monies on deposit with any of
25 these lawyers? And by that I'm saying have you paid a

Page 23

1 retainer that they have not yet already consumed by
2 providing you legal services?
3  A. No. All the money's used up. I owe.
4  MR. HAYS: And those are my questions.
5  Thank you, Mr. Golden.
6  MS. GALLIAN: Thank you.
7  THE TRUSTEE: On the phone...
8  On the phone, are there any questions at this
9 point? I may continue the matter.
10  MR. POOLE: This is Michael Poole, counsel for
11 the Gables. I believe Mr. Hays covered any of the
12 questions I had.
13  THE TRUSTEE: Okay, wonderful. Wonderful.
14  Then what I'm going to do is --
15  MR. DAVIS: Mr. Golden, I'm sorry to interrupt
16 you. This is Jeff Davis on behalf of Lisa Ryan.
17  THE TRUSTEE: Of course.
18  MR. DAVIS: If you're going to continue this
19 matter, as I have some questions -- even though Mr. Hays
20 did a wonderful job of covering a lot of what I had --
21 would I be able to ask these questions at the continued
22 hearing?
23  THE TRUSTEE: So you can, if you'd like to ask a
24 few questions now and if you'd like to ask some questions
25 at the continued hearing meeting, that's totally fine as

Page 24

1 well. I don't know if I'm going to have a meeting -- I'm
2 going to have at least one more meeting, that might be the
3 last meeting, but I've asked Ms. Gallian for some
4 documents. And I agree with Mr. Hays, I'd like to get
5 copies of some of the documents that he asked for as well.
6  So Ms. Gallian, I may have some questions for you
7 regarding those.
8  So, sir, if you want to ask a few questions now
9 or if you prefer to just wait until the continued meeting.
10  MR. DAVIS: Oh, I'd like to see what is documents
11 say. I have a number of questions for her regarding some
12 of these transactions, as well as her relationship with my
13 client. And so I see it's 10:51.
14  I don't think I can get -- I prefer not to start
15 and then stop, is really what I'm getting at.
16  THE TRUSTEE: That's fine.
17  Are there any other documents that you would like
18 to request, other than what has been identified?
19  MR. DAVIS: Yeah, I would like to request if
20 Ms. Gallian has any written agreements relating to the
21 purchase of the property from my client, Lisa Ryan, on or
22 around November of 2018.
23  THE TRUSTEE: She's nodding. If you have any,
24 you will provide those, right, Ms. Gallian?
25  MS. GALLIAN: Yes. It's the same documents that

Page 25

1 Ms. Ryan has, but I can give counsel a copy, if he would
2 like.
3  THE TRUSTEE: So I'm going to go ahead and
4 continue this, then, to September 22nd. Do you think,
5 Ms. Gallian, you can get me whatever documents we talked
6 about in the next two weeks, do you think?
7  MS. GALLIAN: Yes. Obviously I'm nervous and if
8 somebody could either email me a list of exactly the
9 documents. I couldn't pay attention to the question and
10 write at the same time and it was a pretty extensive list
11 and they would be readily available, I just need to upload
12 them to you. I just need a list, to make sure that I -- I
13 didn't write down and listen at the same time.
14  THE TRUSTEE: Understood. I think I could put
15 together a list of documents I want and I think counsel on
16 the phone and Zoom could help participate by giving me a
17 list of the documents that they identified as well, to
18 make sure that we didn't miss anything, and I think we can
19 get you a list I think probably pretty soon.
20  And so if we got you that in the next few days or
21 so --
22  MS. GALLIAN: Absolutely.
23  THE TRUSTEE: -- let's say within the next week,
24 then by mid -- within two weeks or thereafter, you think
25 you can provide --

Case 8:23-cv-00001-DSF   Document 19-1   Filed 05/25/23   Page 9 of 16   Page ID #:3535

Case 8:21-ap-01096-SC   Doc 90-6   Filed 12/30/22   Entered 12/30/22 15:22:08   Desc
Exhibits 65-72   Page 290 of 298

341 Meeting
August 18, 2021

26 to 29

Page 26

1  MS. GALLIAN: Oh, absolutely.
2       And with that being said, I just wanted to make
3  sure that everybody knows that the petition is going to be
4  amended. It has several errors.
5       THE TRUSTEE: So when do you think you're going
6  to be making amendments to the schedules?
7       MS. GALLIAN: You said when?
8       THE TRUSTEE: When. In the same time frame?
9       MS. GALLIAN: Whatever you prefer, sir. If it's
10 proper to do it before, I'll do it before. If it's proper
11 to wait and do it after, I'll do it after.
12      THE TRUSTEE: If possible, I'd like you to do it
13 within the same time frame of you getting the documents
14 done. So if within two weeks of us giving you the list of
15 documents, if you could also make the schedule amendments,
16 that would be great as well.
17      MS. GALLIAN: Yes, sir.
18      THE TRUSTEE: Is September 22nd... is
19 September 22nd too soon?
20      MS. GALLIAN: No, that's fine, sir.
21      For me it's fine.
22      THE TRUSTEE: I'm going to want and get the
23 documents at least probably ten days in advance of the
24 meeting. So do you think --
25      MS. GALLIAN: So the meeting will be the 22nd,

Page 27

1  and then as far as having the documents, say maybe by the
2  first business day after Labor Day; is that okay with
3  everybody?
4       THE TRUSTEE: That would be great.
5       That would be wonderful.
6       MS. GALLIAN: As soon as I get the list, I'll put
7  it together and send it, and I just want to make sure that
8  I just upload it to the court.
9       THE TRUSTEE: Yeah, Lori, what time on the 22nd?
10      MS. WERNER: Either -- we want an hour that
11 doesn't have any other matters; is that correct, Jeff?
12      THE TRUSTEE: Yes.
13      MS. WERNER: Do you want to do 1:30?
14      THE TRUSTEE: Yeah.
15      Do we have any in the morning?
16      MS. WERNER: We might have some at 11:00 so I
17 didn't want to do -- continue it to 11:00.
18      So you can do noon, but that's lunchtime.
19      I don't know what people feel about that.
20      THE TRUSTEE: Let me just check my schedule.
21      September 22nd.
22      All right. Unless people have strong feelings,
23 why don't we just do the 22nd at 1:30. Does that work?
24      MR. HAYS: Yes, thank you.
25      THE TRUSTEE: Okay. All right, great.

Page 28

1       All right. Thank you, everybody.
2       MS. GALLIAN: Just to confirm, should I -- make
3  sure I understand, I will get one email from the trustee's
4  assistant and then I will compile that list of documents
5  and then forward them to the trustee or everybody or how
6  would you like that to be done?
7       THE TRUSTEE: To make it easier for you, you can
8  just take the documents and just send them to -- it would
9  be great if you send them to everybody, but if not, if you
10 just send them to me, then I'll make sure that everybody
11 gets a copy of it. So either way works.
12      MS. GALLIAN: Okay. Thank you very much.
13      I appreciate it.
14      THE TRUSTEE: Thank you, everybody. Anything
15 else for anybody? Thank you, everyone, very much.
16      MS. GALLIAN: And then if I could get the other
17 counsel, Ms. Ryan's, address. I don't have any contact
18 information regarding him, if I need that, to list him.
19      THE TRUSTEE: He's going to send it to you.
20      MS. GALLIAN: Perfect. Thank you.
21      THE TRUSTEE: Thank you, everybody.
22      (End of recording.)
23
24
25

Page 29

1                    C E R T I F I C A T E
2
3
4       I, TERRI NESTORE, Certified Shorthand Reporter/
5  Transcriptionist, do hereby certify that I was authorized
6  to transcribe the foregoing recorded proceeding, and that
7  the transcript is a true and accurate transcription of my
8  shorthand notes, to the best of my ability, taken while
9  listening to the provided recording.
10
11      I further certify that I am not of counsel or
12 attorney for either or any of the parties to said
13 proceedings, nor in any way interested in the events of
14 this cause, and that I am not related to any of the
15 parties thereto.
16
17
18 Dated this 11th day of April, 2022.
19
20
21                    _____
                      TERRI NESTORE, CSR 5614, RPR, CRR
22
23
24
25

August 19, 2021

1

**$**

$1,278   18:15
$113,000
   22:20
$20,000   8:1
$225,000
   15:15,19,20
   17:22
$235,000   7:23
$32,000   22:2
$379,000   8:23
   10:8   17:6
$5,000   19:5
$8,000   11:14

**1**

1099   22:5,11
10:51   24:13
11:00   27:16,
   17
1278   18:12,13
140,000   8:25
16th   18:3
175   8:12   9:2
175,000   17:8,
   13
178-011-01
   12:2
1980   12:1,6
1:30   27:13,23
1st   8:6

**2**

2/25   10:18
20   8:2   20:18
2000   21:7
2009   11:22
   19:21
2014   7:19
2016   13:16
2017   20:19
   21:1,8

2018   8:5,6
   15:23   18:3
   20:1   21:16
   22:20   24:22
2020   6:16
   22:20
2021   10:18
2059   20:10
225   15:1
225,000-dollar
   15:3,8,14
22nd   25:4
   26:18,19,25
   27:9,21,23
25th   10:18

**3**

376   7:20   8:9
   11:20,24
379   9:2
379,000   8:22

**4**

4   19:5
40   12:2
401(k)   17:16
   22:10,13,17

**5**

55   12:12

**8**

80-year   20:9

**A**

A/b   7:19
absolutely
   17:20   25:22
   26:1
absorbed   8:25

account   9:7,
   11   11:13   19:6
   22:12,13
acquire   8:7
actual   10:24
   18:11
added   8:1
   22:10
address   5:6
   28:17
administrator
   20:21
advance   26:23
agree   24:4
agreed   20:6
agreements
   24:20
ahead   25:3
Airlines
   21:15
Alderport
   16:1,20
alimony   6:8
alive   21:11
allowed   19:25
amend   5:19
   13:21
amended   13:10
   26:4
amendment
   22:4
amendments
   6:7   26:6,15
amortized
   18:1,12
amount   14:25
   15:21
amounts   6:24
   7:11
Anthony   14:1
APN   12:1,13
apologize
   16:12
appearance
   3:25
appearances
   4:11

April   20:1
arrive   7:24
asset   16:21
assets   5:15,
   25   6:23   11:12
   14:18   19:3
assigned
   17:15
assistant
   28:4
Association
   4:5
attacked
   21:20
attendant
   21:15,18
attention
   25:9
attorney   4:9
   7:17
attorneys
   22:20
attorneys'
   9:1
August   21:16
average   8:3

**B**

back   10:4
   12:1,21,23
   14:2,24   16:6,
   13   18:3   21:7
   22:9
balance   14:22
bank   11:13
   19:5
bankruptcy
   5:10,22   7:18
   10:19,22
   11:5,12
   18:19,24
Beach   4:5
   12:18,22
beginning
   15:23

Jasso
August 19, 2021
2

| | | | |
|---|---|---|---|
| behalf 23:16 | code 6:7 | 15:11,12 16:9 | developing |
| believed | comments | 18:14 27:11 | 19:7 |
| 12:9,12 | 21:24 | counsel 4:4 | died 20:17 |
| bit 3:12 5:1 | company 9:16 | 23:10 25:1,15 | 21:8 |
| 20:10 | 15:25 | 28:17 | difficult |
| board 21:21 | compile 28:4 | couple 12:25 | 3:20 16:12 |
| Bob 18:18 | completely | court 27:8 | directly 9:23 |
| borrow 14:24 | 22:18 | covered 23:11 | distribution |
| 16:22 18:17 | conference | covering | 22:7,11 |
| borrowed | 10:13 | 23:20 | divorced |
| 22:9,14 | confirm 28:2 | COVID 18:6 | 13:16 |
| bought 16:20 | confused 16:7 | 19:10,11 | document |
| Bros 4:13,16 | 18:16 | creditor 4:4, | 18:11 |
| 7:17 17:14 | confusing | 12 | documentation |
| brother 21:10 | 18:16 | Curtis 19:25 | 7:5 |
| business | connected | Custom 7:19 | documents |
| 11:16 19:16 | 19:15 | | 3:15 4:21 |
| 27:2 | connection | **D** | 21:6 24:4,5, |
| | 4:24 5:3 | | 10,17,25 |
| **C** | consumed 23:1 | date 9:18 | 25:5,9,15,17 |
| | contact 28:17 | 10:16 | 26:13,15,23 |
| care 3:22 | contacted | Davis 4:8 | 27:1 28:4,8 |
| cash 15:15 | 17:2 | 23:15,16,18 | dollars 13:7, |
| 16:11 | contention | 24:10,19 | 9 |
| cashier's | 19:17 | day 8:14 | door 19:22 |
| 8:19 9:13 | continue | 10:22 11:12 | drawn 18:2 |
| 10:2,5 | 23:9,18 25:4 | 19:24 27:2 | driving 12:23 |
| certificate | 27:17 | days 5:18 | duly 3:8 |
| 5:18 10:9,16 | continued | 25:20 26:23 | |
| challenged | 20:11 23:21, | dba 4:13 | **E** |
| 20:20 | 25 24:9 | dead 20:10 | |
| changed 10:10 | contract | debt 18:19 | easier 28:7 |
| 18:7 | 12:2,6,9,12, | declaration | Ed 4:14 7:16 |
| check 10:2 | 13,15 | 6:22 | EDD 13:11 |
| 27:20 | contracts | defaulted | email 25:8 |
| checked 8:2 | 11:19,23 | 22:10 | 28:3 |
| checks 8:19, | conversation | Delray 4:13 | employed |
| 20 9:13 10:5 | 20:8 | depending | 6:12,14 |
| choose 6:7 | copies 24:5 | 14:6 | end 16:23 |
| claims 6:24 | copy 12:14 | deposit | 28:22 |
| 7:4,6,9 | 25:1 28:11 | 22:16,24 | envelope 11:2 |
| clarification | corner 12:1 | deposited 9:6 | errors 6:4 |
| 21:22 | correct 5:6, | destroyed | 26:4 |
| clearing | 21,25 6:2,6 | 21:6 | established |
| 21:25 | 9:16,19 10:20 | developed | 14:2 |
| client 24:13, | 11:15,18 | 15:24 18:7 | estate 20:15 |
| 21 | 13:21 14:13 | | |

Hearing
August 19, 2021                                                                                          3

```
Estates    4:13        10:19 11:12       great    7:15        Houser   4:12,
evaluate    7:4      filings   17:11       26:16 27:4,25        16 7:17 17:14
evaluation           financing              28:9              Housers   19:23
  7:25                 16:22             ground    11:19,     hundred   8:24
ex-husband           fine   23:25          25 12:9 19:18      Huntington
  13:24                24:16 26:20,        20:9,13              4:5 12:18,22
exact    14:22         21                                     husband's
examined    3:9      firm    4:4                 H              21:21
exception            flight   21:15,
  5:17                 18                half    22:8
exchange             flow   9:5 10:8     hand    3:5                  I
  15:13,20           flying   21:20      happen    20:9
  17:21              forward   28:5      happened   8:23      ID    3:14
exemption    6:7     forwarded             9:9 16:24          idea    20:24
existing    9:3        11:2                17:14 18:5         identification
explain   12:7       frame   26:8,13       19:10,11             4:20
  19:17              friendship          Hays    3:3          identified
explained              12:24               4:12,14 7:14,        24:18 25:17
  20:7               fund    16:9,10       15,16 23:4,        included
extensive            funding   16:2        11,19 24:4           20:14
  25:10              funds   9:9,11        27:24              income   11:17
extra    12:22         10:8              HCD    10:24           13:8 22:2
                                           11:1              incorrect
                                         hearing                9:17
        F                    G             23:22,25           indication
                                         held    9:16,19        13:19
face    14:25        Gables   4:5          11:14              individual
fact    22:6           8:15 12:8,20      helping   17:4         10:23
father   20:17         16:24 20:6        HOA    21:21         individual's
  21:10,12             23:11             hold   11:17           13:1
father's             Gallian   3:2,        20:1,4             individually
  20:15 21:5           4,7,13,16,19      home    4:13           16:9
February               4:19 7:16           7:20,21 8:4,       information
  10:18 11:4           13:12 23:6          9,14,16 9:1,         5:8 17:18
  14:2 15:23           24:3,6,20,24        3,14 10:6,13         28:18
  16:13                25 25:5,7,22        11:11,17           initially
feel    12:23          26:1,7,9,17,        12:3,8,10,16         22:14
  17:17 27:19          20,25 27:6          13:5 15:25         injured
feelings               28:2,12,16,20       16:19 17:2,5,        21:15,18,19
  27:22              gave    17:21         9 19:22 21:19      injury   22:15
fees    9:1          give   15:13,19       22:22             interest
Feldsott   4:4         25:1              Homeowners             18:1,3
Fidelity   22:5      giving   25:16        4:5                interests
file   15:22           26:14             hour   27:10           14:15
  21:9               Golden   23:5,      house   20:1,3,      interrupt
filed   3:20           15                  4                    23:15
  5:10 6:14,16       Good   4:3,8,12                          introduced
                       7:16                                     20:2
```

JASSO DECL. PAGES - 1558

001263

Jasso Hearing
August 19, 2021                                                                    4

| | | | |
|---|---|---|---|
| inventory 19:8,13 20:22 | land 8:15 | lived 11:22 19:21 | matters 27:11 |
| invested 15:24 | Lane 7:20 | living 12:6 17:17 | Mclelland 13:2,3 14:10 |
| investment 15:25 | late 20:15,23 | LLC 9:16 13:25 14:1,3,18 | meeting 23:25 24:1,2,3,9 26:24,25 |
| issue 10:11 | laughed 20:10 | loan 14:25 15:21 17:24,25 22:9 | melamine 19:12,13 |
| issued 10:17 11:5 | law 18:9 | loaning 17:12 | member's 21:21 |
| issues 16:24 | lawsuits 16:25 | located 7:20 | mentioned 19:7 |
| **J** | lawyer 3:17 4:23 | location 13:11 | Michael 4:3 23:10 |
| J-PAD 13:25 14:18 15:10,13,19,24 16:2,3,4,9,10,17,21 17:4,6,16,21,22 18:9,20,23 19:3 | lawyers 22:25 | long 8:4 11:1 | mid 25:24 |
| | learned 21:5,8 | Lori 27:9 | minute 6:20 |
| | lease 10:11,15 11:19,25 19:18 20:9 | lot 14:23 23:20 | misleading 22:7 |
| | leasehold 12:9 | lunchtime 27:18 | misstate 21:23 |
| | leases 11:23 | Lynn 3:7,13 | Mobile 4:13 |
| J-SANDCASTLE 9:16,19,22,24,25 10:12,23 11:8,11,16 15:9 17:13 | Lee 4:4 | **M** | money 9:5,21,25 14:24 15:21 16:3,4,6,9,10,22 17:6,13,16 18:17 22:3 |
| | left 12:21 | made 15:10 18:22,25 19:1,10 | |
| | left-hand 12:1 | mail 10:25 | |
| Jamie 3:2,7,13 | legal 23:2 | make 3:22,25 4:11 6:6 15:2,5,7 16:11 18:9 25:12,18 26:2,15 27:7 28:2,7,10 | money's 23:3 |
| Japan 19:12 | letter 19:24 | | monies 22:16,24 |
| Jeff 23:16 27:11 | liabilities 5:16,25 | | Monterey 7:20 |
| Jefford 4:8 | life 14:7 | making 18:14,15,20,21 26:6 | month 13:8 18:13 |
| job 23:20 | limitations 20:24 | mandatory 10:12 | monthly 17:24 18:8 |
| **K** | Lisa 4:9 8:8 23:16 24:21 | manufactured 7:20 19:22 | months 10:25 17:1 |
| Katherine 19:25 | list 5:15 6:23 7:19 25:8,10,12,15,17,19 26:14 27:6 28:4,18 | married 13:12,14,19 | morning 4:3,8,12 7:16 27:15 |
| kind 16:1 18:15 20:9 22:6 | listed 5:24 17:2 18:18,24 20:25 | Marshack 4:14 | myriad 18:6 |
| knew 19:22,23 | listen 25:13 | matter 3:2 23:9,19 | **N** |
| **L** | litigation 8:25 11:21 18:5 20:5 | | NADA 7:25 |
| Labor 27:2 | live 11:20 12:16,19 | | named 19:25 |

Hearing
August 19, 2021

5

nervous 25:7
nice 20:7
Nickel 8:17,
  18 9:6 12:11
  16:20 17:1,5
nodding 24:23
noon 27:18
note 14:19,
  20,21 15:3,8,
  14,18 17:15
  19:4,5
November 8:5,
  6 18:3 24:22
number 5:21
  12:13 24:11

O

obligor 15:2,
  5
observe 4:17
office 19:23,
  24 20:2
offline 7:8
older 14:2
omissions 6:4
one-third
  14:3,15
ongoing 8:25
  20:5
open 20:1,4
opened 20:18,
  19 21:1,4
order 14:8
original 3:14
  4:20 11:25
  14:25
originally
  16:18,19
  17:12
owe 23:3
owed 14:20
  15:10
owned 8:4
owner 10:10
owns 14:5

P

paid 7:25
  22:19,25
paper 21:5
papers 5:22
paperwork
  10:24 11:1,3
paraprofession
  al 4:24
parcel 8:15
park 8:2
  10:11 19:22,
  24 20:5
part 19:15
participate
  25:16
participated
  10:12
pay 5:3 6:8
  8:13,18 9:23
  13:5 15:19,20
  16:6 17:22
  18:19 22:9
  25:9
paying 16:3
payment 18:8,
  15,22,25 19:1
payments
  14:23 15:2,5,
  7,10 17:24
  18:14,20 19:1
people 6:20
  18:18 27:19,
  22
percent 18:4
Perfect 28:20
permanent
  12:17
permits 11:20
person 12:17
  19:25
petition 3:20
  4:24 5:4,13
  6:14 9:18
  21:4 26:3

phone 3:2,18,
  24,25 4:1,2,7
  22:6 23:7,8
  25:16
Pierpont
  13:23 14:13
plans 18:6
point 11:21
  13:14,19 23:9
Poole 4:3
  23:10
portion 16:5,
  6,15,16
potential
  20:25
prefer 24:9,
  14 26:9
preparation
  5:4
prepared 10:3
pretty 18:4
  25:10,19
price 8:11,
  13,21 16:19
prior 22:22
priority
  20:20
pro 6:22
probate
  20:15,18,19,
  20 21:1,9
proceeds
  22:21
process 11:2
  19:9
produce 10:7
  12:14
product
  19:11,12,14
products
  15:23,24 17:4
  18:7 19:8
promise 15:20
  17:22
promissory
  15:18

prompted 21:8
proper 26:10
property 9:22
  11:22 12:4
  16:11 17:3
  19:21 20:6
  24:21
provide 17:18
  24:24 25:25
providing
  23:2
purchase
  8:11,13 9:1,
  2,13,22 10:6
  16:18 17:9
  24:21
purchased
  10:1 12:10
  17:9 19:19
put 7:3,23
  9:23 10:13
  11:7 16:6,15,
  17 21:5 25:14
  27:6
putting 16:4,
  18

Q

question 10:4
  15:16 16:13
  18:8 25:9
questioning
  7:13
questions
  6:20,21 7:13
  23:4,8,12,19,
  21,24 24:6,8,
  11

R

raise 3:4
  4:19
Rancho 4:13
Randy 8:17

Hearing
August 19, 2021

6

| | | | |
|---|---|---|---|
| ranges 7:3 | retainer 23:1 | September | stay 12:22 |
| rate 18:1,3 | retirement | 25:4 26:18,19 | staying 13:5 |
| read 12:9 | 22:2,12,13 | 27:21 | stem 21:2 |
| readily 25:11 | return 6:17 | services 23:2 | stepmother |
| ready 3:2 | review 5:12 | set 17:25 | 20:18 21:5 |
| realized | reviewing | settlement | stop 24:15 |
| 20:12 | 7:18 | 10:12 | stopped 19:11 |
| recall 10:3 | rights 12:5 | sheet 5:8 | street 8:15 |
| 11:9,10,14 | 19:18 20:15, | short 12:21 | 12:8,11 |
| received 5:18 | 16 21:2 | show 10:8 | strong 27:22 |
| 10:24 22:1,5 | Rob 13:3 14:2 | showing 17:19 | study 6:6 |
| receiving | Robert 13:4 | shredder 21:6 | support 6:8 |
| 19:24 | 14:7,9 | siblings | 11:24 |
| record 13:21 | Ron 13:23 | 21:12 | sworn 3:8 |
| 16:25 | 14:1,6,12 | sign 15:18 | |
| recorded 12:1 | 18:18 | signed 5:12 | **T** |
| recording | room 12:20,22 | sir 4:22 5:20 | |
| 28:22 | run 20:24 | 6:3,18 7:1,7, | takes 10:25 |
| records 10:5, | Ryan 4:9 8:8 | 10 14:14 24:8 | talked 25:5 |
| 7 | 9:12,23 10:2, | 26:9,17,20 | tax 6:16 |
| referring | 6 19:19 23:16 | sister 21:10 | technical |
| 6:25 14:9,12 | 24:21 25:1 | sits 12:3 | 3:23 |
| reflected | Ryan's 28:17 | situation | ten 26:23 |
| 13:8 | | 17:15 18:5 | testified 3:9 |
| refused 21:9 | **S** | Skyline 7:19 | thing 3:23 |
| relating | | small 11:13 | things 6:19, |
| 24:20 | sale 16:1 | Social 3:15 | 21 18:6 |
| relationship | 17:2 20:3 | 4:20 5:21 | thought 20:11 |
| 24:12 | 22:21 | sold 8:2,14 | thousand |
| rent 12:20 | sales 8:21 | 12:10 17:2 | 13:7,9 |
| 13:5 | schedule 7:19 | sons 14:2,7 | time 6:13 |
| represented | 13:7 22:1,4 | sounds 18:15 | 9:17 10:3 |
| 3:17 | 26:15 27:20 | source 13:9 | 12:21 14:22 |
| representing | schedules 5:6 | 22:3 | 16:14 18:2, |
| 7:17 | 6:22,23 7:18 | Space 7:20 | 22,25 20:12 |
| request | 9:15,18 13:18 | 8:9 11:20,24 | 25:10,13 |
| 24:18,19 | 20:14,22 | speak 3:12 | 26:8,13 27:9 |
| requested | 21:14,25 | 5:1 6:10 | title 5:18 |
| 11:4 | 22:19 26:6 | specific | 9:15,23 10:9, |
| required | Security 3:15 | 15:17 | 16,22 11:4,5, |
| 15:2,5,7 18:9 | 4:21 5:21 | start 7:14 | 7,17 |
| requires | sell 8:16 | 24:14 | today 14:6 |
| 15:18 | 17:5 20:6 | state 3:11 | told 20:3 |
| reserve 7:12 | send 11:1 | 4:1,2 | Torrance |
| residence | 27:7 28:8,9, | statute 20:24 | 12:18,24 |
| 12:17 | 10,19 | | |

Meeting - August 19, 2021                                                                                        7

| | | | |
|---|---|---|---|
| **totally** 16:7 23:25<br>**transactions** 24:12<br>**transfer** 9:12,21,25 15:15<br>**transferred** 16:19,20<br>**transfers** 16:11<br>**trip** 21:20<br>**true** 6:2<br>**trust** 21:3<br>**trustee** 3:1, 4,11,14,17,21 4:6,10,15,18 6:19 7:2,8,11 10:8 11:3 12:15 17:19 23:7,13,17,23 24:16,23 25:3,14,23 26:5,8,12,18, 22 27:4,9,12, 14,20,25 28:5,7,14,19, 21<br>**trustee's** 28:3<br>**turn** 7:13<br>**turned** 12:11<br>**Twenty** 5:11<br>**two-thirds** 14:5<br><br>─── **U** ───<br><br>**UCC** 14:19 17:10,11<br>**understand** 3:21,23 21:24 28:3<br>**understanding** 21:2<br>**Understood** 25:14 | **United** 21:15 22:14,17<br>**units** 8:2<br>**unknown** 6:24 7:11<br>**upload** 3:14 4:20 25:11 27:8<br><br>─── **V** ───<br><br>**Villa** 7:19<br><br>─── **W** ───<br><br>**wait** 24:9 26:11<br>**wanted** 26:2<br>**week** 25:23<br>**weeks** 25:6,24 26:14<br>**WERNER** 27:10, 13,16<br>**wonderful** 23:13,20 27:5<br>**work** 19:8 22:9,15 27:23<br>**works** 12:18 28:11<br>**worth** 7:4<br>**write** 25:10, 13<br>**written** 12:2 24:20<br>**wrong** 13:11<br><br>─── **Y** ───<br><br>**yard** 21:19,20<br>**year** 6:16 22:2<br>**years** 5:11 11:9 12:2 13:15,17,20 20:18<br>**yesterday** | 22:6<br>**yet already** 23:1<br><br>─── **Z** ───<br><br>**Zoom** 4:10 25:16 | |

JASSO DECL. PAGES - 1562