**EXHIBIT 3**

### UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT

### ---oOo---

In Re

JAMIE LYNN GALLIAN,

      Debtor
_____

HOUSER BROS. CO. Dba RANCHO DEL
REY MOBILE HOME ESTATES,

       ,
      Plaintiff,

vs.               No. 8:21-bk-11710-ES

JAMIE LYNN GALLIAN,

      Defendants.
_____/

**CERTIFIED COPY**

### REMOTE CONFERENCING DEPOSITION OF JAMIE GALLIAN

#### Taken before NICOLE HATLER

#### CSR No. 13730

#### June 28, 2022

JOB No. 22-112744

THE SULLIVAN GROUP
OF COURT REPORTERS
SULLIVANCOURTREPORTERS.COM
PHONE 855.525.3860  |  323.938.8750



1      UNITED STATES BANKRUPTCY COURT

2         CENTRAL DISTRICT

3            ---oOo---

4   In Re

5   JAMIE LYNN GALLIAN,

6         Debtor
    _____
7   HOUSER BROS. CO. Dba RANCHO DEL
    REY MOBILE HOME ESTATES,
8              ,                    **CERTIFIED COPY**
         Plaintiff,
9
    vs.                      No. 8:21-bk-11710-ES
10
    JAMIE LYNN GALLIAN,
11
         Defendants.
12  _____/

13

14

15   REMOTE CONFERENCING DEPOSITION OF JAMIE GALLIAN

16

17

18

19         Taken before NICOLE HATLER

20            CSR No. 13730

21            June 28, 2022

22

23

24

25  JOB No. 22-112744

```
 1                         I N D E X

 2                                              PAGE

 3     EXAMINATION BY MR. HAYS.......................4

 4

 5

 6

 7

 8                        E X H I B I T S

 9                                              PAGE

10     PLAINTIFF'S

11     Exhibit 1     Pages 3 through 5 of 461..........79

12     Exhibit 2     Tax clearance certificate.........80

13     Exhibit 3     Page 396 of 461...................83

14     Exhibit 4     Page 11 of 461...................103

15     Exhibit 5     Page 13 of 461...................103

16     Exhibit 6     Page 14 of 461...................104

17     Exhibit 7     Page 18 of 461...................105

18     Exhibit 8     Page 20 of 461...................105

19     Exhibit 9     Page 346 of 461..................110

20     Exhibit 10    Page 356 of 461..................110

21     Exhibit 11    Page 358 of 461..................110

22     Exhibit 12    Page 360 of 461..................111

23

24

25
```

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1319

001287

1          **REMOTE CONFERENCING DEPOSITION OF JAMIE GALLIAN**

2

3

4          BE IT REMEMBERED, that pursuant to Notice, and on

5     the 28th day of June 2022, commencing at the hour of 8:11

6     a.m., in the respective locations via Zoom, before me,

7     NICOLE HATLER, a Certified Shorthand Reporter, State of

8     California, personally appeared JAMIE GALLIAN, produced

9     as a witness in said action, and being by me first duly

10    sworn, was thereupon examined as a witness in said cause.

11                         ---oOo---

12    APPEARANCES ALL REMOTELY VIA ZOOM

13    For the Plaintiff:

14          ED HAYS
            Marshack Hays LLP
15          870 Roosevelt
            Irvine, California  92620
16          (949)333-7777
            ehays@marshackhays.com
17

18    For the Defendant:

19          JAMIE LYNN GALLIAN
            In pro per
20          16222 Monterey Lane, Spc 376
            Huntington Beach, CA 92649
21          (714) 321-3449
            Jamiegallian@gmail.com

22

23

24

25

                                                            3

```
 1                        JAMIE GALLIAN
 2                      sworn as a witness
 3                      testified as follows:
 4             THE REPORTER:  Good morning.  My name is Nicole
 5   Hatler, California Certified Shorthand Reporter No.
 6   13730.  This deposition will be stenographically reported
 7   pursuant to CCP 2025.
 8             Counsel, you may proceed.
 9             MR. HAYS:  Thank you.
10   EXAMINATION BY MR. HAYS:
11        Q.  Good morning, Ms. Gallian.  We've met several
12   times before, but for the record, my name is Ed Hays, and
13   I am the attorney for the plaintiff and creditor in your
14   bankruptcy proceeding, which is Houser Bros.
15             Ms. Gallian, have you ever been deposed before?
16        A.  Yes.
17        Q.  And can you estimate for me how many times
18   you've been deposed?
19        A.  I think once.
20        Q.  And --
21        A.  I believe it was once.
22        Q.  And how long ago was that?
23        A.  I believe it was -- I believe it was at the
24   beginning of 2020.
25        Q.  And in what matter was that in connection with?
```

```
 1        A.  Gables Huntington Beach.

 2        Q.  And that was litigation between you and Gables

 3   Huntington Beach?

 4        A.  Yes, the homeowners' association.

 5        Q.  Yes.  And that's been a couple of years, so let

 6   me just give you a couple of reminders.  And the court

 7   reporter also gave us a couple of reminders.

 8            Please do not start talking or answering my

 9   question until I'm done so that we're not talking at the

10   same time, which makes her job a whole lot easier, and

11   also makes for a cleaner record so the entire question is

12   there and then your answer will be there.  I will do my

13   best not to start asking you the next question until

14   you're done answering the first question.

15            This is also a deposition of you.  So I'm the

16   person who gets to ask the questions today, and so, I

17   would ask you to refrain from asking me any questions

18   other than, perhaps, a question to clarify what I am

19   asking you.

20            The -- is there any reason why the examination

21   cannot proceed this morning?

22                  (Technical interruption.)

23      (A recess was held from 8:13 a.m. until 8:18 a.m.)

24            THE WITNESS:  No, not at this time.

25   //
```

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1322

001290

1    BY MR. HAYS:

2        Q.  And let me -- I think that the next question had

3    been, Ms. Gallian, what was the highest level of

4    education that you had completed?

5        A.  High school, some college, no degree.

6        Q.  No degree.  Thank you.

7            And Ms. Gallian, are you currently employed?

8        A.  Yes.

9        Q.  And what is your job?

10       A.  Assistant manager for Walgreens pharmacy.

11       Q.  And how long have you worked for Walgreens?

12       A.  Since the end of March 2022.

13       Q.  And when were you last employed prior to this

14   job with Walgreens?

15       A.  I worked for, I believe, two or three days for

16   Albertsons, but the injury hadn't healed yet, so I was

17   not able to continue.

18           Prior to that, my normal career as a flight

19   attendant October 2018.

20       Q.  Is when you last worked --

21       A.  Yes.

22       Q.  -- as a flight attendant, correct?

23       A.  Yes.

24       Q.  Okay.  Speaking of October 2018, at that time,

25   were you the owner of a property located at 4476

JASSO DECL. PAGES - 1323

001291

1    Alderport Unit 53 in Huntington Beach?

2         A.  Potentially.

3         Q.  And can you explain why you used the word

4    potentially?

5         A.  I discovered that when Sandra Bradley in 2010

6    filed a document in the recorder's office, she was trying

7    to -- she was trying to -- you're probably better than

8    this than I am, but she was trying to put the home, which

9    she had purchased November 23rd, 2009, into the name of

10   her trust.  However, it never made it into the name of

11   her trust.  Instead, it made it into Houser Bros. name as

12   a grant deed.

13        Q.  When did you first start occupying the Alderport

14   property?

15        A.  On the -- tenancy -- my tenancy began for

16   Ms. Bradley on November 23rd, 2009.

17        Q.  And when you say tenancy, is that because you

18   were renting as opposed to owning?

19        A.  That's correct.

20        Q.  At some point, did you purchase the property?

21        A.  No, I did not.

22        Q.  Were you ever the owner of the property?

23        A.  I was assigned an assignment of something.  I'm

24   not sure if it was the unit or if it was the ground

25   lease.

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1324

1     Q.   What did you pay in exchange for receiving that

2   assignment?

3     A.   I didn't pay anything.   It was a part of my

4   inheritance is what I was told.

5     Q.   And was Ms. Bradley related to you?

6     A.   She was my father's wife.

7     Q.   And when you say part of your inheritance, does

8   that mean that, after Ms. Bradley passed away, you

9   received this assignment?

10     A.   No.

11     Q.   What triggered your inheritance which included

12   receiving this assignment?

13     A.   Ms. Bradley is still alive.

14     Q.   That wasn't my question.

15          My question is, you said you were told this is

16   part of an inheritance, and I'm asking what triggered

17   your right to inherit.

18     A.   She called me up and said, I'm gifting you the

19   property.   Go down to the trust office and sign the

20   documents.

21     Q.   And when you said that she was your father's

22   wife, is that your biological father?

23     A.   Yes, it is.   To the best of my knowledge, yes,

24   it is.

25     Q.   And what is his name?

```
 1          A.  Charles Bradley, Jr.
 2          Q.  So when Ms. Bradley gifted you the property,
 3   what document did you receive?
 4              Was it a grant deed or something else?
 5          A.  It was an assignment -- that's all that it said.
 6   It was an assignment.
 7          Q.  That was the title of the document?
 8          A.  That was the title of it.
 9          Q.  And was the assignment recorded with the county
10   recorder?
11          A.  Yes.
12          Q.  And do you know when that was recorded?
13          A.  March 23rd, I believe.
14          Q.  Of which year?
15          A.  2017.
16          Q.  Is that what time the gift was made to you?
17          A.  Yes.
18          Q.  In March of 2017?
19          A.  Yes.
20          Q.  So just to make sure I'm understanding, you
21   first --
22          A.  I --
23          Q.  -- you first started living there in November of
24   2009 as a tenant, and you then became the owner by
25   receipt of a gift in March of 2017?
```

1        A.   That's correct.

2        Q.   The assignment that was recorded in your favor,

3   was your individual name listed as the assignee?

4        A.   I believe it was.  I was looking to see if I had

5   it readily available, but I don't.

6        Q.   At some point, did you sell the Alderport

7   property?

8        A.   Yes.

9        Q.   And when was that?

10        A.   October 31st, 2018.  October 31st.

11        Q.   Yes, I heard, Halloween.

12             So who was the buyer from you at that time?

13        A.   Randall Nickel.

14        Q.   And how did you come about selling the property?

15             Did you retain a broker and put it on the

16   Multiple Listing Service, or was there some other process

17   you used?

18        A.   Originally, it was listed on the MLS.  That

19   contract was canceled.  Then I listed it for sale by

20   owner on multiple listing sites as, like, Zillow for

21   example, Zillow or Trulia or those types of internet.

22        Q.   And so, the buyer that was found, Mr. Nickel,

23   was somebody that responded to some of your for sale by

24   owner advertisements?

25        A.   His wife responded.

1      Q.  And had you ever met or heard of Mr. Nickel
2  before that response?
3      A.  No.  His wife -- his wife originally contacted
4  me through Zillow.
5      Q.  And you never heard of him or his wife?
6      A.  No.
7      Q.  Prior to that initial contact, correct?
8      A.  That's correct.
9      Q.  Okay.  And what was the sale price?
10     A.  $379,000.
11     Q.  And what was the price at which the property had
12  been listed when you were represented by a broker?
13     A.  I believe the property -- this was several years
14  ago, but I believe the property when the broker was --
15  listed for 461 or 441.  It was -- it was higher than what
16  I ended up selling it at.
17     Q.  Understood.
18        Was there a traditional escrow that was opened
19  and used in connection with the sale of the property?
20     A.  No.
21     Q.  And how was the sale of the property handled in
22  the absence of an escrow?
23     A.  Well, let me -- let me with rephrase.
24        I was working as a referral from Old Republic
25  to -- I'm trying to think what that company's name was.

JASSO DECL. PAGES - 1328

1    I remember the person that was working with me was

2    Cheryl, but I can't remember right this second what the

3    name of the escrow company was.  So I was working with an

4    escrow company for several months.

5        Q.  In connection with the actual sale?

6        A.  There -- Mr. Nickel was the third buyer.  So

7    there was -- there was potential -- previous buyers that

8    were -- that were canceled, fell through, whatever.

9        Q.  Let me -- let me try to clarify.

10           In connection with the sale to Mr. Nickel, was

11   there an escrow that was handling receipt of documents

12   and money and doing the recordings and all of the

13   traditional functions of an escrow?

14       A.  No.

15       Q.  And so, then the question I had for you was in

16   the absence of that escrow, in connection with your

17   actual sale to Mr. Nickel, how were the documents and

18   money handled?

19       A.  It's a title.  So the -- and I owned it

20   unencumbered.  I provided a preliminary title report from

21   the Old Republic title company, offered title insurance

22   and had notebooks full of all the governing documents and

23   e-mails of receipt that I had sent a demand.  I just --

24   basically, it was a -- an assignment.

25       Q.  So let me see if I can try to summarize and make

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1329

001297

```
 1    sure I understand.
 2            The document that you signed to transfer title
 3    to Mr. Nickel, was that done at the same time that
 4    Mr. Nickel handed you the money?
 5            A.  That's correct.
 6            Q.  So if this were a used car as opposed to a
 7    mobile home, it would have been handled in a similar
 8    fashion to --
 9            A.  There --
10                (Multiple speakers simultaneously.)
11            THE REPORTER:  I'm sorry.  I couldn't --
12            THE WITNESS:  I interrupted -- I -- go ahead.
13    Go ahead, Mr. Hays.
14    BY MR. HAYS:
15            Q.  Would have been handled in a similar fashion to
16    the sale of a used car, correct?
17            A.  The chattel, yes.
18            Q.  And when you're saying chattel, you're referring
19    to the mobile home, correct?
20            A.  No.
21            Q.  What are you referring to?
22            A.  The assignment on the -- you're asking about the
23    Alderport address.
24            Q.  Oh, I'm sorry.  You are correct.  The -- the
25    real property.
```

1          So in what form did Mr. Nickel pay the $379,000?

2     A.   Cashiers.

3     Q.   Cashier's check.

4          And was the cashier's check made payable to you

5     individually?

6     A.   Yes.

7     Q.   And what did you do with the cashier's check?

8     A.   Deposited them, both checks, into the Santa Ana

9     branch of Chase Bank.

10    Q.   And you said both checks.

11         There were two cashier's checks?

12    A.   That's correct.

13    Q.   And you deposited them at the Santa Ana branch

14    of Chase Bank into accounts in the name of whom?

15    A.   Jamie Gallian.

16    Q.   At or about the same time, did you purchase the

17    mobile home located at 16222 Monterey Lane, space 376, in

18    Huntington Beach?

19    A.   Yes.

20    Q.   And what was the date of your purchase of the

21    mobile home?

22    A.   I received the -- trying to get the name of the

23    on the back of the document -- I received the

24    surrendered -- I received the surrendered certificate of

25    title November 1st.

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1331

001299

```
 1        Q.  Of 2000 --

 2        A.  2018.

 3        Q.  And the seller of the mobile home was Ms. Ryan?

 4        A.  Yes.

 5        Q.  And what was your purchase price?

 6        A.  Originally, it was 225, but I ended up paying

 7   185.

 8        Q.  And how is the one -- how are you coming up with

 9   185 number?

10        Because I think I've seen 175, 179, some number

11   around that.  How is it that you're coming up with 185?

12        A.  Because I gave her $10,000 cash as a deposit.

13        Q.  And then you paid an additional 175?

14        A.  That's correct.

15        Q.  Okay.  That explains it.

16        How did you pay her the money?

17        A.  In Chase cashier's checks.

18        Q.  And so, you went down to the Santa Ana branch of

19   Chase and got cashier's checks out of the account that

20   was in your name that was holding the sales proceeds from

21   Alderport?

22        A.  I don't know if it was the Santa Ana branch, but

23   it was a Chase branch.

24        Q.  Okay.  More important than the particular branch

25   was you took the money out of the account in which you
```

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1332

001300

1    had deposited the sales proceeds of Alderport, correct?

2        A.   That's correct.

3        Q.   And there were two separate cashier's checks for

4    10,000, and 175,000?

5        A.   No.   They were $50,000 checks and a $20,000

6    check and $10,000 in cash.

7        Q.   So the deposit of 10,000 was cash?

8        A.   Yes.   That -- that was the deposit.

9        Q.   And was the -- when was the deposit paid?

10           Was it before or after you sold Alderport?

11       A.   After.

12       Q.   So were the proceeds of Alderport constituting

13   the full 185,000 that you paid to Ms. Ryan?

14       A.   That's correct.

15       Q.   And so, the 185, you said 10,000 was cash, and

16   the balance was a series of cashier's checks totalling

17   175,000?

18       A.   I remember -- it's been so long -- I remember

19   there was three $50,000 checks, and a $20,000 check,

20   maybe there was a 5,000, but I don't recall.   But I do

21   remember the $10,000 cash and then the other three --

22   four -- I guess it would be four -- three 50,000s and a

23   20 and maybe there was a 5, but I remember it was 175.

24       Q.   Okay.   If you sold the property at Alderport for

25   379,000 and then you used 185 to purchase the property --

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1333

001301

```
 1   the mobile home, that leaves approximately $194,000 of

 2   excess sales proceeds.

 3           What happened to that money?

 4      A.  $175,000 of it was a loan to J Sandcastle, and

 5   the balance was just paid to attorneys.

 6                  (Reporter clarification.)

 7   BY MR. HAYS:

 8      Q.  And Ms. Gallian, that's J as in Jamie, for

 9   example, and is Sandcastle one word or two words?

10      A.  One.

11      Q.  And that's an LLC?

12      A.  That's correct.

13      Q.  And you loaned $175,000 to J Sandcastle, you

14   were just telling us.

15           Do you know when that occurred?

16      A.  I signed the loan documents on November 16th,

17   2018, at the courthouse in Santa Ana.

18      Q.  And why did J Sandcastle borrow money from you?

19      A.  I don't recall at this time.  It's been so long.

20      Q.  When Ms. Ryan transferred the title to the

21   mobile home --

22      A.  She surrendered.

23      Q.  Surrendered?

24      A.  She surrendered the certificate of title.

25      Q.  Surrendered, transferred, I think it means the
```

17

1    same thing, but I'll try to use your word.  The -- when

2    she surrendered it, which name went on title?

3           Was it your name, individually?

4        A.  It was two documents that go into a surrender of

5    a certificate of title.  You have to give notice, and my

6    name was on the notice.  There's a -- it's a -- it's an

7    HCD document, Housing and Community Development document,

8    and its notice -- I believe the document says -- it's one

9    of your documents here.  It says notice or transfer of

10   something, and my name was on the line for the purchaser.

11       Q.  Okay.  And then you said there were two

12   documents.  What's the second document?

13       A.  The actual certificate, the original certificate

14   that's surrendered.

15       Q.  So procedurally, please explain what happens

16   with the actual certificate.

17           Is there an actual certificate similar to a

18   vehicle's pink slip that the seller signs off and then

19   hands to the buyer, and then the buyer submits that to

20   HCD and then a new certificate gets issued?

21           Is that how that works?

22       A.  That's correct.  That's the way I have come to

23   find out.  Yes.

24       Q.  Okay.  So when the actual certificate was

25   reissued showing the new registered owner, which name

1    appeared as the new registered owner of the mobile home?

2            Was it you, individually, or was it J

3    Sandcastle?

4        A.   No.   The -- the notice of transfer was

5    subsequently changed from Jamie Gallian to J Sandcastle.

6    If you'll -- if you'll notice your document -- I was

7    trying to find the document.   You'll notice that it's

8    whited out on the document, and on November 15th,

9    Ms. Ryan re-signed it, the notice of transfer, and on

10   the -- the back of your document, you actually have the

11   notarization of her signature on November 15th.

12       Q.   Not --

13       A.   And the --

14       Q.   I'm not sure I heard the answer to the question.

15            When --

16       A.   I was -- I was getting to the second sentence.

17       Q.   Okay.

18       A.   Okay.   So then on November 16th, when I drove

19   the actual original certificate, I listed as the

20   registered -- I registered the manufactured home in the

21   name of J Sandcastle on November 16th.

22       Q.   And -- and I've been saying mobile home.   You

23   just said manufactured home.

24       A.   Yes.

25       Q.   We're referring to the same thing, right?

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1336

001304

1      A.  Yes.

2      Q.  The property that's located at space 376?

3      A.  That's correct.

4      Q.  Okay.  Is it more correct to say manufactured

5  home over mobile home?

6      A.  In California, they kind of use it

7  interchangeably.  Manufactured homes is probably more

8  accurate.  Mobile home, kind of, means it -- things like,

9  you know, you can park -- you know, back in your

10  grandma's 1962 Chevy and pull it out it.  It's -- it

11  doesn't move, doesn't have any wheels on it.

12      Q.  I understand.

13      A.  Probably manufactured is more accurate.

14      Q.  Okay.  I will attempt to remember manufactured

15  home.

16      A.  Okay.

17      Q.  So we speak the same language here.

18      A.  Sure.

19      Q.  So when the certificate was reissued from

20  Ms. Ryan as owner, HCD reissued it in the name of J

21  Sandcastle, correct?

22      A.  As the registered party, yes.

23      Q.  Okay.  And by registered owner, does that mean

24  similar to a vehicle, who is the owner of the car, as

25  opposed to a lienholder, which would be the legal owner?

1          Are -- did you understand my question?

2      A.  Yeah.  I'm just re-reading it.

3          Because at the time, I was not familiar with a

4  lot of HCD policies like I am now.  So at the time, I

5  didn't consider it a big pink slip, but you're right.  It

6  is exactly like a giant pink slip, as a car.

7          So when you -- when you register a home -- the

8  home in the name of one person, if there's no legal

9  owner, they are one and the same.

10     Q.  And then the legal owner would be similar to

11  buying a vehicle that a bank or a credit union finances,

12  the legal owner is the party that holds the lien secured

13  by the title, correct?

14     A.  That's correct.

15     Q.  Okay.  So why did you put J Sandcastle down as

16  the registered owner of the manufactured home upon

17  acquisition?

18     A.  Okay.  Because when Lisa Ryan, on November 1st,

19  gave notice on the transfer document, the Houser attorney

20  filed a writ of execution without notice, without

21  approval from the court, and in the name of Lisa Ryan and

22  executed -- well, let me see -- did she send it to me?

23  How did I get that?  I'm trying to think of how I got the

24  writ.

25          Because that was the whole reason why I

1    requested Lisa Ryan to re-sign that notice on

2    November 15th is because of that writ.  I didn't -- I was

3    going to back out of the deal.  I was not happy that

4    after the certificate of title had been surrendered and

5    the notice was given -- signed on November 1st that I was

6    the purchaser, I was not happy with Houser's attorney

7    interfering with the sale of the home.

8            So I had was at court on November 16th at Santa

9    Ana, and it was a decision.  It was -- it was whether I

10   was going to back out of the deal or whether I was going

11   to go through with the deal.  And obviously, I went

12   through with the deal.  However, I registered the home in

13   the name of J Sandcastle.

14       Q.  Let me unpack a little bit of what you just said

15   to make sure that the record is clear.  You're saying

16   that the Houser's attorney had filed a writ of execution

17   against Lisa Ryan.

18           Are you saying that the Houser Bros. were in

19   litigation against Lisa Ryan, correct?

20       A.  I wasn't aware of that at the time.

21       Q.  I'm not asking what you were aware of at the

22   time.  I just want to try to explain and make sure that

23   your answer from a minute ago was clear.

24           You were referring to litigation between Houser

25   Bros. and Lisa Ryan, correct?

1      A.  I can't state that -- I can't tell you what I'm

2  referring to back when I was became aware of that writ.

3  I didn't even know what a writ was.

4      Q.  But -- but my point is the Houser Bros. were not

5  in litigation with you in November of 2018, correct?

6      A.  No.  I was not a party.

7      Q.  Yes.  So whatever this litigation was, was not

8  against you, but it was against Lisa Ryan, and the Houser

9  Bros. attorneys did something that you said caused there

10  to be a lien against the title.

11          Is that what you said?

12      A.  No.  What I said was -- is that I became aware

13  of an execution -- a writ of execution after I purchased

14  the home with the money that I got from the sale of

15  Alderport, and I believe that writ -- the notice was

16  dated November 1st -- the notice of transfer was dated

17  November 1st, and I believe the writ was dated either

18  November 11th or the 14th.  I don't remember exactly what

19  date and I became very concerned because the writ was --

20  to my knowledge as I remember it, I believe that the writ

21  was on the space -- not the home, the space, the ground,

22  the -- the real property.

23      Q.  So -- so just to make sure I'm following you

24  because it's important that I understand what you're

25  saying.

```
 1        A.  Sure.

 2        Q.  You acquired the property by surrender on

 3   November 1st?

 4        A.  That's correct.

 5        Q.  But then there was this writ of execution that

 6   pops up on November 11th to 14th, somewhere in that time

 7   frame?

 8        A.  That's correct.

 9        Q.  And that --

10        A.  But it was not in my name --

11            (Multiple speakers simultaneously.)

12            THE REPORTER:  Hold on.  Everybody has to

13   remember one at a time.  I can't get you both

14            THE WITNESS:  Yep.  Sorry.

15            MR. HAYS:  And me, as well.

16   BY MR. HAYS:

17        Q.  So -- so when you discovered this, you were

18   deciding whether to try to back out of the sale or not,

19   and then you ultimately went forward with the purchase,

20   correct?

21        A.  That's correct.

22        Q.  Okay.  And then you were saying you made a

23   decision at that time to put title -- the registered

24   owner in the name of J Sandcastle.

25            Can you tell us any reasons that you would have
```

1  done that?

2      A.  Because I loaned -- I made the loan on the

3  same -- November 16th.  So on November 15th, I met with

4  Lisa Ryan and shared her with my concerns and -- you

5  know, again, not being familiar with the difference

6  between personal property and real property and, you

7  know, I did not consider my manufactured home as a used

8  car, and that's exactly what it is, and I was not

9  familiar with that.  I did not believe that when I

10  purchased it.

11          So I was a little leery, and I went ahead and

12  registered it in the name of J Sandcastle.  And I also

13  loaned J Sandcastle an amount of money and executed a

14  security agreement and promissory note and secured it

15  with the house.

16      Q.  And when you said you loaned an amount of money,

17  was that the $175,000 that you referenced earlier?

18      A.  No.  The loan amount is 225.

19      Q.  I believe earlier you testified that 175 was a

20  loan to J Sandcastle.

21          Is that the amount of money that went from the

22  account in your name to an account in the name of J

23  Sandcastle?

24      A.  Yes.  That is correct.  That is the cashier's

25  check -- that I drew a cashier's check for 175 from my

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1342

001310

```
 1   private account and placed it in the account of J

 2   Sandcastle.  Yes.  You are absolutely correct.

 3        Q.  And then there was the promissory note, but the

 4   promissory note was in the amount of 225,000?

 5        A.  Yes, in contemplation of future advances or

 6   if -- if they needed more money.

 7        Q.  And then you also said that you signed a

 8   security agreement in favor of J Sandcastle?

 9        A.  That's correct.

10        Q.  And what was the collateral in this security

11   agreement?

12        A.  The home.

13        Q.  What did J Sandcastle give you in exchange for

14   receipt of the money and receipt of your executed

15   promissory note and receipt of the security agreement

16   pledging the property as collateral?

17        A.  The promissory note to pay it back.

18        Q.  Well, no.  You -- you gave -- you gave the cash

19   to J Sandcastle.  You signed a promissory note in favor

20   or -- it -- it signed a promissory note in favor of you?

21        A.  Correct.

22        Q.  Okay.  I had it backwards from what you were

23   saying?

24        A.  Correct.

25        Q.  And then the security agreement was J Sandcastle
```

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1343

001311

1    pledging the home as collateral to secure repayment?

2         A.   Correct.

3         Q.   All right.  When was J Sandcastle formed?

4         A.   October 18th, 2018.

5         Q.   Was it formed in contemplation of your purchase

6    of the manufactured home?

7         A.   No.

8         Q.   Why did you form it?

9         A.   I liked the name.

10        Q.   But why did you form an entity?

11             Why did you form an LLC at that time?

12        A.   There isn't a reason.  That's the reason.  I

13   secured -- or I -- what do you call it -- what do you

14   call that when, you know, you have to search to see if

15   even a name is available?

16        Q.   You ran the name search to see if the entity was

17   available --

18        A.   Yes.

19        Q.   -- is that what you're saying?

20        A.   Yes.

21        Q.   All right.  When did you decide to use the name

22   J Sandcastle as the registered owner if it wasn't formed

23   for that purpose?

24        A.   On November 16, 2018.

25        Q.   At the time that J Sandcastle was formed, were

JASSO DECL. PAGES - 1344

001312

1  you 100 the owner and member?

2       A.  Yes.

3       Q.  Has there ever been a change of ownership from

4  its inception to the present?

5       A.  No.

6       Q.  You have always been the 100 percent owner?

7       A.  Yes.

8       Q.  What did J Sandcastle do with the 175,000 of

9  cash that it received from you?

10      A.  I don't remember.  I don't -- that was almost

11 five years ago.

12      Q.  Did anybody, other than yourself, ever have

13 signature writing authority on the J Sandcastle bank

14 account?

15      A.  I believe -- and I'm not 100 percent sure, but

16 Bob McLelland has a -- he signed a signatory card, but I

17 was not --  I'm not sure if it's on the J Sandcastle

18 account.  It probably is.  I'm going to say 90 percent

19 sure that it's Bob McLelland.  He's never signed

20 anything, though, but he's on the signature card.

21      Q.  Can you spell McLelland for us?

22      A.  M-C-L --

23          THE REPORTER:  Say that one more time?

24          THE WITNESS:  M-C-capital L-L-E -- L-L -- let's

25 see, oh, my God.  M-C-L-E-L-L-A-N-D, I believe.

JASSO DECL. PAGES - 1345

001313

```
 1   BY MR. HAYS:
 2        Q.  And then who is Mr. McLelland?
 3        A.  He's just a friend that I've known since
 4   probably 2010.
 5        Q.  And why was he on the signature card for J
 6   Sandcastle?
 7        A.  Emergency reasons.
 8        Q.  To the best of your knowledge, he never signed
 9   anything to withdraw, transfer, or pay money out of the J
10   Sandcastle account?
11        A.  No, he did not.
12        Q.  Okay.  How much money is currently on deposit in
13   the J Sandcastle accounts?
14        A.  I don't think anything.
15        Q.  How much money was in the J Sandcastle accounts
16   when you filed your bankruptcy petition in July of 2021?
17        A.  I believe it was -- well, maybe a little bit
18   more than $9,000.  It might have been a little bit more,
19   little bit less, but it was around 9.
20        Q.  Has J Sandcastle ever filed its own tax returns?
21        A.  No.
22        Q.  And --
23        A.  Hasn't done any business.
24        Q.  Is it a passthrough entity and whatever it would
25   be doing is something that gets reflected on your
```

JASSO DECL. PAGES - 1346

001314

1   personal tax returns?

2       A.  That's correct.

3       Q.  Was any of the $175,000 transferred to anyone or

4   any other entity in the form of a loan or a gift or was

5   it basically spent on living expenses?

6       A.  I don't believe that that -- you said living

7   expenses.  I don't believe that I've ever even made that

8   statement.

9       Q.  I'm asking what happened to the money.  Was any

10  of it gifted away or --

11      A.  No.

12      Q.  -- loaned to anyone else?

13      A.  No.

14      Q.  And --

15      A.  No.

16      Q.  So if it wasn't gifted or loaned by J

17  Sandcastle, describe for me what you think the $175,000

18  was used for?

19      A.  I don't know.  I -- I think I -- it's already

20  been answered.  That was five years ago.  I don't -- it

21  could be a myriad of things, attorneys fees, insurance,

22  just -- just whatever -- whatever the company needed is,

23  it's -- that's their money.

24      Q.  When you say whatever the company needed and

25  that you previously said it wasn't living expenses -- and

1   I never said you said that -- I -- that's what I was

2   assuming, and apparently incorrectly.  So let me just ask

3   and be very clear.

4            Was any of the $175,000 used by you for living

5   expenses, including food or utilities or, you know, car

6   payments or anything else that would traditionally be

7   used as living expenses?

8        A.  They -- the -- the J Sandcastle, I believe, paid

9   my car payment, it might have paid my insurance for the

10  car, and my cell phone bill.  Just basic items that a

11  company would normally pay for its manager.

12       Q.  When you said that the money was used by the

13  company for company purposes, including, you know, what

14  could be described as perks, was that your money or was

15  that J Sandcastle's money?

16       A.  It's J Sandcastle's money.

17       Q.  And so, if some creditor of you came along and

18  tried to collect from you, they would not have been able

19  to take that money that was in the J Sandcastle account,

20  correct?

21       A.  I can't speak to that.  I don't know.  I don't

22  know the legal ramifications of that.

23       Q.  I'm just asking for your personal understanding.

24       A.  I don't know.  I cannot answer that.  That's a

25  legal question.

31

1        Q.  I'm just -- I'm not asking you from a legal

2    question, what would a judge say.  I'm asking from your

3    personal belief.

4        A.  I don't --

5        Q.  Was that your money?

6        A.  I don't know.

7        Q.  Let me just ask you this question.

8            Was that your money or J Sandcastle's money?

9        A.  J Sandcastle's.

10       Q.  How many different certificates of title has HCD

11   issued for the manufactured home?

12           From the very first one, being re-issuance from

13   Ryan to J Sandcastle as registered owner, that's No. 1,

14   how many different certificates of title from that point

15   forward?

16       A.  Can you be a little more specific?

17       Q.  Well, if -- if we're equating the certificate of

18   title to a car's pink slip, there's the one you get

19   issued when you purchase, and then I understand that

20   there have been a couple of, you know, one or more

21   different certificates after that point in time that

22   changes the owner or legal owner.

23           I just want to make sure I understand how many

24   different certificates of title has there been from the

25   time that the Ryan sale to J Sandcastle was first

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1349

1   reported to HCD.

2       A.   Okay.  I believe in 2020 -- in August 2020 was

3   the first -- maybe it was the second.  J Sandcastle has

4   always remained the registered owner, but I believe that

5   a lienholder was added January 14th and then again

6   August 20th of 2020.

7       Q.   So there's the first one in -- that resulted

8   from the January 2018 purchase.

9            And when was that certificate of title issued?

10      A.   Sometime in 2019.

11      Q.   Okay.  And then the next change would have been

12  in January of 2020 --

13      A.   No.

14      Q.   -- and then in August of 2020?

15      A.   January 14th was the next change, 2019.

16      Q.   And then?

17      A.   WJC.

18      Q.   And then when?

19      A.   Then August 20th, 2020.

20      Q.   And so, there's three?  There's the one issued

21  in January 2019 reflecting the sale from Ryan to J

22  Sandcastle, that's No. 1.  Then there's one in January of

23  2019, that's No. 2.  And then there's one in August of

24  2020, and that's No. 3?

25      A.   That's correct.

1      Q.   And then there hasn't been any since then?

2      A.   January -- February.  February 24th, 2021, and

3   then February 25th, 2000 and -- was it 21?  God, it's

4   been so -- so February 24th and then February 25th is

5   when the registered owner changed, 2021.

6      Q.   So there's been five certificates of title since

7   you first started occupying the manufactured home?

8      A.   Because of lienholders added and removed, yes.

9      Q.   Okay.  But -- but five -- five is the number,

10  you're very confident of that?

11     A.   Four or five, yeah.

12     Q.   Okay.  Going to the January 2019 certificate of

13  title, that's the first one that reflected J Sandcastle

14  as the registered owner, correct?

15     A.   That's correct.

16     Q.   And who was listed as the legal owner at that

17  time?

18     A.   Well, at that time, I was not aware of how

19  relevant a certificate of title was with what they refer

20  to something as COTA in the State of California.  The

21  only thing that I perfected was -- or J Sandcastle or

22  JPad perfected was the UCC on January 14th, 2019.  In

23  hindsight, that should have also been reflected on what

24  they call COTA, certificate of title.

25     Q.   Well, do you know what CODA stands for, if CODA

```
1    is C-O-D-A?

2         A.  It's COTA, C-O-T-A.

3         Q.  But what's the A for?

4             Certificate of title would be the COT.  What's

5    the A for?

6         A.  I -- that's just what they call it, COTA.  I

7    don't know why they call it COTA.  I, kind of, thought

8    the same thing.  I know that certificate of title law is,

9    or code, whatever they call it.  I don't know what the A

10   is.

11        Q.  So who was reflected as the legal owner on that

12   first certificate of title?

13        A.  The only perfected filing was under the Uniform

14   Commercial Code on --

15        Q.  I --

16        A.  -- February 14th, so there wasn't anybody

17   because I wasn't aware of COTA yet.

18        Q.  Okay.  So that -- the answer was -- the answer

19   is there -- there was no legal owner listed at that time

20   on the first certificate of title, correct?

21        A.  That's correct with HCD.

22        Q.  Okay.  But what you're trying to explain to me

23   is that there's was, in fact, a UCC1 that had been filed

24   and should have been reflected on that certificate of

25   title?
```

JASSO DECL. PAGES - 1352

001320

1      A.  That's correct.

2      Q.  And who filed that first UCC1?

3      A.  I did.

4      Q.  And who was listed as the secured party?

5      A.  So when I did the UCC, the secured party was

6  myself, and then I realized that I had listed myself as

7  the debtor.  So then I did an AD -- what they said, AD-1,

8  my name was removed.  And then my name was then listed as

9  the assignor to JPad.

10     Q.  So when you're saying that your name was

11 removed, you're saying your name was removed as the

12 debtor, correct?

13     A.  That's correct.

14     Q.  And then at that same time, you changed the

15 secured party from yourself to JPad LLC?

16     A.  That's correct.

17     Q.  When was JPad LLC formed?

18     A.  February -- I don't remember the exact date, but

19 February 2018.

20     Q.  Was it formed to become the secured party on the

21 manufactured home?

22     A.  No.  This is February 2018.

23     Q.  I'm sorry.  So -- I had my date wrong.  Why was

24 JPad formed?

25     A.  Same reasons as J Sandcastle.  I secured the

1  name.

2       Q.  So no particular reason upon --

3       A.  No.

4       Q.  -- formation?

5       A.  No.

6       Q.  Why was JPad listed as the secured party and

7  legal owner of the manufactured home?

8       A.  At that time.  There were some other

9  circumstances in my life that were going on, and I needed

10 a manager to have authority to make decisions in my

11 absence -- or any person I gave the authority to in my

12 absence.  I didn't have a will.  I didn't have a living

13 trust.  I didn't have any of those things.

14      Q.  What agreements existed between J Sandcastle and

15 JPad that gave JPad the -- a lien against the property?

16      A.  I was the signer.

17      Q.  You were the signer, like you signed something?

18      A.  Assignor, A-S-S-I-G-N-O-R.  I was the assignor.

19      Q.  Of what?

20      A.  Of the note.

21      Q.  So you're saying you assigned the note and your

22 rights under the security agreement as a lienholder to

23 JPad?

24      A.  That's correct.

25      Q.  And the result of that transaction was that JPad

1    became the recipient of the right to collect on the

2    $225,000 note that was secured by the manufactured home?

3         A.   That's correct.

4         Q.   What, if anything, did JPad give to you in

5    exchange for this assignment?

6         A.   Again, there's a security note.  There's a note

7    and a promissory note.  It's secured, the home.

8         Q.   No, no.  I'm asking, you gave up your right to

9    the note and the lien to JPad.

10        What did JPad give to you, if anything?

11        A.   I don't have an answer to that because, again,

12   my intent was to -- because of personal situations or

13   circumstances that were going on at the time, I needed to

14   have somebody step into my shoes in my absence.

15        Q.   So --

16        A.   That was the whole purpose.

17        Q.   So JPad didn't give you money to purchase the

18   note?

19        A.   No.

20        Q.   And the lien, correct?

21        A.   No.

22        Q.   And did it give you any other asset or thing of

23   value?

24        A.   No.

25        Q.   Upon its formation, who was -- who was or who

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1355

001323

1    were the owners or members of JPad?

2        A.   The only member of JPad at the time that it was

3    formed was Anthony Calderon, and a subsequent article of

4    organization, an L2 I believe it was, was executed on

5    October 18th, 2018, where I became the member.

6        Q.   So by the time you were purchasing the

7    manufactured home, you were the only member of JPad,

8    correct?

9        A.   I don't recall --

10       Q.   Well --

11       A.   -- I don't recall what happened to Anthony.  I

12   don't -- that was back in 2018, so I don't recall --

13       Q.   All I'm saying is you gave us the date that you

14   became the sole member on October 18th of 2018 --

15       A.   No.  It's --

16       Q.   -- I believe you previously said you purchased

17   the manufactured home on October 31st of 2000 -- or

18   November 1st of 2018.

19            So at the time that you closed your purchase,

20   you were the only member of JPad?

21       A.   No.  That's not what I said.

22       Q.   Okay.  So please clarify.

23       A.   Okay.  So I believe that Anthony organized, I

24   guess, so to speak, JPad on February 9th, 2018.  I

25   believe on October 18th, 2018, an LLC -- or I believe it

1   was an LC -- or L2 is an amendment to the article of

2   organization which added me, Jamie Gallian, to JPad, and

3   the document reflected that there was one or more

4   managers or members at that time.

5       Q.  So what percent membership interest did you have

6   in JPad when you were added by this amendment in October

7   of 2018?

8       A.  I don't recall.

9       Q.  Was it less than 100 percent because it was

10  reflecting you and Mr. Calderon as members?

11      A.  That's -- that's -- that's correct.  I would --

12  yes, I would agree with that.

13      Q.  Who is Mr. Calderon in relation to you?

14      A.  Nobody.  I don't know him.

15      Q.  How did you come to find him?

16      A.  I didn't find him.  He is a friend of Ron, my

17  ex-husband's.  And I believe that Anthony was the

18  organizer.

19      Q.  What is Ron's last name?

20      A.  Pierpont, P-I-E-R-P-E-O-N.

21              (Reporter clarification.)

22          THE WITNESS:  P-I-E-R-P-O-N-T.

23  BY MR. HAYS:

24      Q.  So is it -- is my understanding correct that it

25  was your idea to form JPad, and it was your idea for the

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1357

001325

1     name of JPad, correct?

2          A.  No.

3          Q.  Okay.  So whose idea was it to form JPad?

4          A.  I believe it was Ron's.

5          Q.  And when did you first ever hear of JPad?

6          A.  After Ron told me that it had been formed.  And

7     I thought, Well, that's cool.  Okay.  JPad, J Sandcastle.

8     So it was -- in Ron's mind, it was supposed to be Jamie's

9     pad and Jamie's sandcastle.

10         Q.  So I just want to be clear because I think I

11    heard something originally when you were talking about

12    formation of JPad in February of 2018 and what I'm

13    hearing now, so I just want to make sure it's clear.

14         A.  Uh-huh, uh-huh.

15         Q.  It was not your idea to form JPad, and you never

16    heard of JPad until after it had been formed by

17    Mr. Pierpont and/or Mr. Calderon, correct?

18         A.  No.  The only person who formed it was Anthony.

19    The person who told me about it was Ron.

20         Q.  But -- but again, you only learned about it

21    after it had been formed by Mr. Calderon?

22         A.  That's correct.

23         Q.  Okay.

24         A.  Ms. Court Reporter, Calderon is spelled

25    C-A-L-D-E-R-O-N.

41

```
 1      (Whereupon an off-the-record discussion was held.)
 2   BY MR. HAYS:
 3      Q.  Ms. Gallian, when you were added as a member of
 4   JPad in October of 2018, did you pay any money to
 5   Mr. Caldron in exchange for your acquisition of that
 6   membership interest?
 7      A.  No.
 8      Q.  Can you explain to us the history of ownership
 9   of JPad -- finish the history, if you will?
10          You told us it was 100 percent Mr. Calderon, and
11   then you were added for some unknown percent in October
12   of 2018.  What happened after that?
13      A.  I believe what I said was the only function of
14   Mr. Calderon was the organizer or the -- he was the one
15   that did the paperwork, the incorporator I guess is what
16   you would call it.  That's all I know.
17      Q.  Who -- let me just make sure I got this point
18   clear.
19          Was the owner, upon formation, Mr. Calderon or
20   was it Mr. Pierpont?
21      A.  Mr. Calderon.
22      Q.  So Mr. Calderon was the owner and organizer upon
23   formation, and to the best of your knowledge, you were
24   added for some unknown percent, and that was the next
25   change in ownership in October of 2018?
```

1     A.  Right.  And you have to remember, you're dealing

2  with lay people.  So when you talk about owners and those

3  types of things, I have learned a lot more now five years

4  later.

5     Q.  All we're looking for here is the, like, actual

6  history.

7         So after October 2018, did the membership

8  interests in JPad change again?

9     A.  I believe it did.  However, I believe that the

10 tax returns did not reflect BIFs, and it was just opening

11 up too many cans of worms as far as -- yeah.  I just --

12 there wasn't enough time in the -- time to investigate

13 everything.  So I -- if you want to know exactly where it

14 stands, my intent is -- was that -- when it was amended

15 on October 18th, was that it was managed or members of

16 more than one.  However, relationships have come and

17 gone, and -- and things have changed.

18     Q.  I'm going to try to unpack that.

19         You -- you referenced tax returns.

20     A.  Right.

21     Q.  Had JPad filed tax returns at any point in time?

22     A.  No.  So again, that is another one of the

23 entities that comes over to mine, and my intent was to

24 gift a percentage to each one of the children.  I

25 think -- I think, from what I was told -- again, you're

1   talking to a layperson here.  I believe that the gift

2   amount each year was $15,000.  And I believe that my

3   intent was to gift each one of my children and my

4   granddaughter $15,000 per year, but it just was getting

5   too complicated.  I didn't know enough to be able to do

6   something like that.

7        So to answer your question, my intent was -- is

8   that a percentage amount would have been gifted to them

9   every year, but as far as reflecting that on my tax

10   return, that was not done.

11        Q.  After you became a member of JPad in October of

12   2018, did documents ever get filed with the Secretary of

13   State to reflect that ownership of JPad changed after

14   that point in time?

15        A.  I believe that there was always the SOI form,

16   the 12 form, was changed or updated, you know, on

17   whenever -- whenever the -- the date is you're supposed

18   to file it -- reflecting different managers at the time.

19        Q.  And were the filings of those forms accurate

20   when they were filed?

21        A.  I believe so.

22        Q.  And so, if I wanted a more precise history of

23   ownership and membership interest in JPad, I would just

24   have to pull those forms and look at them?

25        A.  But I don't think a manager is an owner.  I

1    think -- I think you're missing that -- that it was --

2    the company was managed, as I have already testified,

3    that -- that I needed, in my absence, to be able to have

4    managers make decisions for me, and that's why the SOI

5    was updated.

6         Q.  So -- so going back to my original question,

7    what is the history of ownership?

8             And so, I thought you were saying that the forms

9    that got filed were reflecting the different ownership

10   over time, but apparently that was reflecting the

11   different managers over time.

12        A.  That's correct.

13        Q.  So sticking specifically to the owners, what

14   were -- who were the owners at all times from

15   October 2018 to the present?

16        A.  Just me.

17        Q.  Did any document ever get filed removing

18   Mr. Calderon as an owner?

19        A.  We only did the L2 that one time on October 18th

20   adding me.  I believe he was listed as a manager only.

21        Q.  And so, earlier I think I asked you, when you

22   became an owner, what was your percent ownership, and you

23   said, Unknown.

24        A.  Right.

25        Q.  And I said that is less than 100 percent, and

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1362

001330

1    you said, correct.

2        A.  Right.

3        Q.  You are now saying you are the 100 percent

4    owner?

5        A.  Right.

6        Q.  So did anything change from October 2018 to

7    remove Mr. Calderon as an owner?

8        A.  No.  I don't believe so.

9        Q.  Nothing formal, but your understanding is he's

10   not an owner?

11       A.  No.  I don't believe -- I think he was just the

12   the organizer -- I don't know, organizer, incorporator.

13   So no, he -- he was not an owner.  He's not an owner.

14   He's a manager.

15       Q.  So when you became a member in October 2018, are

16   you now saying that you believed you became the

17   100 percent owner?

18       A.  That's correct.

19       Q.  Member?

20       A.  That's correct.

21       Q.  Okay.  And that's been the same from

22   October 2018 to the present?

23       A.  That's correct.

24            THE REPORTER:  If we can take a break at a

25   convenient time?

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1363

001331

1            MR. HAYS:  We can take a break right now.  How

2    long would you suggest, Ms. Reporter?  Ten minutes?

3            Okay.  So we'll reconvene at 9:40, which is 11

4    1/2 minutes.

5            THE WITNESS:  Okay.

6            MR. HAYS:  Thank you, everybody.

7      (A recess was held from 9:28 a.m. until 9:46 a.m.)

8            MR. HAYS:  Okay.  We're back on the record at

9    9:46.

10   BY MR. HAYS:

11       Q.  And when we took a break, I think you had been

12   testifying about ownership of JPad from October 2018 to

13   the present.  And you said, at all times during that

14   period, you were the 100 percent owner, correct?

15       A.  That's correct.

16       Q.  Is JPad still an active LLC in good standing

17   with the Secretary of State?

18       A.  They're in good standing with the Secretary of

19   State, both LLCs are.  However, I was told, whether good,

20   bad, or indifferent -- or counselled that in order for me

21   to avoid paying the $800, I needed to file the document

22   with them, the Secretary of State, and -- I don't

23   remember exactly what the document was called -- inactive

24   or something -- something.  It was basically just to

25   avoid having to pay the extra $800 per month for both --

1    or per year that California state tax or something.

2         Q.  When you say you were counselled, who was

3    telling you this?

4         A.  One of the attorneys, I'm not sure I remember

5    exactly which one.

6         Q.  One of your attorneys?

7         A.  Or a attorney.  I can't even remember which one.

8    But I just remember that was the reason.  They said, you

9    know, that you want to always remain in good standing

10   with the -- the -- California so that you're not, I don't

11   know, default or something.  So that's what they told me

12   to do, which I did.

13        Q.  When was this document filed that you're

14   referring to?

15        A.  I believe in November of 2021.  I don't recall

16   the exact date.

17        Q.  Is JPad currently listed as the legal owner on

18   the certificate of title to the manufactured home?

19        A.  Yes.

20        Q.  Earlier we discussed the promissory note which

21   is listed in writing with a principle amount of $225,000.

22            Were payments ever made on account of that note?

23        A.  The note's not due until 2048.  So there have

24   been principle payments made, however, not on a regular

25   basis.  It wasn't anticipated that Covid would happen or

```
 1    that I would lose my job or that -- for a variety of
 2    reasons.  So I re-read the note and made sure that it
 3    states that it hasn't -- it's still in effect until
 4    2048 -- or to 40 -- 2048.
 5        Q.  I think that you said -- and I'm looking at the
 6    realtime transcript -- you re-read the note.  That's what
 7    you said?
 8        A.  Yeah, just to make sure that there wasn't
 9    something in there --
10        Q.  I just needed to hear that --
11        A.  Yeah, yeah.  I really just -- I hadn't read it
12    in several years.
13        Q.  Okay.  And I just wanted to make sure I heard
14    the word correctly.
15        A.  Yeah, yeah.
16        Q.  So under the -- what are the terms of the note?
17    Let's discuss that for a second.
18        A.  I don't --
19        Q.  Do you -- do you --
20        A.  I don't have it in front of me.  It wasn't part
21    of, you know, the discussion.
22        Q.  Hold on.  Hold on.
23            J Sandcastle is the obligor that owes the money,
24    correct?
25        A.  That's correct.  That's the way it was
```

1   originally set up.

2       Q.  And the beneficiary of the money is you,

3   personally, correct?

4       A.  I was the lender.  Yes.

5       Q.  Is there an interest rate in the note?

6       A.  I believe you asked me that before, and I

7   believe it's 5 -- 5 percent or 5 1/2.  Or maybe it wasn't

8   you that asked me.  Somebody asked me what the interest

9   rate was.  No.  It was you in the 341.

10      Q.  And what does the note provide as far as

11  payments?

12          Is it interest only?  Principle only?

13  Principle --

14      A.  I don't recall.

15      Q.  -- tell -- tell me what you recall.

16          THE REPORTER:  Sorry.  I -- just real quick.  I

17  really need you to remember to wait until the question is

18  finished.  I'm missing when you guys interrupt each

19  other.  So just pause and then finish.

20          THE WITNESS:  So I don't recall what the

21  specific terms of the note are.  You've asked me at the

22  341 -- I believe that I stated that the -- it was a fully

23  amortized note.  I believe that the due date is 2048.  I

24  believe that -- it seems to me that I might recall

25  something about $1,200, and that would probably seem

1    about right if the note was amortized out for 30 years.

2    BY MR. HAYS:

3        Q.  So your recollection is a 30-year term, fully

4    amortized, with a monthly  payment of approximately

5    $1,200?

6        A.  I believe that -- it sounds correct, yes.

7        Q.  Okay.  And a minute or two ago, I think you said

8    some principle payments have been made.

9            Can you elaborate on that?

10       A.  I've tried to do the best that I can as far --

11   so I don't recall exactly dates, times when, amounts.  I

12   don't recall that.  Again, this was five years ago, and

13   the intent was completely different than what has

14   happened five years later.

15       Q.  How many payments would you estimate J

16   Sandcastle made to you?

17       A.  Again, I don't -- I don't have a specific

18   amount.

19       Q.  Do you believe it was more or less than 12?

20       A.  I don't know.

21       Q.  Do you know if it was more or less than 24?

22       A.  I don't remember.  I don't know.  I don't have

23   an amount in my head.  It's completely different than

24   what the initial purpose was set up for.  It's -- it's

25   been completely changed.  It's -- the terms -- the terms,

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1368

001336

1    the purpose, the intent, it's -- it's five years later

2    and --

3         Q.  So -- so -- hold on.

4         A.  The whole thing needs to be redone.

5         Q.  So -- so let's -- let's talk now about the

6    initial purpose and intent is what --

7         A.  The initial purpose and intent was, for several

8    years -- and I think you and I have talked about this

9    before -- that the initial payment was -- the initial

10   intent of setting up the loan was all of my savings,

11   retirement.  It was more of -- to force -- to force the

12   amount not to be squandered away, and to be paid, and

13   that eventually I would have income.  That's the whole --

14   that was the whole purpose.

15        I didn't know whether I was going to be able to

16   get out of that three-year loan -- or that three-year

17   rental agreement.  I didn't know if I was going to have

18   to rent this house.  I didn't even know if I was going to

19   be allowed to rent the house.  The purpose was -- has

20   been completely changed.

21        Q.  You referred to a three-year rental agreement.

22        A.  Yes.

23        Q.  What is that?

24        A.  So after the battery over at the Gables, I

25   wanted to get out of there as quickly as possible.  So I

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1369

```
 1    rented a home and signed a three-year lease agreement

 2    with Henry Newton for the property at 5782 Pinon Drive.

 3    It was a three-year term.  It was $3,400 a month.

 4        Q.  So you're saying one of the purposes of setting

 5    up the loan was that you had signed this three-year lease

 6    and you weren't sure if you were going to be able to get

 7    out of the lease, correct?

 8        A.  Well, because that would meant -- that would

 9    mean -- I had been looking to purchase a home in here.

10    The first two fell through.  I had opened escrow in July

11    of 2018, two months before I even signed that note.  I

12    mean, everything was -- you know, I was flying a lot that

13    summer and everything was just moving so fast in here.  I

14    mean, there was things that had offers on it before it

15    actually even was listed to the public.

16            And I didn't have money to be able -- or even

17    anything, I didn't have -- the house at Alderport hadn't

18    sold yet.  So there was a whole lot of reasons to protect

19    the money and make sure that it was getting paid back as

20    income if I had to rent this house if -- because if I had

21    to -- to stay in the other house.  I mean, there was a

22    whole lot of different reasons.

23        Q.  When did you sign this three-year lease?

24        A.  9-11-18.

25        Q.  And were you ultimately able to get out of the
```

JASSO DECL. PAGES - 1370

1    lease?

2        A.  I did.  If you look closely enough, the last

3    payment -- if you look closely enough at the Chase -- my

4    chase account, I paid the rent through -- what do you

5    call those, like, when the landlord wants you to pay,

6    like, direct deposits -- I believe the last payment I

7    made was December of 2018 or November of 2018, one of

8    those months.  However, I had to pay all the utilities on

9    the property through February of 2019.

10          My deposit check finally came after much

11    negotiation back and forth.  So I believe that when the

12    deposit check finally came and then I paid the last

13    utility, I believe that I was finally relieved of my

14    three-year obligation by February 2019.

15        Q.  So one of the purposes of putting title to the

16    manufactured home in J Sandcastle and putting a lien

17    against the property was to protect the money because of

18    this three-year lease, correct?

19        A.  Because it was -- it was really possible that I

20    would have had to do, you know, short-term leases,

21    whatever the city ordinance here allows -- Huntington

22    Beach now does allow short-term leases, and I wanted to

23    be protected if there were going to be tenants in here,

24    subtenants I guess, and I wanted the money to go towards

25    paying off the -- the note.

JASSO DECL. PAGES - 1371

001339

1           I think Ron and I were putting our marriage back

2      together, and I'm certainly not going to support a man.

3      So again, the whole purpose was -- the way that I looked

4      at it is -- I was a bank and I was making a loan, and

5      that my upside of that was to be able to collect interest

6      over the term of the loan and have income.  I didn't -- I

7      was on a leave of absence -- the medical leave of

8      absence.  So that was the whole purpose.  But that all

9      changed.  I didn't realize that the -- the injury was as

10     bad as it did; the marriage, you know, fell apart again;

11     and then this nonsense with Houser started.  So things

12     changed.

13          Q.  What -- what benefit was there to -- I'm not

14     following entirely?

15          A.  Okay.

16          Q.  So what benefit was there to you of using the

17     LLCs to be on title as registered owner and legal owner

18     as opposed to you individually?

19          A.  Because I didn't live here, it was going to be a

20     rental.  It was going to be a rental, you know, for -- to

21     protect me for whatever the renters did.  That was the

22     purpose.  But that all changed.

23          Q.  Can --

24          A.  Lisa Ryan, you know, had asked if she could take

25     over the three-year, and I'm, like, No, I don't -- I

1    don't want to get -- I don't want to get involved in

2    this.  I think she submitted or contacted the landlord to

3    see if she could take over it, but I wasn't willing to

4    assign a three-year lease.  No.  I wanted off the lease.

5        Q.  When did you first start residing in the

6    manufactured home?

7        A.  Sometime in November.  I was back and forth

8    between both of the homes.

9        Q.  And so, sometime in November 2018 to the

10   present, you've been exclusively in the manufactured

11   home?

12       A.  That's correct.

13       Q.  Okay.  How was J Sandcastle going to earn money

14   in order to service the note by making the payments?

15       A.  For the rental.  That was the purpose is renting

16   this house at fair market value, and they were going to

17   service the note to me with the interest, and that was

18   the point is so that I could have income.

19       Q.  How is that any different than if you had become

20   the owner and rented and would have received the income

21   directly from the tenants?

22       A.  Because I didn't live here and it was a

23   liability -- it's a liability on me personally to have

24   renters in the home.  That's just the way I did it.

25   Again, I didn't have a legal background.  It's just what

1    I came up with --

2        Q.   And you --

3        A.   -- trying to solve the problem.

4        Q.   And then you've been living there exclusively

5    since November 2018 without renting it to third parties

6    with you living elsewhere.  So --

7        A.   I -- you have to slow down.  You have to repeat

8    that again.  I kind of lost you there.

9        Q.   Sure.  So you said at first you set this up

10   thinking you might have to rent the property and then you

11   didn't want to be on title and be the landlord

12   individually to these renters and have liability or

13   potential liability to the renters, I think you said.

14       A.   Correct.

15       Q.   So the question is, when that changed and you

16   moved into the home exclusively in 2018 to the present,

17   why did you leave J Sandcastle on as registered owner and

18   JPad on as legal owner?

19       A.   That -- that's important to mention.  I'm glad

20   you asked that question because the whole -- it -- a lot

21   of things happened during that 60-day period.

22            You've got the Houser attorney continuing to

23   file documents in the -- the -- Lisa Ryan's name.  So

24   that was the biggest -- that was the biggest question is,

25   like, why is this -- why is this happening?  Why -- if

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1374

001342

1    you know I'm the owner, you've been given notice by the

2    owner, you made an agreement that she was going to sell

3    the home, you knew she was going to sell the home, she

4    sold the home, you moved out, you were paid the amount,

5    it's like, why are you still filing documents in the old

6    owner's name?  It's -- it's like the whole thing is just,

7    like, a cluster you-know-what.  It just didn't make sense

8    to me.  So that's why.

9         Q.  But -- but you --

10        A.  You know, and --

11        Q.  Hold on.

12             How is putting the registered owner and legal

13    owner in the name of the LLCs any different or providing

14    you any additional protection than just putting it in

15    your individual name?  That's the part I'm not following.

16        A.  Mr. Hays, I don't know the legal ramifications

17    of whether it's good, bad, or indifferent.  I just know

18    that this is what I've seen happen, that, if you have a

19    rental property, you put it in the name of the LLC, it

20    protects you personally, you're only exposed to something

21    about as far as the LLC, they can't come after you.  That

22    was the whole purpose.

23        Q.  But -- but I understand that that was the

24    initial purpose, but then things changed during the

25    60-day period, you reference.

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1375

001343

```
 1        A.  Right, right.

 2        Q.  And you said it was important I brought it up.

 3        A.  Right.

 4        Q.  And then you discussed that the Houser Bros.

 5   kept pursuing Lisa Ryan, and so, that was the reason why

 6   you kept things in the LLC --

 7        A.  Well --

 8        Q.  -- instead of just putting it your individual

 9   name --

10        A.  Well, however --

11        Q.  Hold on.  Hold on.  That's the part that I'm not

12   following --

13        A.  Okay.

14        Q.  -- that I need you to tell us what your intent

15   was and why you thought the LLCs would provide you better

16   protection than having it in your individual name

17   vis-a-vis the Lisa Ryan issue.

18        A.  Correct.  Okay.  So one of the things that we

19   haven't touched on was J Sandcastle as the registered

20   owner was also the resident applicant.  So -- with the

21   residency application.  However, at that time, I think

22   there was some -- and I can't speak for Houser, but it

23   appears that Houser focused in on Jamie Gallian instead

24   of reading that Jamie Gallian signed as the member of J

25   Sandcastle.  So I believe that J Sandcastle was the --
```

1    the applicant, J Sandcastle was the registered owner,

2    Jamie Gallian had a three-year lease hanging over her

3    head, the home quite possibly could have had to be rented

4    as a short-term rental, but all of the -- all of those --

5    all of those situations changed and -- and I ended up

6    getting out of the lease.  I ended up moving over here,

7    but yet the -- the issue with Houser continuing to

8    convolute and recognize J Sandcastle or Jamie Gallian or

9    anybody else besides Lisa Ryan continued until April of

10   2019.

11       Q.  Did you -- at the time you were purchasing the

12   manufactured home, isn't it true that you had some

13   litigation that you were a party to with the Gables or

14   somebody else?

15       A.  That's correct.

16       Q.  And was putting -- was using the LLCs on title

17   and lienholder also protecting your equity in the

18   property?

19       A.  No.  Because it -- my -- I didn't have any

20   liens.  There were no judgements.  I sold the home

21   unencumbered, so it wasn't a thought.

22       Q.  I'm saying you were -- I'm saying you were a

23   party to litigation which could have resulted in a

24   judgment against you, and did you view using the LLCs on

25   title and as lienholder as providing you some protection

1  against any possible judgment that would be entered

2  against you in the future?

3      A.  No.  I don't believe that ever even came into my

4  mind.  I was very transparent with the judge, and the

5  judge was very supportive of me getting out of there, and

6  that's exactly what I did.  The judge and the attorneys

7  for HOA -- the HOA, and the HOA, I think it's no -- it's

8  no secret that, you know, we -- I had agreed in March of

9  2018 to sell the property.

10         The landlord or sublessor, or whatever you want

11  to call them, was very supportive.  My attorneys were in

12  contact with him almost daily.  They sent me an e-mail on

13  November 1st and approved the sale.  So there would be no

14  reason for that -- those thoughts to come into my head.

15      Q.  But isn't it true that judgements were later

16  entered against you in that litigation?

17      A.  That was months later.  So I didn't think of it.

18  I didn't -- it didn't -- as a -- as a layperson, you

19  don't -- I wasn't even thinking that.  I mean, I was

20  completely shocked, as well as anybody that was in my

21  circle or my attorneys -- completely shocked when that

22  judgment came down, what, eight months later.

23      Q.  You were talking earlier about the number of

24  certificates of title, and I think you said it was four

25  or five, and the very first one was J Sandcastle as

1    registered owner with no legal owner, correct?

2         A.  Except for the UCC I mentioned.

3         Q.  I'm just talking about what appeared on the face

4    of the document.

5              And then because the document wasn't accurate,

6    there was the amendment in early 2019 to add JPad as the

7    secured creditor or lienholder, right?

8         A.  Say that again.  Oh, I'm sorry.  My screen went

9    black here.  Okay.

10        Q.  Do you need me to repeat?

11        A.  No.  I got it here.  Sure.  Go ahead.

12        Q.  Because that original certificate of title did

13   not reflect the lienholder, but there was a UCC 1 out

14   there that had been filed, the certificate of title was

15   amended in early 2019 to reflect JPad as the lienholder,

16   correct?

17        A.  No.  I don't believe that's when it happened,

18   but -- I --

19        Q.  When did --

20        A.  -- believe that it wasn't recorded.  I don't --

21   I believe that it didn't hit the HCDs certificate of

22   title -- God, I don't even recall when they -- when they

23   changed the certificate of -- every time you change or

24   add something to the CD, the certificate of title, it

25   takes months for it to get processed.  So I don't recall

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1379

001347

1   when it finally got entered or corrected -- or not

2   corrected.  That's not a right word.  But when I finally

3   got the next original in the mail, I don't recall when it

4   was.

5          I do recall that I was not familiar with COTA

6   and that the way to give public notice was through UCC

7   filings.  That's what I was aware of.

8      Q.  Earlier you said the date of January 14, 2019,

9   in connection with this issue.  What was that date?

10     A.  Those are the -- those are the recordings of the

11  UCC filings.  That's the recording date or the file date

12  with the State of California giving public notice of the

13  encumbrance.

14     Q.  And so, sometime after that date, a request was

15  made of HCD to reissue the certificate of title?

16     A.  I believe it -- they both happened at the same

17  time.  You know, Mr. -- Mr. Hays, quite honestly, I don't

18  know -- I -- I don't know the exact date.  I just know

19  that when the -- the UCCs were recorded, the file dates

20  are January 14, 2019, with public notice, the next

21  certificate of title seem to be August 20th, 2028, and I

22  think that was the typo because the -- the notarization

23  is the 28th.  So I don't know why they put the 20th.

24     Q.  And what year was that?

25     A.  2020.

JASSO DECL. PAGES - 1380

001348

1      Q.  So you think the next certificate of title is in
2  August of 2020, correct?
3      A.  That's the next one that reflects the actual
4  COTA changing to JPad and Ron Pierpont.
5      Q.  And this is the first certificate of title that
6  reflects on its face the JPad Pierpont lienholder?
7      A.  That's correct.
8      Q.  So that would be the second certificate of
9  title, correct?
10     A.  Second or third.
11     Q.  Do you think --
12     A.  I don't recall.  I don't have the documents in
13  front of me, but --
14     Q.  But -- but I'm asking you to give me a
15  recollection.  And the first one reflected J Sandcastle
16  as registered owner and no legal owner.  And then there
17  was a second one that was issued to reflect J Sandcastle
18  as registered owner and JPad as legal owner.
19         And you believe this was in August of 2020,
20  correct?
21     A.  That's correct.
22     Q.  All right.
23     A.  Yeah.  To the best of what I can remember
24  without documents in front of me or being shown to me,
25  that's correct.  I believe it was August of 2020.

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1381

001349

1      Q.   Okay.  What do you believe to be the next

2  certificate of title that was issued?

3      A.   The 24th of February 2021.

4      Q.   And that's not the issued date, though, correct?

5      A.   That's the date that it was -- it is effective.

6      Q.   That's not --

7      A.   The --

8      Q.   -- that's not the date that the HCD handed you a

9  piece of paper, correct?

10      A.   No.  I believe that is the date.  I believe it's

11  right down there in tiny, tiny little print on the face

12  of that document.  It says 2-24.

13      Q.   I thought that what that was -- and you tell me

14  if you believe it's different -- is that the February 24,

15  2021, date is the date that a transfer was effective.

16  That transfer then gets submitted to HCD for an

17  application to modify the title, and then the modified

18  title comes out later; is that correct?

19      A.   With the effective date of the transfer is the

20  way that I understand it.

21      Q.   I understand.  I'm just trying to get the timing

22  down here.

23      A.   Yeah, yeah.

24      Q.   And so --

25      A.   I believe it started -- if -- if -- I know I

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1382

1   provided tons of e-mails between HCD and me.  I believe

2   that transaction started at the beginning of February,

3   and I don't know why it took them three or four weeks to

4   finally get it right, but I know that they kept calling

5   me because they were -- something about having

6   "Mr. Pierpont and" -- with a company -- or with the name

7   of the LLC -- they were saying -- I would do it one way

8   and then they would call and say, No, we found out that

9   you have to do it this way, and then they would change it

10  again.

11          So the -- the -- those are two separate -- two

12  separate.  Mr. Pierpont is not a member of JPad.

13      Q.  All right.  I think that there's a date stamp on

14  the front of the title that says -- that has the

15  February 24, 2021, date that says July 14, 2021.

16      A.  That's correct.  That's the day that I have

17  since -- and if you actually -- this is how I came up

18  with that, because I'm, like, July 14th -- where did that

19  come from?  So I called and asked.

20          That's the day that they opened the envelope.

21  They stamp it.  Or like when I turned in the Lisa Ryan

22  certificate, it's stamped November 16th, but you don't

23  get it until months later.

24      Q.  So my -- my question, if I can finish, is that

25  that July 14th of 2021 date stamp is a stamp put on the

1    document by the HCD, correct?

2         A.   That's what I would think.

3         Q.   But -- but --

4         A.   It seems like it -- seemed like it made sense.

5         Q.   -- it wasn't put on the document by you,

6    correct?

7         A.   No, no.

8         Q.   And the date that you received this document

9    back from HCD would have been some date after July 14 of

10   2021?

11        A.   That's correct.

12        Q.   Okay.  And do you know when you received the

13   document back?

14        A.   I believe my first inquiry was through these

15   $35 -- it may have been $25, but I think it was 35 --

16   title searches.  Because I'm, like, what is taking so

17   long?  Then I -- then I got a title search that said --

18   it reflected Jamie Gallian as 2-25-2021, and I'm, like,

19   what happened to JPad?  Because they took JPad and Ron

20   Pierpont off.  It wasn't supposed to be both.  It was

21   supposed to be one.  It was supposed to be only Ron

22   Pierpont.

23             So then I contacted them and I said -- actually,

24   that was during COVID, so we weren't sure whether the

25   office was even open -- there's one in San Luis Obisbo,

1   one in Riverside, what office is going to be open.  I

2   contacted them -- I believe the e-mail I have is July 7th

3   or 8th -- and said, Are you open?

4         And I finally got an e-mail back that said, Yes,

5   we're open, limited hours.  So I told them what the

6   situation was and they said, Have you gotten the original

7   from Sacramento?  I said no.  They said, Well, you have

8   to wait until you get the original.

9         So I believe I got it around -- the original,

10   around August 4th, and I think the following workday

11   would have -- or the next workday would have been, like,

12   the 5th or 6th, and I actually drove it out there.  They

13   said that I had to bring it to them in order to correct

14   it to put JPad back on.  And that's how that happened.

15       Q.  And that resulted in another, new, fourth

16   certificate of title?

17       A.  Yeah.  I had to deliver the -- the one that took

18   JPad and Ron off, delivered that back to them, had to pay

19   another $115 or 16, whatever it was.  They said, You know

20   we're going to charge you again?  I said, I know.  It's

21   okay.  So I paid it there at the office.

22         And then I got an e-mail from a technician with

23   another title search that it was corrected, and they

24   said, you know, give it some time because these only come

25   from Sacramento.  However, the first document that comes

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1385

001353

1   is the registration card -- well -- yeah, the

2   registration card is just a white, soft, 8 1/2 x 11 piece

3   of paper.  And then the registration -- or the

4   certificate of title card is sent to the address that

5   reflects the legal owner, which was Torrance.  And I --

6   and he got it really quick, Mr. -- Bob got it really

7   quick.  The way that they made it sound like it would be

8   weeks, and I think he got it within, like, a week.

9        Q.  So the February 25, 2021, date?

10       A.  Uh-huh.

11       Q.  That's a date that or J Sandcastle or JPad,

12  somebody puts on a form to submit to HCD, correct?

13       A.  No.  That's the day that I released -- well, not

14  I.  That's the day that J Sandcastle released their

15  interest as the registered owner in the manufactured home

16  to me.

17       Q.  My -- my question was, that's a date provided to

18  HCD by you or J Sandcastle.  That's not a date that HCD

19  would otherwise have on its own, correct?

20       A.  No.  That's the -- that HCD document -- or that

21  date that the HCD takes is on the back of the certificate

22  of title form.

23       Q.  But -- but I'm saying that's a date that you

24  provide to them --

25       A.  Yeah.

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1386

001354

1       Q.   -- correct?

2       A.   It was a notarized signature, yes.

3       Q.   Okay.  And that was my next question is how do

4   we know that it happened at or about that time --

5       A.   Because --

6       Q.   -- and --

7       A.   -- it was notarized, twice.

8       Q.   And you've provided us with that notary

9   acknowledgement in the documents, correct?

10      A.   Yes, I have.

11      Q.   And --

12      A.   It's in your -- it's in your documents, as well.

13      Q.   And I'll -- I think I have it up on the screen

14  here.  So let me see if I'm smart enough to do a screen

15  share.

16      A.   And I think that -- I believe I asked -- sent

17  you back your documents yesterday and put page numbers,

18  if we could use the page numbers so that I can get to it

19  easily.

20      Q.   It's page 5 of 461.

21      A.   Okay.

22      Q.   In the PDF.  And that's an acknowledgement of

23  February 25, 2021, by a notary Greg Buysman, or something

24  like that.

25      A.   Yeah.  He's at the local UPS store here.

1      Q.  Okay.  And so -- oh, Buysman.  I see it -- it's

2  spelled out below.  I was trying to read the printing.

3  B-U-Y-S-M-A-N.

4          And so, you went into the UPS store and had this

5  notary acknowledge that this document -- this certificate

6  of title was being signed on February 25th of 2021,

7  correct?

8      A.  That's correct.  However -- if you stop

9  scrolling for a second -- what he notarized -- go up a

10  little bit.  No, up, up, up, up.  Okay.  Okay.  So what

11  he's notarizing -- I'm sorry.  Can you show me the first

12  line under the signature?  No.  Go, go -- well, I guess

13  down.  Is that what you're -- okay.  Stop.

14          So what he's notarizing is this section right

15  here, the date that I released section B is what he's --

16  what he's -- you see the 2-25 right here?

17      Q.  Yeah.  I see it.  So that's what's notarized and

18  then ultimately submitted to HCD, correct?

19      A.  Yes.  However, don't forget the tax clearance

20  certificate.  That was a nightmare

21                  (Reporter clarification.)

22          THE WITNESS:  It's called the tax clearance

23  certificate.

24  BY MR. HAYS:

25      Q.  So why don't you tell us what this is and why it

1  was a nightmare?

2       A.  Well, because the HCD does not change a --

3  change a certificate of title without paying the current

4  taxes and a year in advance, and I didn't have the money

5  for that.  And that's why there's such a difference

6  between -- you see this date right here is July 9th.

7       Q.  Of 2021, correct?

8       A.  That's right.  That's the day that I filed

9  bankruptcy.  That's when I had -- that's the only time I

10  had the money to pay all that.  I didn't realize that

11  they -- they charge so -- they -- they --

12            And I go, Why are you charging me, like, two or

13  three years?

14            That's our policy.

15            I'm like, That can't be the policy.  But it's --

16  it's what they do.

17       Q.  So you submitted the request for the title to be

18  reissued --

19       A.  Uh-huh.

20       Q.  -- based on the February 2021 release?

21       A.  Right, but I didn't have a tax clearance

22  certificate.

23       Q.  And then you were notified that they would not

24  reissue the title until you get this tax clearance

25  certificate?

1      A.  That's correct.  And that's why, finally, when I

2  got everything, that's why I believed that July 14th

3  stamp is finally on when they started making -- when they

4  finally officially started making the change.

5      Q.  And so, when -- what resulted in this tax

6  clearance certificate getting issued?  You submitted some

7  money?

8      A.  Yeah.  You have to pay the current plus a year

9  in advance.

10      Q.  And the money that you paid was paid on

11  July 9th --

12      A.  Correct.

13      Q.  -- 2021?

14      A.  That's correct.

15      Q.  And in what form did you pay it?

16      A.  My Capital One charge card, my VISA card.

17      Q.  Did you have to submit any other paperwork on

18  that date or was it just make the payment?

19      A.  No.  You order it online and you go and pick it

20  up with -- and, you know, obviously besides give the

21  money, but that's it.

22      Q.  So on July 9, you go online on the computer --

23      A.  And order it again.  Because, see, it's only

24  good for -- when you order it -- I ordered it in -- you

25  know, a long time ago, but I didn't know they were going

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1390

001358

1    to charge me two years.  So I never went and picked it up

2    the first time.  And then it wasn't until the 9th that I

3    had all the money.  I went down there, I paid it, and

4    then that certificate is good for 90 days.

5        Q.  Okay.  Let me stop you right there.  You said

6    you went down and paid it, and earlier I thought you said

7    you paid online with your charge card?

8        A.  No, no, no.  You order it.  No.  You order the

9    certificate.  Okay.  They don't -- you -- you have to

10   order it.  You can go to the Orange County tax assessor

11   and you drop down to the mobile home, and you type in

12   there, and you order this tax clearance certificate, and

13   they call you and tell you when it's ready.

14         Or you can follow up and say, Hey, you know

15   what, I've been waiting a long time, you know, can you

16   possibly find the time to do this today?  And I went down

17   to the office, the tax clearance -- or the tax assessor's

18   office and paid the bill with my Capital One VISA card.

19       Q.  So --

20       A.  And then they give you this document.

21       Q.  So on July 9th of 2021, you were standing in the

22   tax collector's office with a charge card paying the

23   money that they required?

24       A.  Yes.  Before I filed bankruptcy.  It was in the

25   morning that I was there and the -- the -- I don't know,

1   Bankruptcy Court was in the afternoon, like, 2:00 or
2   something.
3       Q.  And then when you got this piece of paper --
4       A.  Uh-huh.
5       Q.  -- handed to you, this original piece of paper
6   with the fancy stamp on it?
7       A.  Yep.
8       Q.  What do you do with that?
9       A.  You have to send it up to Sacramento.
10      Q.  So you then mailed it to Sacramento?
11      A.  Or I could have scanned it into my computer,
12  either one.  I don't remember which, how -- how it got
13  there.  But they have the original, so I think I followed
14  up with the original.
15      Q.  So you think you mailed the original to them and
16  that's why, on July 14, five days later, they finally put
17  a stamp on it like they're now processing all of this?
18      A.  That's correct.
19      Q.  Okay.  And then sometime after July 14th, you
20  get the brand new, original certificate of title back in
21  the mail?
22      A.  Yeah.  Well, yeah, but I think that what I said
23  was -- is that I had thought, you know, what is taking so
24  long?  I didn't realize that Sacramento is the only one
25  that -- that processes original, you know, so to speak,

JASSO DECL. PAGES - 1392

001360

 1    these big pink slips.  So anyway -- so that's what

 2    happened.

 3            So I remember I said that I had to wait because

 4    I noticed on the -- what do you call it -- the title

 5    search that whoever processed it took JPad and Ron

 6    Pierpont off, and that was not the intent.

 7        Q.  I understand.  So the -- I want to make sure

 8    that the documents are -- that we've been referring to

 9    are clearly marked as exhibits.  And so --

10        A.  They are, but they're out of order, and you've

11    got -- and that's why I wanted to do the page numbers so

12    that --

13        Q.  But -- but just hold on.  Hold on.

14        A.  Go ahead.  I'm sorry.

15        Q.  I'm trying to -- I'm trying to ask a question

16    and we need to --

17        A.  I'm sorry.

18        Q.  -- keep the reporter happy with both of us.

19            So the first piece of paper that shows the

20    July 14th stamp is now up on the screen.  It's page of 3

21    of 461.

22            Is that the front page of the title that got

23    issued after the tax clearance certificate?

24        A.  No.  That's the -- that's the original

25    certificate of title, the February 24th one, 2021.  If

1   you look down here at the bottom -- if you go up a little

2   bit -- tiny, tiny print, there should be -- okay.  See

3   right there underneath the word "department," see

4   right -- those -- those numbers down there 02-24, way

5   down underneath the word, Department.

6        Q.  Yes, yes.

7        A.  That's the day I come to find out -- or come to

8   learn that's their little date on there where they mail

9   this document, but that's just my own -- I don't work

10  there, so I don't know what they do.

11       Q.  So --

12       A.  -- I, kind of, figured out that's -- must be

13  what that means.

14       Q.  Hold on.  Hold on.  I'm trying to figure out

15  because all of this is in one big PDF --

16       A.  Uh-huh.

17       Q.  -- what is the first page of the title.

18           Is this the first page?

19       A.  Correct.

20       Q.  Okay.  And is it a one-page document?

21       A.  This is the back.

22       Q.  So the back of page 3 of 461 is what's up on the

23  screen now, which is page 4 of 461.

24       A.  Correct.  But that -- that -- this document that

25  was submitted to HCD wasn't -- well, let's see.  No.

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1394

001362

1    Okay.

2            So because the tax clearance certificate had J

3    Sandcastle and Jamie Gallian, they said I had to sign it

4    and put it in both names, and I said, No, that defeats

5    the whole purpose.  So we argued about that back and

6    forth, and I think one of your exhibits here -- Rebecca

7    whatever, I don't know, O'Laughlin or something, does

8    a -- does a memo or something that she spoke to me after

9    I contacted the tax assessor's office.

10           And I said, Why would you put both names on

11   there?  Because that's not how -- when you go online

12   under the tax assessor's portal and order this document,

13   that's not what it said.  It did not say Jamie Gallian

14   and J Sandcastle, or J Sandcastle and Jamie Gallian.  So

15   I don't know why they did that, and I didn't notice it

16   when I -- when I picked it up.  And so, she called me.

17       Q.  Let me stop for a second.  I'm trying to figure

18   out which pages of this big PDF constitute a single

19   document so that I can -- can call that Exhibit 1 for the

20   record.

21       A.  Okay.

22       Q.  So -- so going to page 3, it's entitled,

23   Certificate of title, near the top.

24       A.  Uh-huh.

25       Q.  And that's the front page of a document, and

```
 1    then page 4 is the back of that same document, correct?

 2         A.  That's correct.

 3         Q.  And -- and that's the only pages that are part

 4    of that document?

 5         A.  That's -- that's correct.

 6         Q.  Okay.

 7         A.  But it -- yeah, the hard copy.  It's, like, a --

 8         Q.  So -- so --

 9         A.  -- a beige color or something.

10         Q.  So pages 3 and 4 will be marked as Exhibit 1 for

11    purposes of reference.

12         A.  Uh-huh.

13            (Exhibit 1 was marked for identification.)

14    BY MR. HAYS:

15         Q.  The acknowledgement, which is page 5, is not

16    something that was physically stapled to the certificate

17    that HCD issued, correct?

18         A.  It -- well, yeah.  I had to give it to them.  I

19    gave it to them at the same time, but that -- I sent the

20    original.  They have the original acknowledgement.

21         Q.  So --

22         A.  They have the wet copy, I guess, is what they

23    referred to it as.

24         Q.  So when they mailed you Exhibit 1 back, the

25    acknowledgement was on it?  This -- this piece of paper
```

JASSO DECL. PAGES - 1396

001364

1    was included?

2         A.  No, no.  That's -- no.  The original was already

3    at HCD, is already at HCD, the -- they have the wet inked

4    copy, both of them.

5         Q.  So this should be as hard as it is.  I don't

6    know if it's me or you, but let me try one more time.

7              When you opened the mail and you got Exhibit 1

8    which is pages 3 and 4, was --

9         A.  No.

10        Q.  -- was that the only piece of paper in the

11   envelope?

12        A.  Okay.  I didn't get 3 and 4.  I sent 3 and 4.

13   3, 4, and 5 went to HCD.

14        Q.  So -- so 3, 4, and 5 is a single document, which

15   will be marked as Exhibit 1, which was your application

16   and submission to HCD.

17        A.  Uh-huh.  With --

18        Q.  Okay.

19        A.  -- the tax clearance certificate, eventually.

20        Q.  And then, subsequently, the tax clearance

21   certificate gets submitted to them, which we will call

22   Exhibit 2.

23        A.  Okay.

24             (Exhibit 2 was marked for identification.)

25   //

1   BY MR. HAYS:

2       Q.  Okay.  And then in response, they issued an --

3   an original certificate of title?

4       A.  Right.  And that's your next document right

5   there.  Go -- go -- stop.  See right there where it says

6   August 3rd?

7       Q.  Yes.

8       A.  Okay.  That's when they actually -- and if you

9   go down to the bottom, it will say August 3rd, right --

10  see right there, August 3rd, 2021?

11          Okay.  That's when they mailed it, and I believe

12  I got it on the 5th.  And that's when I took that

13  document and drove it to HCD and gave to them, because

14  this August 3rd took off JPad.

15      Q.  And so, this August 10th down at the bottom is

16  an HCD stamp?

17      A.  That's right.  That's when they got it back up

18  in Sacramento and they processed it -- keep going down --

19  keep going.

20      Q.  I don't --

21      A.  Whenever -- whenever you see the HCD, that's, I

22  think, August 10th or 11th.  That's what that is, is they

23  mailed it again.

24      Q.  Okay.  And so -- and so, the -- it's not

25  included in these exhibits, but I understand what you're

JASSO DECL. PAGES - 1398

001366

1    saying.

2         A.   You have it in there or something, Exhibit 22,

3    or something.  It's there.

4         Q.   You -- you marked it as Exhibit 22?

5         A.   It's down there somewhere.  Something -- it's

6    one of those way at the bottom.

7         Q.   I'm going back to what you had marked.  These

8    are the ones that you had sent.

9         A.   Oh, I'm -- okay.  I'm sorry.  I'm sorry.  I saw

10   it in there -- you know what, I might -- I might be

11   confusing it with your exhibits in the motion.

12        Q.   Yeah.

13        A.   That's probably where --

14             (Multiple speakers simultaneously.)

15             THE REPORTER:  Okay.  I'm sorry.  I cannot get

16   you both at the same time.  One at a time, please.

17             THE WITNESS:  So Mr. Hays, stay right there --

18   right there.  See -- see right there, August 11th, Sylvia

19   Cruz, so that's when -- what I figured out -- again, I

20   don't work there, but what I figured out by staring at

21   all these documents, that's the day -- that date will be

22   on the bottom, again, what is that -- see -- no.  That's

23   not -- that's not the one -- you have to find the one

24   that says, Issued August 11th, and at the bottom, it will

25   say the same thing.

1    BY MR. HAYS:

2         Q.   Okay.  At least I understand now.

3         A.   Okay.

4         Q.   And --

5         A.   That's all -- again, I don't work there, but

6    this is, kind of, what my own personal -- just in -- and

7    the way things are cycled and when I received things.

8              So if you look at that one document that you

9    just scrolled through -- just -- keep -- no, up a little

10   bit, okay.  See that date right there, August 6th, that's

11   the day that I had to provide this Statement of Facts

12   with the original August 3rd certificate and pay the

13   extra, the second payment.  That was the document, and

14   it's dated August 6th because I executed it there.

15        Q.   And this is page 396 of 461 which we will mark

16   as Exhibit 3.

17             (Exhibit 3 was marked for identification.)

18   BY MR. HAYS:

19        Q.   And the purpose of this document was to get a

20   new title issued that still reflected JPad as the legal

21   owner, correct?

22        A.   Correct.

23        Q.   Okay.  And that's the way that title remains to

24   this day is -- as reflected on the August 11th

25   certificate of title?

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1400

001368

```
1         A.   That's correct.

2         Q.   And that is J Sandcastle as legal owner -- or,

3   no, Jamie as legal owner and JPad -- Jamie as registered

4   owner and JPad as legal owner?

5         A.   Correct.

6         Q.   Okay.

7                   (Off the record discussion.)

8   BY MR. HAYS:

9         Q.   Ms. Gallian, what prompted J Sandcastle to

10  transfer its registered owner status to you in 2021?

11        A.   Houser and I participated in one mediation and a

12  second mandatory settlement conference, and I also

13  received an e-mail from the attorney stating that Houser

14  will not issue a lease agreement in the name of a

15  company.  And I had told the mediator in the Zoom room or

16  whatever, I said, Fine.  I said, I will put it in my

17  name.  And he said, Fine.  That was it.

18        Q.   Do you recall when that mediation occurred?

19        A.   I don't remember.  I don't remember.  I have the

20  e-mail, I -- I -- if you need it, I will forward -- I

21  will forward it to you.

22        Q.   Let's leave a blank in the transcript.  And

23  Ms. Gallian, you're going to get a chance to read the

24  transcript and make sure it's accurate.  And can you fill

25  in the blank what you believe the date of the mediation
```

1   was?

2       A.  There was two.

3       Q.  The dates, plural, of the mediations, plural,

4   and then if you could also just separately forward that

5   e-mail you're referring to?

6       A.  Yeah, of course.  No problem.

7   _____

8   _____.

9       Q.  Does the promissory note still exist in the

10  sense that it's still an obligation of J Sandcastle to

11  repay the debt?

12      A.  I need to get legal advice on what to do,

13  because I still have the intent of replenishing and just

14  trying either -- either to rent the house or to do

15  something that forces the obligation to be satisfied.

16      Q.  So -- so the debt still exists, and you're

17  saying you want to do something to --

18      A.  I want to get -- I want to get legal advice.

19      Q.  Hold on.  Hold on.

20      A.  Right.

21      Q.  The debt still exists and you want to do

22  something to put J Sandcastle in a position to be able to

23  repay the obligation?

24      A.  Well, I don't know if it will be J Sandcastle.

25  It could be changed to somebody else.  I mean, J

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1402

001370

```
 1    Sandcastle has been removed, you know.  I -- they
 2    surrendered -- they surrendered the title.  It's now in
 3    my name.  Whether I rewrite the note -- I don't know.  I
 4    need to get legal advice because now it just seems
 5    that -- that the purpose is just so convoluted now,
 6    especially with, now, the bankruptcy that came out --
 7    that came up.  You know, the whole -- the whole reason --
 8    now I'm living in it, you know, and my income is changed,
 9    I have a job now.  So things are just -- the -- the
10    circumstances have changed.
11        Q.  But -- but to confirm, J Sandcastle did not
12    repay the note in full, correct?
13        A.  No.
14        Q.  And there are no agreements currently -- and
15    you're referencing you're going to seek counsel.  There
16    are no agreements right now with respect to the note,
17    correct?
18        A.  I don't know -- I can't -- I can't speak to the
19    legal ramifications, I mean, because -- just because I --
20    I -- it doesn't make sense to me that it can just
21    disappear.  So I don't know what -- I just don't know
22    what the -- the -- the legal ramifications are of that
23    security agreement and the promissory note.  I don't
24    know.  I -- I have no idea.
25        Q.  And I'm not asking you for the legal
```

1    ramifications.

2           I'm asking, is it correct that there are no

3    agreements that release J Sandcastle from its obligation

4    to repay the note?

5           A.   Again, I can't speak to that because they

6    released the title to me.  So that would seem like that

7    they -- to me, it would appear that it's -- the debt has

8    been -- or, not the debt, the -- the collateral has been

9    surrendered to the lender.  So, I mean, that would make

10   sense to me, so that's why I need to get advice on what

11   to do.

12          You know, it depends on how this whole thing

13   with Houser works out.  It might turn out that I move and

14   I use it -- I go back to using it as a rental.  I don't

15   know.

16          Q.   But -- but again, all I'm asking is, is there

17   any agreement in existence now -- and I'm not asking

18   about legal ramifications or releasing title -- I'm --

19   I'm just asking.  Because if there is an agreement, I

20   would like to see a copy of it.

21          A.   Right.

22          Q.   Is there or is there not an agreement?

23          A.   Just the original 11-16 agreements, that's it.

24   That's all that exists.

25          Q.   Do you --

1      A.  Nothing else has been changed.  It hasn't been

2   amended there.  Nothing -- no.  The answer is no.

3      Q.  Let me -- okay.

4          And when you say the original 11-16 agreement,

5   you're referring to the promissory note and security

6   agreements from 2018?

7      A.  That's correct.

8      Q.  Okay.  Thank you.

9          THE REPORTER:  And whenever it's convenient, I'd

10   like to take a break.

11          MR. HAYS:  Sure.  How much break are you

12   thinking about now so we can pick a time to resume?

13          THE REPORTER:  Ten minutes is fine.

14          MR. HAYS:  I didn't hear you, Nicole.

15          THE REPORTER:  Ten minutes is fine.

16          MR. HAYS:  Ten minutes is fine.  So it's 10:50.

17   We'll resume at about 11:00.  Thank you.

18    (A recess was held from 10:51 a.m. until 11:03 a.m.)

19   BY MR. HAYS:

20      Q.  Ms. Gallian, you first transferred title to J

21   Sandcastle and then you transferred $175,000 of funds to

22   J Sandcastle in connection with the execution of the

23   note, correct?

24      A.  Okay.  So that's a little gray, that statement,

25   so you have to reprint because I think because of the --

1    what I'm hearing you say is that because the dollar

2    amount is the same, you think that they're one and the

3    same transaction.  There was two transactions.  So I

4    purchased the home, but I loaned $175,000 to J

5    Sandcastle.

6        Q.  What -- what I'm trying to clarify -- and I know

7    they're two different transactions, is two different

8    things went from you to J Sandcastle.  One was title to

9    the property, and two was $175,000 of cash?

10       A.  Uh-huh.

11       Q.  And J Sandcastle has now transferred title to

12   the property back to you individually, but you said that

13   it made some note -- some payments on the note, you don't

14   recall how many, but that it did not fully repay the

15   $175,000 back, correct?

16       A.  Yes.  And if I may clarify that statement?

17       Q.  Sure.

18       A.  So -- okay.  So again, the intent of how it was

19   the -- the -- how it was set up and how it was supposed

20   to flow and work did not happen because there were

21   attorneys' fees that J Sandcastle paid for.  So I'm not

22   the best bookkeeper and I have, you know, given

23   everything to a CPA to go through and go, You know what,

24   make sense of this.  Okay.  What realistically is the

25   bottom line number?  What is it?

1    Q.  And you said that you currently have somebody

2    looking into that?

3    A.  Well, I gave them all the documents, but, you

4    know, that -- they get around to it when they get around

5    to it, but I -- I would like a more -- you know, from a

6    CPA when you just dump off boxes of papers and go, Look,

7    I need spreadsheets or something, you know, with all of

8    the checks that J Sandcastle has paid out, I need to know

9    where -- where the note stands.

10        I don't know.  And that's honest -- honest to

11   God, I don't know.

12   Q.  So let's leave two blanks in the transcript.

13   One will be for the amount of payments actually made

14   pursuant to the note, and a second will be for the

15   amounts, if any, that you or your CPA believe should be

16   credited against the note for other things such as

17   payment of attorneys fees', for example.  Okay?

18   A.  Yeah.  I mean, that's fair.

19   _____

20   _____.

21   Q.  Okay.  Now which litigation would J Sandcastle

22   have been paying for counsel on?

23        Which case or cases are we talking about?

24   A.  Uh-huh.  Well, everything is related to the

25   Gables, everything stems from the Gables.  So the

90

1    appellate attorney, Mr. Cassello [phonetic], I believe

2    Ms. Garrels [phonetic], you know, the criminal nonsense.

3    So it -- it just seemed like everything -- everything

4    stemmed --

5              THE REPORTER:  I'm sorry.  You have to stop when

6    the dog barks.  I can't hear both.

7              THE WITNESS:  Yeah.  It's very busy out there on

8    the street.

9              Okay.  So that's why I'm trying to figure out --

10   and again, I'm not a CPA.  I'm not any of those things,

11   you know.  I don't know if the CPA is going to come back

12   and say none of this stuff -- I don't know -- or all of

13   it.  I don't know.  So to answer your question -- did I

14   answer it the best I could?

15   BY MR. HAYS:

16        Q.  And I'm trying -- I'm trying not to talk when

17   you're talking.

18             The question was, which litigation would J

19   Sandcastle have been paying the attorneys on?  And I

20   think your answer is, It's all related to the Gables?

21        A.  Well, it is.  You're right.  Because -- because

22   that -- that's a correct statement because the Housers

23   are related to the Gables, the Gables are related to the

24   Housers, the leases.  I mean, all -- there's all sorts of

25   stuff.

91

1    Q.  Well, let's stop for a second.  Instead of

2    lumping it into, It's all related to the Gables, can you

3    try to break it down for me, such as, there is one

4    lawsuit where the Gables sued me, and this is what

5    happened to it; and then there's another lawsuit -- can

6    you just try to break it down --

7    A.  Sure.

8    Q.  -- for me?

9    A.  Sure.  Okay.  Well -- and I think what's in my

10   mind is -- and I wish I knew the date that I did that

11   deposition for Mr. Fellsot [phonetic], but right before

12   that deposition is when I learned that the Gables home

13   was never transferred to Sandra Bradley's trust.  That's

14   where I got the assignment was from the Sandra Bradley

15   trust.  So what's the ramifications of that?  I don't

16   know.

17        You know, how did Houser ever get on the title?

18   I don't know.  I just know the date that they got on

19   there.  That was in 2010.  So --

20   Q.  So just go case by case, if you can.

21   A.  Well -- but that is -- that is -- it's the

22   Gables case.  It's the 913985 case.

23   Q.  And is J Sandcastle a party to that case?

24   A.  No.  They are the -- they are a party to the

25   Houser Bros., which is a party of that case.  Well,

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1409

1   not -- not -- not on paper, but that's why I -- when I

2   amended my bankruptcy, I'm like, there isn't a cross --

3   you know, there's not a cross-complaint filed yet.

4   Because we've got some real problems with it.  It's --

5        Q.  So hold on.  What do you refer to this case --

6   you mentioned a case number.  What do you --

7        A.  That's the Gables HOA that started the whole

8   thing.

9        Q.  So the Gables HOA case.  And what you're saying

10  is that J Sandcastle is currently not a named party as

11  plaintiff, defendant, or otherwise, correct?

12       A.  That's correct.  Neither are they any of those

13  things on the Houser v. Gallian case.

14       Q.  And is there any other pending litigation

15  outside of the Bankruptcy Court?

16       A.  Yeah, there is.  There is the Gallian v.

17  Huntington Beach Gables, the personal injury, which is

18  going to end up dragging Houser in because they're the

19  property owner -- they claim to be the property owner of

20  that parcel of land over there.  So --

21       Q.  So there's -- there's three cases.  Anything

22  else?

23       A.  Let's see Houser v -- or I mean, Gallian v. HOA

24  and Hosso [phonetic], I can't think of anything else

25  besides just the Houser v. Gallian case that, you know,

1    Jeanine Hosso in these adversaries are trying to drag

2    JPad and J Sandcastle in.  So that's why I mentioned it.

3        Q.  Okay.  So three separate cases pending in state

4    court, correct?

5        A.  The -- well, the Randy Nickel case.

6        Q.  So there's four?

7        A.  Randy Nickel -- well, Randy Nickel versus

8    Huntington, then Huntington counter-sued to drag me back

9    into it.

10       Q.  So four cases?

11       A.  I would think so.  Is that four?  Yeah.

12   Personal, Nickel, Houser.  I can't think of anything

13   else.

14       Q.  What's the Nickel lawsuit about?

15       A.  I'm not involved in that.  I just know that I

16   get the papers and -- the only thing that I can think of

17   is that Jeanine Hosso got herself into a mess and just --

18   because she has a bar number, I believe she made some

19   poor decisions and she got herself and other people sued.

20   And she tried to do things without a court order, and she

21   just thought she was going to bully her way through, and

22   Mr. Nickel is not somebody you can bully.

23       Q.  You said Nickel versus Huntington, then

24   Huntington counter-sued to drag you back in.

25           Huntington Gables?

1          A.   Yeah.   Huntington Beach Gables, yes.

2          Q.   Just trying to make the record clear.

3          A.   Yeah.

4          Q.   And so, you believe it's possible that J

5     Sandcastle funded some of the attorneys' fees in some of

6     these four cases even though it was not a named party,

7     correct?

8          A.   Well, because that's where all the money is.   I

9     mean, there was only -- you know, as you said in the

10    beginning, you know, there's only $379,000.   Okay.   Well,

11    if 185 of it went over to here, you know, what's left?

12    And, well, 175 went over here.   Okay.   Well, you know, I

13    took money out of my 401(k) because all the money is

14    gone.   There is no more,.

15          And so, the problem -- I think -- I think -- let

16    me just -- let me just say this.   What's convoluted about

17    all of this is the fact that I've been trying to be very,

18    very frugal in trying to not spend money that I believe

19    didn't belong to me, meaning that I am -- I was J

20    Sandcastle's tenant.   Okay.

21          And I was paying rent to J Sandcastle, so, you

22    know, yeah, though I'm the member also, I -- in my mind,

23    they are separate -- separate.   And it's -- I paid rent

24    just as if a stranger off the street, like I said, that

25    if I was forced to have to -- to rent this place.

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1412

001380

1              That's -- that's why that $9,000 was there.

2      It's like -- it's not -- it doesn't belong to Jamie

3      Gallian any more.  It's rent paid to J Sandcastle because

4      they are the legal owner who's trying to pay the debt of

5      the space.  So it just gets so convoluted when you --

6      when -- and I know that you're doing -- we've been very

7      patient with each other; however, it's not simple.  It's

8      not a simple answer because it's been almost five years.

9          Q.  So let me clarify something you just said.  I

10     believe you said you've been paying rent to J Sandcastle;

11     is that correct?

12         A.  That's correct.  Well, until February 25th.

13         Q.  And so, from November of 2018 through February

14     of 2021, you were making monthly payments to J Sandcastle

15     for rent?

16         A.  Yeah, or I would make -- give deposits to them

17     so that -- you know, I was the tenant.  Okay.  They're

18     still entitled to be paid rent for the person who lives

19     in -- in the unit.  And that's the way I was trying to

20     treat it is that the -- the rent goes to them and --

21         Q.  So -- so on a monthly basis, you would pay rent?

22         A.  Yes.

23         Q.  And what was the amount of the rent?

24         A.  1,086, exactly what the ground lease -- or what

25     the last ground lease payment or amount was here, that

1    was in the UD action.

2         Q.  So from November of 2018 through February of

3    2021, that's a little bit more than two years --

4         A.  Correct.

5         Q.  -- it's about two years and three or

6    four months?

7         A.  Yes.

8         Q.  And at just over $1,000 a month, that's roughly

9    $25,000, give or take, correct?

10        A.  That's -- that's correct.  That's correct.

11        Q.  So --

12        A.  However -- okay.  However, circumstances

13   changed, okay, where there were many months that I

14   couldn't pay that because I lost my job.  Okay.  And my

15   disability was exhausted.  Okay.  Thank God, you know,

16   COVID relief money came.  So yeah, about 20,000 --

17        Q.  Is there --

18        A.  -- about $20,000 is -- is about what I believe

19   that I have set aside, specifically, that is due Houser

20   because of the rent that I need to pay that I set aside

21   for J Sandcastle, who should have paid Houser, but that

22   whole thing fell apart, so now I'm paying Houser -- or

23   JPad is paying Houser.

24        Q.  Let me -- let me clarify.

25             So on a monthly basis, you would take the money

1   from a Jamie Gallian account and transfer it over to a J

2   Sandcastle account?

3         A.   Pretty much.   Or -- or if there was a lump sum

4   that I put into that account, meaning, I think, there was

5   one or two when my career ended at United, the 401(k)

6   payments -- so those went to J Sandcastle.   So that's why

7   I'm so interested in getting with the CPA to figure out,

8   you know, this money was paid on my behalf for the

9   purpose, because I was their tenant, and that's the way I

10  had always intended to treat it, if that makes sense.

11        Q.   But again, whether it was each and every month

12  or periodically, you paid rent by transferring money from

13  your account to a J Sandcastle's account over this period

14  of time?

15        A.   Yes.

16        Q.   And then the rent stopped in February of 2021

17  after J Sandcastle transferred title back to you?

18        A.   Released.   Yeah.   Released their interest in

19  the -- in the home.   Then I never paid out of the J

20  Sandcastle account again.

21        Q.   And so, from that point in February of 2021

22  forward, you now considered yourself an owner and not a

23  tenant or renter?

24        A.   Yeah, so to speak.   Then I -- then it was really

25  my responsibility to keep separate, you know, the rent

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1415

001383

1  ongoing from February 21st forward.  I think that I got a

2  little confused because, not only is J Sandcastle's name

3  printed on the check, but Jamie Gallian's name was

4  printed on the check.  So, you know, it made sense to me

5  that -- wait a minute -- no, no, no, no.

6         It's J Sandcastle's account number on the

7  bottom, so it's not Jamie Gallian's account, and that was

8  my mistake.  So I believe May or June is when I just

9  completely stopped making any payments for rent to Houser

10  and used the Alliant account only, or paid cash.

11     Q.  Let me -- let me try to clarify what you just

12  said because I'm trying to make sure I understand it when

13  I'm looking at the realtime, but I'm not sure I'm getting

14  it.

15     A.  Yeah.

16     Q.  So rent payments continued after February

17  because you were confused about accounts or something?

18     A.  No, no, no.  That's not what I'm saying.  What

19  I'm saying is, if you look at J Sandcastle's checks that

20  I paid every single month to Houser and then they sent

21  them back, I needed to make sure that when I filed

22  bankruptcy in July, that there was a clear line, okay,

23  that Jamie Gallian and the Alliant account because they

24  weren't accepting them, I needed to keep a running total,

25  and that was the whole reason why I started at the end of

99

1    June, I believe it was, trying to get them to do an

2    invoice.  So I obtained an invoice from a neighbor here

3    that lives a couple of doors down, and I was just trying

4    to keep a running balance because they refused to send me

5    anything.

6         Q.  So -- so two different -- two different things

7    going on here --

8         A.  Right.

9         Q.  -- and I want to make sure I have them straight.

10        A.  Right.

11        Q.  One is you were making payments from a Jamie

12   Gallian account to a J Sandcastle account --

13        A.  Correct.

14        Q.  -- periodically on account of rent over --

15        A.  Because I was their --

16        Q.  -- this 2 1/2 year period?

17        A.  -- tenant, yes.  I believed I was their tenant.

18        Q.  Please -- please, try to let me finish my

19   question.  Let's keep our reporter happy.

20        A.  Of course.

21        Q.  Second thing that was going on was that, even

22   after February of 2021, J Sandcastle kept tendering

23   payments to Houser Bros. even though it was no longer the

24   registered owner.

25             Is that what you're saying?  I'm just trying to

1  understand here.

2      A.  Let me try to think for a second.

3          Okay.  So February -- because it wasn't until

4  the beginning of March -- no.  It was -- let's see.

5  February 25th is when I signed as the member to release

6  title.  So I believe March and April and May, or March

7  and April were cash that was dropped off as rent with a

8  receipt.  Okay.

9      Q.  Okay.  And -- and from which account did the

10 cash come?

11     A.  It might have come from the EDD Bank of America

12 card because by that COVID happened again and they

13 were -- they were putting money back on my card because

14 that's the only income I had.

15     Q.  So you're not sure, but you think it was from

16 your --

17     A.  It was either --

18     Q.  -- personal account?

19     A.  Oh, I know it was the personal account.  That's

20 the only -- that's the only income that I had was the

21 COVID money that went into the Allient account, you know,

22 the two payments of, I don't know what was it, 1,400 or

23 $1,500.  So that was the -- because the -- you know, I

24 hadn't worked at United since October, then the COVID

25 money started happening again, but that went on the EDD

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1418

```
 1    Bank of America card.
 2         Q.  Chase account ending in 4589, whose account is
 3    that?
 4         A.  4589 that -- 45 -- wait a second.  I pulled out
 5    my statements today.  I pulled these thinking you might
 6    ask me questions.
 7         Q.  The easy place to maybe get an answer to this,
 8    Ms. Gallian, is --
 9         A.  It doesn't sound -- it doesn't sound familiar to
10    me.  I know that Sandcastle is 7860.  4589, and that's
11    Chase?
12         Q.  Yes.  And let me finish my statement here.
13         A.  Sorry.
14         Q.  The exhibits that we sent you --
15         A.  Uh-huh.
16         Q.  -- include some checks at the beginning of the
17    file.  And so, for example --
18         A.  Do you have a page number?
19         Q.  Yeah.  And I'm looking it up.  Oh, that's --
20    that's check number 4589, so 7860 is the account number
21    and there's -- it's page 11 of 461, and on the name in
22    the check on the top left corner, it says, J Sandcastle
23    Company LLC, and then underneath it, it says Jamie
24    Gallian.
25         A.  That's right.
```

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1419

1          Q.   So is account 7860 the J Sandcastle money?

2          A.   That's correct.

3          Q.   Okay.  And so, we will mark and I will write

4     down this page 11 as Exhibit 4.

5              (Exhibit 4 was marked for identification.)

6     BY MR. HAYS:

7          Q.   And so, this check is dated in March of 2021,

8     correct?

9          A.   Yes, that's right.  March --

10          Q.   And it says, Pay to the order of, and I'm not

11     sure I'm reading your writing correctly.

12              Can you tell us what that says?

13          A.   R-D-R-M-H-E.

14          Q.   And what does that sound for?

15          A.   Rancho Del Rey.

16          Q.   Mobile Home --

17          A.   Mobile Home Estates, yes, for space 376.

18          Q.   And then, if we flip two more pages to page 13,

19     there is another check --

20          A.   Uh-huh.

21          Q.   -- from the same account with the same payee

22     dated in April of 2021, correct?

23          A.   That's correct.

24          Q.   That will be Exhibit 5, which is page 13.

25              (Exhibit 5 was marked for identification.)

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1420

```
 1   BY MR. HAYS:
 2        Q.  And then it looks like on page 15, there's --
 3   no, page 14, it is a handwritten note that appears to be
 4   from you saying, Please credit to the account.
 5             Is this the cash payment you were referring to
 6   starting in May of 2021?
 7        A.  Yeah.  And there was another one up -- also, I
 8   thought there was another one before that, but maybe I'm
 9   mistaken.  Oh, no.  There was another one.  Got it.
10        Q.  Just -- just hold on.
11             And so, you signed this note.  Is that your
12   handwriting?
13        A.  Yes.
14        Q.  And that is -- you signed this J Gallian,
15   member.  Is that what that reads?
16        A.  That's correct.  Right.
17        Q.  So we will mark this page 14 as Exhibit 6.
18         (Exhibit 6 was marked for identification.)
19   BY MR. HAYS:
20        Q.  And if you skip to page 18, there's a letter
21   from J Sandcastle dated June 4th, 2021, that bears the
22   sender of Steven Gallian, and that would show that J
23   Sandcastle tendered $1,100 in cash in June of 2021,
24   correct?
25        A.  Correct.
```

JASSO DECL. PAGES - 1421

1          Q.  And that will be Exhibit 7 page 18.

2              (Exhibit 7 was marked for identification.)

3    BY MR. HAYS:

4          Q.  And then if you'll skip to page 20, there's a

5    typed note with a handwritten signature that appears to

6    be yours, dated July 1st of 2021, where you're signing as

7    the member of J Sandcastle.

8              Is that your signature?

9          A.  Yes.

10         Q.  So Exhibit 8 will be page 20.

11             (Exhibit 8 was marked for identification.)

12   BY MR. HAYS:

13         Q.  So J Sandcastle continued to make the tender of

14   payments to Rancho Del Rey even after the February 2021

15   transfer where they got off of title, correct?

16         A.  That's correct.  Because it hadn't been

17   processed yet.  The title hadn't been processed and that

18   was the whole reason.  Because if anybody was to do a

19   title search, it still shows J Sandcastle.  So yes,

20   that's correct.

21         Q.  Okay.

22         A.  And they're the only ones that had any money.

23         Q.  So the title hadn't been processed, the transfer

24   wasn't official, if you will.  And so, J Sandcastle kept

25   making the --

1     A.  But --

2          THE REPORTER:  I'm sorry.  I didn't hear the

3     question.  So J Sandcastle kept making the --

4     BY MR. HAYS:

5     Q.  -- payments, correct?

6          THE REPORTER:  I couldn't hear an answer.

7          THE WITNESS:  Oh, yes.  The registration hadn't

8     been processed through Sacramento, correct.  I had the --

9     a copy of it, but if anybody was to do a title search, it

10    would still show J Sandcastle, as well as J Sandcastle is

11    the only one that had any money because the COVID rent

12    relief money didn't start until the first quarter of

13    2021.

14    BY MR. HAYS:

15    Q.  I believe you testified earlier that, at all

16    times since you acquired your interest in JPad, you have

17    been the 100 percent owner, correct?

18    A.  That is eventually what happened.  That was not

19    the intent, but that's what eventually happened.

20    Q.  In your bankruptcy, you filed, I think, at least

21    ten different sets of schedules, correct?

22    A.  Uh-huh.

23    Q.  And in some of those schedules, isn't it true

24    that you're listing your ownership interest in JPad to be

25    various different percentages?

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1423

1        A.  That's correct.  As a layperson, yes, that is

2    correct.  That -- I was subsequently told by the -- what

3    is that -- Jeffrey Golden recommended that I contact

4    the -- there's, like, these help center whatever's --

5    help -- these attorneys that come in on their lunch hour

6    or something that help and you could ask questions.  And

7    they said don't worry about filing amendments.  It's --

8    whatever was filed previous to the next amendment is

9    disregarded.

10        Q.  My -- my point is, you -- you filed various

11    different sets of schedules with varying different

12    ownership interest in JPad, correct?

13        A.  That's correct.

14        Q.  And then, on advice of counsel from one of the

15    pro per clinics that the court makes available, you

16    changed your ownership interest in JPad to 100 percent at

17    some point in time, correct?

18        A.  That's correct.  Because I explained to the

19    attorneys that I hadn't gifted the percentage as I

20    intended to do; I hadn't put it on my tax returns; and

21    the relationship with the boys, as I've testified at

22    numerous 341s, is -- you know, they're kids.  You know,

23    yeah, they think it would be great to have an interest in

24    a home, but yet, then when anything legal happens,

25    everybody runs.  They have more money than God anyway, so

1    they don't need it.

2        Q.  So on your original and first amended schedules,

3    you listed that you were a 1/3 owner in JPad.

4            And who would the other 2/3s interest be owned

5    by?

6        A.  My intent was, as you saw in the August 30th,

7    2020, Brian and Steven were the others.

8        Q.  And who are Brian and Steven?

9        A.  Those are my sons.

10       Q.  And are those your only two children?

11       A.  I have three, three boys.  I have Justin --

12   Justin, he's so much older than the other two that he's

13   off on his own thing.

14       Q.  Which explains why it's just Brian and Steven

15   that you were thinking were the other two 1/3 owners,

16   correct?

17       A.  Right.

18       Q.  And were any documents ever filed with the

19   Secretary of State reflecting Brian or Steven as owners

20   of JPad?

21       A.  I believe one of -- I'm trying to think --

22   not -- not L2s, just the 12s.

23       Q.  And you said earlier the 12s --

24       A.  But they're only managers.

25       Q.  -- reflect managers, not owners?

1        A.  Right, right, right.  And that was only to --

2   just for, you know, as I said, that with -- whether I was

3   going to be available, and I testified at the 341

4   meeting -- you and I talked about this before that --

5   once they found out -- once they said, No, we don't want

6   it -- if you actually look at one of your documents here,

7   if you actually see the one that's got all this White Out

8   over it -- do you know what page that was in here?

9        Q.  No, not offhand.

10       A.  Okay.  So I'll scroll through it because it's

11  very easy to point to -- oh, here it is.  If you go to

12  page -- it's the August 20th certificate -- let me see a

13  second, because I just saw it -- it's got a line through

14  it on the certificate of title, and at the 341 meeting, I

15  said, Yeah, it's because at first they wanted to have an

16  interest, and then they changed their minds.  So I put

17  Ron, and then they were pissed.  So then they wanted the

18  UCC filing done in December.

19           So yeah, it's -- that's the boys.  Oh, there it

20  is.  It's 346 of 461.  It's all White Out because they

21  can't make up their minds.

22       Q.  So on page 346 -- and since we're referring to

23  it --

24       A.  Yep.

25       Q.  -- we'll refer to it as Exhibit 9.

1          A.  Yep.  And --

2              (Exhibit 9 was marked for identification.)

3     BY MR. HAYS:

4          Q.  Hold on.  Hold on.  You're -- you're -- you put

5     down new legal owners were Brian and Steven as joint

6     tenants with right of survivorship with -- it would be J

7     Sandcastle, correct?

8          A.  Correct.  The -- the corresponding statement of

9     fact is on page 356.

10         Q.  And was page 346 and page 356 submitted to HCD?

11         A.  Yes, they were.

12         Q.  And page 356 will be listed as Exhibit 10.

13             (Exhibit 10 was marked for identification.)

14             THE WITNESS:  With 358, as well.

15    BY MR. HAYS:

16         Q.  And 358 will be Exhibit 11.

17             (Exhibit 11 was marked for identification.)

18    BY MR. HAYS:

19         Q.  And page 360 also shows that they are

20    lienholders under section 4?

21         A.  Let me look at the date here.  So I believe --

22    was that -- well, because it's -- it's executed the same

23    day, 8-20, as those other documents.  Yep.

24         Q.  Okay.  So Exhibit 12 will be page 360 out of

25    that folder.

JASSO DECL. PAGES - 1427

001395

1          (Exhibit 12 was marked for identification.)

2    BY MR. HAYS:

3          Q.  On --

4          A.  And 354 is what -- is when they all said, Nope,

5    nope, we don't want anything to do with it, and then Ron

6    did it.  And that's 354.

7          Q.  Was a new certificate of title ever issued by

8    HCD reflecting either Brian or Steven as a registered

9    owner or a legal owner?

10         A.  No.  They were just on these documents.  They

11   were -- they were put on as UCCs, and then Ron was put on

12   for his loan to me, and then eventually taken off

13   July 9th.

14         Q.  Okay.  So just to be clear, the title itself

15   never reflected Brian or Steven as registered owner or

16   legal owner, correct?

17         A.  No, just the UCC.

18         Q.  And the documents submitted to HCD that had

19   Brian and Steven's names on it, they were successfully --

20   you managed to successfully keep HCD from issuing the

21   certificates after these documents had been submitted?

22         A.  Yeah.  I sent them an e-mail, and that's why

23   there's a line through and all that White Out, because I

24   whited it all out and put a line through it, and this --

25   this actual copy is in their file.  That's where I

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1428

1    thought you got this.

2        Q.  And then the -- the -- but the UCCs did get

3    filed with Brian and Steven being listed as secured

4    parties, correct?

5        A.  Yeah.  Because those are my sons.  And again, if

6    I was unavailable, they are my sons, they're my family.

7    Those are the ones that would take over and be able to

8    make legal decisions in my absence.

9        Q.  And you were saying earlier that these were

10   gifts, Brian and Steven weren't paying you any money to

11   acquire interest, correct?

12       A.  No.  These were -- from what I understand --

13   what I was told by CPSs, you can give 15,000 per year to

14   anybody.

15       Q.  I understand.  So then in your bankruptcy

16   schedules after saying you were a 1/3 owner of JPad, I

17   think you filed an amended schedule on September 22,

18   2021, saying you were a 1/7 owner of JPad, and who would

19   have been the other six owners?

20       A.  Well, by this time, we were full blown COVID,

21   and everybody was helping me if -- they happen to have

22   been Ron -- I think you and I have talked about this and

23   I testified at 341, it would have been Ron, and Bob,

24   Brian, Steven, and Justin, and Emma -- EJ.

25       Q.  Who is Emma?

1        A.  My granddaughter.

2        Q.  And did any of them ever pay you money to become

3    a partial owner of JPad?

4        A.  No.  This was -- and I -- I -- I gave this --

5    this agreement to Mr. Golden.  I gave this -- this --

6    JPad's operating agreement to Mr. Golden with all of --

7    all of these 15, 15, 15, 15, 15, 15 and -- and reducing

8    my ownership.  But I did not -- I thought the only way to

9    make it legal is you actually have to put it on your tax

10   return.  I don't know if that's true or not true.

11        Again, you know, I was having a rough time with

12   the boys and trying to do what moms -- what parents do,

13   is they -- they leave things to their kids.  That's all I

14   wanted.

15        Q.  So then you filed next an amended schedule on

16   October 14th of 2021 saying that you had a 70 percent

17   interest in JPad.  Who would have been the other

18   30 percent owners?

19        A.  Well, by that time -- by this time now,

20   relationships with the kids changed because, you know,

21   this -- all this legal nonsense, especially with Sandy

22   and nobody wanted to have any part of anything, and they

23   didn't want anything, they didn't want any gifts.  So now

24   I -- I'm like, Okay, fine.  I'll just keep it myself

25   then.  And -- but still Ron and Bob were very helpful

1    during the time that I lost my job.  And so, I -- I --

2    the only thing that I had left was to repay them by a

3    percentage of JPad.

4        Q.  And when you say repay them, how much money had

5    Ron loaned to you?

6        A.  He paid for the bond, two bonds, and he was

7    just -- he was the one that -- that I would call when

8    that crazy woman would lie and get me arrested and I was

9    horrified.

10       Q.  You said he paid for two bonds.  How much was

11   each bond, roughly?

12       A.  I think the first one was for 50,000.  So I

13   think that was, like, 7 1/2 or 8 percent.  And then this

14   second one was 250,000, and I think that was 7 1/2 or 8

15   percent.  And the only thing I had -- he didn't want

16   anything.  He just, like, No, you know, you'll -- you'll

17   pay me back eventually.

18           I go, No, no, no.  It's okay.

19           So I gave him -- gave him an interest in the

20   house until I could pay him back.

21       Q.  And when you gave him an interest in the house,

22   you did it by giving him a partial interest in the --

23       A.  The encumbrance.  No.  Well, no, the

24   encumbrance.

25       Q.  Let me finish my statement and let's not talk on

114

1    top of each other.

2        A.   Sorry.

3        Q.   You -- you were trying to pay him back by giving

4    him the partial ownership interest in JPad which held the

5    legal interest against the house?

6        A.   No.  I never gave a membership interest in JPad

7    to anybody, only a manager interest.  That's it.  And a

8    manager interest, that is my ignorance.  Okay.  I never

9    gave any membership interests.  Okay.  Whether I misspoke

10   or anything, okay.  I gave them an encumbrance on the

11   house.  That was it.  Okay.

12       Q.   Well --

13       A.   Because --

14       Q.   Hold on.

15       A.   Let me --

16       Q.   Hold on.  Hold on.  You're now saying you gave

17   them an encumbrance on the house.

18            What are you referring to?

19       A.   I'm sorry.  Say that again?

20       Q.   You said you gave them an encumbrance on the

21   house.  What are you referring to?  A UCC1?  An ownership

22   interest in JPad?  What are you referring to?

23       A.   No.  At the time, as best as I could recall,

24   again, not having legal advice, okay.  Just trying to be

25   thankful that I was out of jail, just trying to just be

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1432

001400

1    thankful that I had somebody's help.

2        Q.  I'm asking you what I -- what I hope is a very

3    simple question, and that is, you said you wanted to

4    repay them and be fair to them by giving them a lien

5    against the house.

6        A.  Right, right.

7        Q.  I'm asking -- I'm asking in what manner did you

8    accomplish that?

9            Was it through a UCC1 or was it through

10   something else?

11       A.  I think it was just in the statement to

12   encumber.  Was it -- you have the document here.  Right

13   there.  It's an -- I think it was the statement to

14   encumber.

15       Q.  So -- so the -- the liens that you're referring

16   to -- to repay Ron and Bob --

17       A.  Just --

18       Q.  -- was just -- just -- we're starting to talk on

19   top of each other.

20       A.  Sorry.

21       Q.  The -- the liens -- the liens that you are

22   referring to are liens that are referenced in statements

23   to encumber, correct?

24       A.  I believe -- I believe so.  It is, I believe --

25   I believe that's what I did.  I believe that's what I

1   did.

2       Q.   Okay.  And when you were filing the various sets

3   of amended bankruptcy schedules listing varying

4   percentage ownership interests in JPad, what were you

5   thinking was the reason that you were not the 100 percent

6   owner of JPad?

7          Was it because of the gifts and the statements

8   to encumber that we're now talking about?

9       A.   No.  It was -- it was in addition to that.

10   It's -- I didn't have a job.  I didn't have any income

11   and I had, you know, Bob that would bring groceries or --

12   or -- and I just felt like I needed to -- just felt like

13   I needed to show -- you know, show my appreciation

14   that -- that he had something for the money.  I didn't

15   want it to be considered charity or a gift or whatever;

16   that it would be paid back or that, if I sold the house,

17   that I would pay it back.

18       Q.   And I --

19       A.   And that was the only purpose.

20       Q.   I understand the motivation.  I just want to

21   make sure I understand how you implemented that

22   motivation.

23          So when you're filling out the schedules listing

24   varying different percentage ownership interest in JPad,

25   how was it that -- what were you thinking about was the

117

1    reason you were not the 100 percent owner?

2          So we've covered a couple of things.  One is you

3    had signed statements to encumber in giving liens to --

4          A.  Just that one person.

5          Q.  -- to -- to Ron, right?

6          A.  Yeah, for the huge -- yeah.

7          Q.  Okay.  And so, when you're listing Bob or

8    thinking Bob is an owner of JPad, what is it you're

9    thinking of --

10         A.  Just that he's been -- he moved in, originally,

11   to protect me, just to physically protect me because I

12   was scared to be in the house by myself.  After -- after

13   March 4th, 2019, I couldn't sleep.  And so, I was alone.

14   And so, he came just to have somebody else here because I

15   was afraid to be in the house by myself, and to me, that

16   was value.

17         Q.  So -- so in in appreciation of that value, you

18   considered Bob to be a partial owner of JPad?

19         A.  I just wanted him to have something where --

20         Q.  I -- I understand the motivation --

21         A.  Well that --

22         Q.  I -- I'm just trying to --

23             (Multiple speakers simultaneously.)

24             THE REPORTER:  I don't have it.  I just don't.

25   //

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1435

001403

```
 1   BY MR. HAYS:
 2        Q.  You're talking on top of me, Ms. Gallian.
 3             I understand why you wanted to do it.  I'm
 4   asking what, if anything, did you do to implement that?
 5   Did you tell him, You're now a partial owner of JPad?
 6        A.  I think I -- yes.  Yes, I did.
 7        Q.  Did you --
 8        A.  I -- you have --
 9        Q.  Did you put anything in writing that got filed
10   with HCD?
11        A.  No.  It just was in a -- just an agreement.  And
12   I -- I believe the -- the JPad agreement, whatever you
13   call it, operating agreement or something, was given to
14   the trustee.
15        Q.  So the way you implemented it, you're saying --
16   and I'm just trying to understand, is that in the JPad
17   operating agreement and its minutes and books and
18   records --
19        A.  Yes.
20        Q.  -- there were notations reflecting that Bob is
21   now a partial owner of JPad?
22        A.  Yes.
23        Q.  Okay.
24        A.  And Ron.
25        Q.  And Ron?
```

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1436

001404

1        A.  Yes.

2        Q.  And --

3        A.  And the boys, they were, too.  But yet, then

4   they decided they didn't want it, so they did more

5   minutes.

6        Q.  So -- so there are initial minutes that say that

7   Brian and Steven are partial owners, and then there are

8   subsequent minutes that say they're no longer partial

9   owners?

10        A.  Yes.

11        Q.  And for Emma, your granddaughter, same thing?

12        A.  That didn't start until 2020.

13        Q.  But are there minutes --

14        A.  Yeah.

15        Q.  -- at JPad reflecting that she is now a partial

16   owner?

17        A.  Yes.  And then that was changed.  But yes.

18        Q.  And then she was no longer a partial owner?

19        A.  Yeah.  Because her dad, my son, Brian, is her

20   father.  He didn't want her to have -- none of them

21   wanted to be involved because of all this litigation.

22   They just said no.

23        Q.  So then at some point in time, your bankruptcy

24   schedule starts saying that you're the 100 percent owner

25   of JPad.

```
 1          Are there notations on the minutes of JPad books
 2    and records reflecting that Ron, Bob, Brian, Steven,
 3    Justin, and Emma are no longer owners?
 4          A.  No.  I think the last schedule just showed --
 5    I'm trying to think of what the last schedule shows.  I
 6    don't know if that's what you call it.  I think we called
 7    it a schedule, like, a C or D or something like that.  I
 8    don't think there was any -- any amendments after that
 9    because everybody just was -- just -- it just wasn't fun
10    anymore.  It just wasn't -- just wasn't --
11          Q.  So --
12          A.  -- what I intended.  It's kind of like, you
13    know, I almost think sometimes that I used it as a --
14    what do you call that -- not a will -- or something
15    probably like a will, you know, you want to leave your
16    things to your children.  It just -- just wasn't working
17    anymore.  Just too convoluted.
18          Q.  So the last set of JPad books and records
19    reflect whom as the owners?
20          A.  I think the seven people is what I think.  I
21    think it -- it had -- I think that it had notations where
22    for three years there was 15, 15, 15 for all three boys,
23    and then Emma came -- came along, and I think she got 15,
24    and then I don't remember what the amounts were listed
25    for Ron and Bob.
```

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1438

001406

1      Q.  So the JPad books and records still reflect

2   seven owners, correct?

3      A.  That's seven -- four, five, six -- well, if you

4   count me, I would be the seventh.

5      Q.  Yeah.  Exactly.  Okay.

6      A.  But now it's --

7      Q.  How much --

8      A.  I.

9      Q.  -- it -- you were talking about Ron loaned you

10  money for the bonds, and you were saying 7 1/2 to 8

11  percent of 50 grand, and 7 1/2 or 8 percent of 200 grand.

12          Was that the extent of the money he loaned you?

13     A.  No -- oh, you mean the bond amount.  What the --

14  what the bond company charges.  They were caught

15  charging -- I think it was 7 percent of 50,000, so

16  whatever that is.

17     Q.  I understand.  It's --

18     A.  Yeah.

19     Q.  -- 3,500, yeah, your testimony had been 7 1/2 or

20  8 percent --

21     A.  Yeah.

22     Q.  -- of the bond amount was the premium they

23  charged you --

24     A.  Right.

25     Q.  -- to issue the bond.

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1439

1          A.  Right.

2          Q.  So if you take the 7 1/2 or 8 percent of 50

3     grand or the 7 1/2 or 8 percent of 200 grand --

4          A.  Right.

5          Q.  -- that's the amount of -- that's the amount of

6     money that Ron loaned you.

7              Were there other monies that Ron loaned you?

8          A.  Just -- he said it wasn't a loan, but he paid an

9     attorney, his first name is John -- John -- oh, God,

10    what's his first name -- Newport Beach on Birch Street,

11    John Graber maybe?  He paid his bill.

12         Q.  And when was that?

13         A.  I believe January of 2020.  It was a Sunday, and

14    he -- he got cashier's checks and paid them.

15         Q.  And that's 2020, not 2021?

16         A.  Right.

17         Q.  Okay.  And then was there ever any written

18    documents where you said to Ron, I promise to repay you X

19    amount of money?

20         A.  The -- just the encumbrance.  Just -- just the

21    statement to encumber, and I said, No, I don't want this

22    hanging over my head.  You'll get your money back.

23         Q.  Okay.  Now with respect to Bob, did you -- did

24    he ever loan you money or pay for things for you in

25    exchange for you putting him down as an owner of JPad?

123

1     A.  He never asked and he never -- I just -- I was

2  just so grateful that I came up with an amount and I

3  said, I'm going to pay you back.

4     Q.  But he never said, This is a loan, correct?

5     A.  No, No.

6     Q.  Okay.

7     A.  And I did not consider any of these gifts.

8  These were just -- these were things that -- anyway.

9     Q.  Okay.  You and/or J Sandcastle applied to be

10  tenants in the park, correct?

11     A.  J Sandcastle originally applied by itself, and

12  because the park was adamant about not issuing any lease

13  agreements with a business, then subsequently I applied a

14  couple times.  I had a co-signer, Ron, apply with me, and

15  when Ron and I were having problems, then Bob -- then I

16  applied again, but then Bob applied with me for the

17  income qualification.

18     Q.  And these applications are being made over what

19  period of time, November 2018 through?

20     A.  All the way through 2021.

21     Q.  And --

22     A.  No.  Wait a minute.  All the way through -- I

23  believe it was September of 2020 was the last one.

24     Q.  So the very first one you said was submitted by

25  J Sandcastle, correct?

1          A.  Solely, yeah.

2          Q.  And was that one approved or disapproved?

3          A.  Neither.  They didn't -- they didn't even

4    acknowledge J Sandcastle.  They just chose me, and

5    they -- everything came in my name.

6          Q.  But -- but the response to the application to

7    become tenants was the application was denied, correct?

8          A.  That -- yeah, yeah.  Yes.  The application --

9          Q.  Okay.

10         A.  The application was denied without acknowledging

11   that J Sandcastle was the submitter, yes.

12         Q.  Okay.  And I know that you take issue that the

13   denial was not proper, correct?

14         A.  No, it wasn't.  They -- they --

15         Q.  Okay.  I'm just --

16         A.  -- ran my name without permission.

17         Q.  And then when did you get notice that the

18   application was denied?

19         A.  Sometime toward the end of November --

20         Q.  Of --

21         A.  -- the Pinon Drive address.

22         Q.  And that was in 2018, correct?

23         A.  Yes.

24         Q.  And so, when you moved onto the property, you

25   had not yet been approved to be a tenant, correct?

125

1       A.   That's true.

2       Q.   When you were disapproved, why did you continue

3   to remain on the property as opposed to moving?

4       A.   Because I was the purchaser under, you know, I

5   was under the color of being a bona fide purchaser.

6       Q.   Why did you not just sell the property if you

7   weren't accepted as a tenant and --

8       A.   I tried.

9       Q.   -- in this thing -- and so, what efforts did you

10  make to sell it?

11      A.   I did.  I did many times.  Well, at first, I was

12  lied to.  I was lied to by the attorneys for Houser.

13  They told me I had to move the house.  So, foolishly, I

14  called contractors -- local contractors here in

15  Huntington Beach.  One of them was Coast, and they

16  thought I was nuts.  They're going, You want to what?

17          I said, I bought this -- this home, and they're

18  saying that I have to move it.

19          And they go, Who told you that?

20          And I told them the company.  Well, they gave me

21  a phone number to call, which was a person by the name of

22  Richard Hair [phonetic] at Star.

23          I called Star and I told them what I was told.

24  He goes, That's impossible.   He goes, Are you in the

25  Ryan home?

1          And I said, Yes.

2          He goes, I built that home.  He goes, I have --

3  I am the one that probably puts 90 -- well, he is the

4  one -- 90 -- or, maybe it was a greater percentage.  He

5  said, I don't build homes in there to move.  If you try

6  to move that home, it would be uninhabitable, were his

7  exact words.  He then asked me, Who denied your tenancy?

8          And I told him.  And he called the office and

9  spoke to whoever.  I don't know who he spoke to.  I

10  wasn't privy to the conversation.  So he tried to work

11  out something with the park, and they were just adamant

12  that they wanted this house moved.

13          And he goes, They can't force you to move the

14  house.  He goes, That's ridiculous.

15          And then that was the end of that.

16     Q.  What efforts did you make to sell the house?

17     A.  I listed the house.  However, I had two or three

18  people -- and even to this day when anybody contacts me,

19  I don't waste their time.  I immediately refer them to

20  the park because the park is going to either give them an

21  application to complete or just discourage them somehow.

22          Well, it was more of the latter because a couple

23  of brokers that I had asked to represent me contacted the

24  park, and Chris Houser wrote a letter to one of the

25  brokers and said, The house cannot not be sold in place.

1           So it's -- again, nobody wants to get involved

2     when it's messy.  So I've been trying to sell it on my

3     own as just an in-place house; however, with the prices

4     of homes now and the rents and not going back to United

5     yet, and, you know, just various reasons, I -- when I was

6     participating in the mediation, one of the solutions was

7     for Houser to purchase an equal home in another park, and

8     the mediator thought that was a great idea.  He goes,

9     I -- I don't think I see anything wrong with that.  He

10    goes, They don't want you to live there.  He goes, So

11    that's a great solution.  However, they wouldn't do it.

12    They -- they just wanted to give me money, and I said,

13    No, I don't need money.  I need a home.  So that fell

14    out -- that fell apart.

15          So then -- and the second solution was put the

16    registration in Jamie Gallian's name and maybe they'll

17    reconsider and issue a lease and this all nonsense will

18    be over.  And that didn't happen.  So those are the

19    efforts.  Even Judge Bower told them -- he goes, If --

20    told the attorney, he goes, If I find out, if you have --

21    I don't remember his exact words, but I have the

22    transcript.  He goes, If you denied, you know,

23    wrongfully, a potential tenants, we're going to have a

24    problem.  So -- and then he retired.

25          Q.  So are you saying that your present feeling and

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1445

001413

1   intention is that you would be willing to have the

2   property sold if you could get cooperation, if you will,

3   from Houser Bros. to allow someone to purchase and get a

4   tenancy?

5       A.  Yeah.  In fact, it was about -- I have the phone

6   number, and you can call him and confirm it, but, in

7   fact, I sent -- a couple months ago, I sent them a

8   potential buyer and -- I think people nowadays want to

9   see if they qualify for a tenancy in a park.  They

10  wouldn't even talk to them.  They wouldn't even consider

11  letting them fill out an application.  It had to be --

12  the purchase had to have been already in place, you know,

13  like, beginning.

14          And a lot of people just want to see -- they

15  don't want to go through all that.  They want to see if

16  they're even going to qualify as tenants.  They wouldn't

17  even speak to them.

18      Q.  Yeah.  But again, my question was, you would be

19  willing to participate in a sale if the Houser Bros.

20  would consider potential buyers?

21      A.  Well, it's not as simple as all that, but

22  that's -- that's -- that has always been the goal.

23      Q.  How many different UCC1s were recorded against

24  the house -- the manufactured home from and after

25  November 1st of 2018?

1      A.  Well, there's been several depending on who

2  filed them.  I know that I have no problem writing Jamie

3  Gallian at the top.  A lot of people want to file it, but

4  they don't want to put anything at the top.

5           Then Bob and Ron got started doing it, and in

6  November -- I think it was around September -- maybe it

7  was September, August or September of 2021, they started

8  filing stuff because now they're -- they believed that I

9  was being -- I think -- I think everybody's interest was

10  just unclear.  I think everybody was panicking and the

11  only thing -- the only UCCs that I filed was the initial

12  three or four, the one on August -- or was it December,

13  it might have been December -- with Brian, Steven, and I

14  filed the two because Jeanine Hosso filed UCCs that I

15  didn't approve or I didn't agree to.  So then I filed

16  UCC5s that said, No, she doesn't have a claim to my home.

17  I filed those.

18           And then I think I filed -- I know I filed the

19  last two that said -- making the correction that I was

20  never a debtor to begin with, and that was filed in

21  error, the ones in 2019.

22      Q.  I --

23      A.  If you're looking for a number, I have no idea.

24      Q.  On the day you filed bankruptcy, what was the

25  state of UCC filings?

```
 1          A.  Are you looking for a number?

 2          Q.  No.

 3          A.  Or which ones were -- were --

 4          Q.  Just what --

 5          A.  The -- the --

 6          Q.  Hold --

 7          A.  -- the only legal ones are the -- the one I

 8    think it ends in 27 -- or, not legal.  That's not the

 9    right word.  But 27 is the -- is one at the beginning on

10    1-14.  The one in December --

11          Q.  1-14 of what year?

12          A.  '19.

13          Q.  And then the one in December of '19?

14          A.  The one in December, I believe it was

15    December 2020.  What was after that?

16          Q.  So my question is, on the day you filed

17    bankruptcy, if somebody did a UCC search, what would they

18    have found in terms of who were the lienholders of

19    record?

20          A.  The one from 2019, I believe.  Actually --

21          Q.  What --

22          A.  -- there were three -- there were three, 2019

23    and the 8 -- the 2020 --

24          Q.  You're saying --

25          A.  The --
```

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1448

001416

1     Q.  -- you're saying there would be three, but I've

2     got January 14th of 2019 and December 2020.

3          What's the third one?

4     A.  Well, there were three on January 14th, 2019.

5     There's the one that ends in 74.

6     Q.  And then there's the one in December of 2020 --

7     A.  Right.

8     Q.  -- so that would be four liens --

9     A.  That's the fourth.

10    Q.  Hold on.  Don't -- don't talk on top of me --

11    A.  Sorry -- sorry.

12    Q.  -- please.

13         There would be four liens of record that had not

14    been terminated as of the day of bankruptcy, correct?

15    A.  Well, isn't a -- isn't an AD-1 -- isn't that a

16    replacement for an error?

17    Q.  I -- I don't know the forms by form number the

18    way you're referring to them.

19    A.  Okay.

20    Q.  I just want to know, like, what would the title

21    have shown as far as liens --

22    A.  Right.

23    Q.  -- by running a UCC search.

24         There were four separate things that were

25    outstanding at that time?

1          A.  I believe, yes.  There was three on the 19th of

2     20 -- 2019 and one for 2020.

3          Q.  And what do those four UCC1s show as far as who

4     were the secured lienholders?

5          A.  Jamie Gallian, JPad, Brian and Steven Gallian.

6          Q.  Jamie, JPad, Brian and Steven, and you said the

7     one that reflected you as a secured creditor was

8     incorrect?

9          A.  No.  That was the one that reflected me as a

10    debtor.

11         Q.  That was incorrect.

12         A.  That was incorrect.  And I thought -- I wasn't

13    sure, but I believed -- at the time when I was trying to

14    figure out how to correct it, I believed that the AD-1

15    corrected it, but it never got corrected.  So that's why

16    I -- I made sure that I did a 5, a UC-5, I thought was

17    the amendments that you record when you want to change

18    something to make it clear.

19         Q.  What was the thought for why you personally were

20    a secured creditor against the home?

21         A.  I believe that -- do you have a timeframe?

22         Q.  Well, you're -- you're saying that one of these

23    four filings reflected you as a secured creditor --

24         A.  Oh.

25         Q.  -- as an individual name, correct?

1        A.   January -- January 14th, 2019, I was the secured

2   party, and I assigned it to JPad.

3        Q.   Okay.  So that's one and the same lien?

4        A.   Yeah.  That's the same document.

5        Q.   Okay.  So as of the petition date, the three

6   lienholders would be JPad as assignee of you

7   individually, plus Brian, plus Steven?

8        A.   Correct.

9        Q.   Okay.

10        A.   Yeah.  I don't believe Ron was ever added to a

11   UCC.  I could be mistaken, I'm not sure, but I don't

12   remember any.  I just remember he was on the statement to

13   encumber.

14        Q.   And the amounts or percentages that Brian and

15   Steven were due under these UCCs will be reflected in the

16   minutes of JPad?

17        A.   Yeah.  The 15,000 for three years.

18        Q.   For each of them?

19        A.   Yeah.  For those two and Justin, but Justin was

20   never added to a UCC.  He was just added in the -- in the

21   document, in the minutes.

22        Q.   Yeah, but as far as Brian and Steven, according

23   to the JPad minutes, it would be $45,000 each?

24        A.   Yeah.  And Justin would be 45, as well, and Emma

25   would only be 15.

1        Q.  But -- but I'm -- I'm talking about -- let me

2   finish my sentence.

3           I'm talking about what was the amount secured by

4   the actual UCC1 filing.  For Brian, it would be --

5        A.  The --

6        Q.  -- wait.

7           For Brian, it would be 45,000, and for Steven,

8   it would be 45,000, correct?

9        A.  Yeah.  But that doesn't say that on there.

10  That's just what you're assuming, but --

11       Q.  I'm not assuming.  I'm -- I'm repeating your

12  testimony that it was 15,000 a year for three years, so

13  they would have been owed 45,000 each --

14       A.  Correct.

15       Q.  And then the UCC filing -- let me finish,

16  please.

17          The UCC filing would be evidence of their lien,

18  which secures the $45,000 claims, correct?

19       A.  Yes.

20       Q.  Okay.  Thank you.

21          THE REPORTER:  Counsel, if we can take a break

22  whenever it's convenient.

23          MR. HAYS:  If people can hang on -- oh,

24  actually, let's just do a ten-minute break and then I

25  think I'm probably 15 minutes or less from being done as

1   opposed to taking a one-hour lunch break, if that works

2   for people.

3             THE WITNESS:  Yeah.  That's fine.  I'm okay.

4             MR. HAYS:  Nicole, does that work for you?

5             THE REPORTER:  Ten minutes is fine, and then we

6   can come back and finish it up.

7             MR. HAYS:  Okay.  Great.  Thank you.

8      (A recess was held from 12:17 p.m. until 12:34 p.m.)

9   BY MR. HAYS:  Okay.  I do not have any further questions.

10  And so, we just need to do a little bit of housekeeping

11  here.  The court reporter will type up an official

12  transcript.  What you're seeing in realtime is not the

13  official transcript.  And then she will e-mail it to you,

14  if you could provide her with the e-mail address you

15  would like her to use.  You want to just do that right

16  now?

17      A.  Well --

18      Q.  Or we can --

19      A.  I don't want -- yeah.  I don't want to mess up

20  the screen because I might not get you back.

21      Q.  So is 30 days enough time for you to read the

22  transcript and make sure it accurately -- you believe the

23  reporter accurately transcribed your testimony?

24      A.  Yes.

25      Q.  And then you will have an opportunity to make

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1453

1   any changes and then sign and return that within the

2   30 days.  But just be aware that if I asked you a yes/no

3   question and you said yes today but then you changed that

4   to no, that that could be used to impeach your

5   credibility because you've now completely flipped your

6   answer, for example.

7        A.  Okay.

8        Q.  So just -- just be aware as you're making the

9   changes that, you know, you want it to be accurate for

10  what you said here today.  I would also ask that -- you

11  mentioned the minutes of JPad --

12       A.  Uh-huh.

13       Q.  -- that you said you sent to the trustee.  We

14  got a lot of stuff from the trustee, but I don't believe

15  we got all of those minutes.  Can I get your agreement on

16  the record to just --

17       A.  Yeah.

18       Q.  -- e-mail that to Brad Lay Lanais?

19       A.  Do you just the minutes or do you want the whole

20  book?

21       Q.  The book will be fine, if you have it, just to

22  make sure that the --

23       A.  Just -- it's just a bunch of stuff.

24       Q.  Okay.  Just go ahead and send it.

25       A.  All right.  I'll send to you what I can find.

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1454

1       Q.   Okay.  And then the court reporter traditionally

2    has a duty under the law to maintain custody of the

3    original transcript.

4            And Nicole, you said that's your preference for

5    how to handle things?  She's nodding yes.

6            So do I have your agreement, Ms. Gallian, that

7    she will retain the original and that you and I can

8    purchase copies of that?

9       A.   Sure.  That's fine.

10      Q.   Okay.  I think that covers everything.  And so,

11   unless anybody else has anything to say, I think we can

12   go off the record and we will be done with the

13   deposition.

14           But before you disconnect, Ms. Gallian, the

15   reporter does have some questions with regard to

16   spellings, and she will need the e-mail address from you.

17      A.   Okay.

18      Q.   Okay.  So we're off the record now.

19      (Whereupon proceedings concluded at 12:37 p.m.)

20

21

22

23

24

25

JASSO DECL. PAGES - 1455

1                **SIGNATURE OF DEPONENT**

2

3        I, the undersigned, JAMIE GILLIAN, do hereby

4  certify that I have read the foregoing deposition and

5  find it to be a true and accurate transcription of my

6  testimony, with the following corrections, if any:

7

8  PAGE     LINE               CHANGE/REASON

9  _____   _____   _____

10  _____   _____   _____

11  _____   _____   _____

12  _____   _____   _____

13  _____   _____   _____

14  _____   _____   _____

15  _____   _____   _____

16  _____   _____   _____

17  _____   _____   _____

18  _____   _____   _____

19  _____   _____   _____

20  _____   _____   _____

21  _____   _____   _____

22  _____   _____   _____

23

24                 _____

                  JAMIE GILLIAN, Date

25

139

JASSO DECL. PAGES - 1456

001424

1                    REPORTER'S CERTIFICATE

2

3

4          I, NICOLE HATLER, a Shorthand Reporter, State of

5    California, do hereby certify:

6          That JAMIE GILLIAN, in the foregoing deposition

7    named, was present and by me sworn as a witness in the

8    above-entitled action at the time and place therein

9    specified;

10         That said deposition was taken before me at said

11   time and place, and was taken down in shorthand by me, a

12   Certified Shorthand Reporter of the State of California,

13   and was thereafter transcribed into typewriting, and that

14   the foregoing transcript constitutes a full, true and

15   correct report of said deposition and of the proceedings

16   that took place;

17          IN WITNESS WHEREOF, I have hereunder subscribed

18   my hand this 19th day of July 2022.

19

20         _____
             NICOLE HATLER, CSR NO. 13730
21           State of California

22

23

24

25

                                                            140

**Exhibits**

**Gallian Exhibit 1**
2:11 78:19 79:10,13,24
80:7,15

**Gallian Exhibit 2**
2:12 80:22,24

**Gallian Exhibit 3**
2:13 83:16,17

**Gallian Exhibit 4**
2:14 103:4,5

**Gallian Exhibit 5**
2:15 103:24,25

**Gallian Exhibit 6**
2:16 104:17,18

**Gallian Exhibit 7**
2:17 105:1,2

**Gallian Exhibit 8**
2:18 105:10,11

**Gallian Exhibit 9**
2:19 109:25 110:2

**Gallian Exhibit 10**
2:20 110:12,13

**Gallian Exhibit 11**
2:21 110:16,17

**Gallian Exhibit 12**
2:22 110:24 111:1

**$**

**$1,000**
97:8

**$1,100**
104:23

**$1,200**
50:25 51:5

**$1,500**
101:23

**$10,000**
15:12 16:6,21

**$115**
68:19

**$15,000**
44:2,4

**$175,000**
17:4,13 25:17 30:3,17
31:4 88:21 89:4,9,15

**$194,000**
17:1

**$20,000**
16:5,19 97:18

**$225,000**
38:2 48:21

**$25**
67:15

**$25,000**
97:9

**$3,400**
53:3

**$35**
67:15

**$379,000**
11:10 14:1 95:10

**$45,000**
134:23 135:18

**$50,000**
16:5,19

**$800**
47:21,25

**$9,000**
29:18 96:1

**0**

**02-24**
77:4

**1**

**1**
32:13 33:22 62:13
78:19 79:10,13,24 80:7,
15

**1,086**
96:24

**1,400**
101:22

**1-14**
131:10,11

**1/2**

**47:4 50:7 69:2 100:16**
114:13,14 122:10,11,19
123:2,3

**1/3**
108:3,15 112:16

**1/7**
112:18

**10**
110:12,13

**10,000**
16:4,7,15

**100**
28:1,6,15 40:9 42:10
45:25 46:3,17 47:14
106:17 107:16 117:5
118:1 120:24

**10:50**
88:16

**10:51**
88:18

**10th**
81:15,22

**11**
47:3 69:2 102:21 103:4
110:16,17

**11-16**
87:23 88:4

**11:00**
88:17

**11:03**
88:18

**11th**
23:18 24:6 81:22 82:18,
24 83:24

**12**
44:16 51:19 110:24
111:1

**12:17**
136:8

**12:34**
136:8

**12:37**
138:19

**12s**
108:22,23

**13**
103:18,24

**13730**
4:6

**14**
63:8,20 66:15 67:9
75:16 104:3,17

**14th**
23:18 24:6 33:5,15
34:22 35:16 66:18,25
73:2 75:19 76:20
113:16 132:2,4 134:1

**15**
104:2 113:7 121:22,23
134:25 135:25

**15,000**
112:13 134:17 135:12

**15th**
19:8,11 22:2 25:3

**16**
27:24 68:19

**16222**
14:17

**16th**
17:16 19:18,21 22:8
25:3 66:22

**175**
15:10,13 16:23 25:19,
25 95:12

**175,000**
16:4,17 28:8

**179**
15:10

**18**
104:20 105:1

**185**
15:7,9,11 16:15,25
95:11

**185,000**
16:13

**18th**
27:4 39:5,14,25 43:15
45:19

**19**
131:12,13

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1458

**1962**
20:10

**19th**
133:1

**1st**
14:25 21:18 22:5 23:16, 17 24:3 39:18 61:13 105:6 129:25

---

**2**

**2**
33:23 80:22,24 100:16

**2-24**
65:12

**2-25**
71:16

**2-25-2021**
67:18

**2/3s**
108:4

**20**
16:23 105:4,10 133:2

**20,000**
97:16

**200**
122:11 123:3

**2000**
15:1 34:3 39:17

**2009**
7:9,16 9:24

**2010**
7:5 29:4 92:19

**2017**
9:15,18,25

**2018**
6:19,24 10:10 15:2 17:17 23:5 27:4,24 33:8 36:19,22 39:5,12,14,18, 24,25 40:7 41:12 42:4, 12,25 43:7 44:12 45:15 46:6,15,22 47:12 53:11 54:7 56:9 57:5,16 61:9 88:6 96:13 97:2 124:19 125:22 129:25

**2019**
33:10,15,21,23 34:12,

22 54:9,14 60:10 62:6, 15 63:8,20 118:13 130:21 131:20,22 132:2,4 133:2 134:1

**2020**
4:24 33:2,6,12,14,19,24 63:25 64:2,19,25 108:7 120:12 123:13,15 124:23 131:15,23 132:2,6 133:2

**2021**
29:16 34:2,5 48:15 65:3,15 66:15,25 67:10 69:9 70:23 71:6 72:7,20 73:13 74:21 76:25 81:10 84:10 96:14 97:3 98:16,21 100:22 103:7, 22 104:6,21,23 105:6, 14 106:13 112:18 113:16 123:15 124:20 130:7

**2022**
6:12

**2025**
4:7

**2028**
63:21

**2048**
48:23 49:4 50:23

**20th**
33:6,19 63:21,23 109:12

**21**
34:3

**21st**
99:1

**22**
82:2,4 112:17

**225**
15:6 25:18

**225,000**
26:4

**23rd**
7:9,16 9:13

**24**
51:21 65:14 66:15

**24th**

34:2,4 65:3 76:25

**25**
69:9 70:23

**250,000**
114:14

**25th**
34:3,4 71:6 96:12 101:5

**27**
131:8,9

**28th**
63:23

**2:00**
75:1

---

**3**

**3**
33:24 76:20 77:22 78:22 79:10 80:8,12,13, 14 83:16,17

**3,500**
122:19

**30**
51:1 113:18 136:21 137:2

**30-year**
51:3

**30th**
108:6

**31st**
10:10 39:17

**341**
50:9,22 109:3,14 112:23

**341s**
107:22

**346**
109:20,22 110:10

**35**
67:15

**354**
111:4,6

**356**
110:9,10,12

**358**
110:14,16

**360**
110:19,24

**376**
14:17 20:2 103:17

**379,000**
16:25

**396**
83:15

**3rd**
81:6,9,10,14 83:12

---

**4**

**4**
77:23 79:1,10 80:8,12, 13,14 103:4,5 110:20

**40**
49:4

**401(k)**
95:13 98:5

**441**
11:15

**4476**
6:25

**45**
102:4 134:24

**45,000**
135:7,8,13

**4589**
102:2,4,10,20

**461**
11:15 70:20 76:21 77:22,23 83:15 102:21 109:20

**4th**
68:10 104:21 118:13

---

**5**

**5**
16:23 50:7 70:20 79:15 80:13,14 103:24,25 133:16

**5,000**
16:20

**50**
122:11 123:2

**50,000**
114:12 122:15

**50,000s**
16:22

**53**
7:1

**5782**
53:2

**5th**
68:12 81:12

---

**6**

**6**
104:17,18

**60-day**
57:21 58:25

**6th**
68:12 83:10,14

---

**7**

**7**
105:1,2 114:13,14
122:10,11,15,19 123:2,
3

**70**
113:16

**74**
132:5

**7860**
102:10,20 103:1

**7th**
68:2

---

**8**

**8**
69:2 105:10,11 114:13,
14 122:10,11,20 123:2,
3 131:23

**8-20**
110:23

**8:13**
5:23

**8:18**
5:23

**8th**
68:3

---

**9**

**9**
29:19 73:22 109:25
110:2

**9-11-18**
53:24

**90**
28:18 74:4 127:3,4

**913985**
92:22

**9:28**
47:7

**9:40**
47:3

**9:46**
47:7,9

**9th**
39:24 72:6 73:11 74:2,
21 111:13

---

**A**

**A-S-S-I-G-N-O-R**
37:18

**a.m.**
5:23 47:7 88:18

**absence**
11:22 12:16 37:11,12
38:14 45:3 55:7,8 112:8

**absolutely**
26:2

**accepted**
126:7

**accepting**
99:24

**accomplish**
116:8

**account**
15:19,25 25:22 26:1
28:14,18 29:10 31:19
48:22 54:4 98:1,2,4,13,
20 99:6,7,10,23 100:12,
14 101:9,18,19,21

**102:2,20 103:1,21
104:4**

**accounts**
14:14 29:13,15 99:17

**accurate**
20:8,13 44:19 62:5
84:24 137:9

**accurately**
136:22,23

**acknowledge**
71:5 125:4

**acknowledgement**
70:9,22 79:15,20,25

**acknowledging**
125:10

**acquire**
112:11

**acquired**
24:2 106:16

**acquisition**
21:17 42:5

**action**
97:1

**active**
47:16

**actual**
12:5,17 18:13,16,17,24
19:19 43:5 64:3 111:25
135:4

**AD**
36:7

**AD-1**
36:7 132:15 133:14

**adamant**
124:12 127:11

**add**
62:6,24

**added**
33:5 34:8 40:2,6 42:3,
11,24 134:10,20

**adding**
45:20

**addition**
117:9

**additional**
15:13 58:14

**address**
13:23 69:4 125:21
136:14 138:16

**advance**
72:4 73:9

**advances**
26:5

**adversaries**
94:1

**advertisements**
10:24

**advice**
85:12,18 86:4 87:10
107:14 115:24

**afraid**
118:15

**afternoon**
75:1

**agree**
40:12 130:15

**agreed**
61:8

**agreement**
25:14 26:8,11,15,25
37:22 52:17,21 53:1
58:2 84:14 86:23 87:17,
19,22 88:4 113:5,6
119:11,12,13,17 137:15
138:6

**agreements**
37:14 86:14,16 87:3,23
88:6 124:13

**ahead**
13:12,13 25:11 62:11
76:14 137:24

**Albertsons**
6:16

**Alderport**
7:1,13 10:6 13:23 15:21
16:1,10,12,24 23:15
53:17

**alive**
8:13

**Alliant**

99:10,23

**Allient**
101:21

**allowed**
52:19

**amended**
43:14 62:15 88:2 93:2
108:2 112:17 113:15
117:3

**amendment**
40:1,6 62:6 107:8

**amendments**
107:7 121:8 133:17

**America**
101:11 102:1

**amortized**
50:23 51:1,4

**amount**
25:13,16,18,21 26:4
44:2,8 48:21 51:18,23
52:12 58:4 89:2 90:13
96:23,25 122:13,22
123:5,19 124:2 135:3

**amounts**
51:11 90:15 121:24
134:14

**Ana**
14:8,13 15:18,22 17:17
22:9

**and/or**
41:17 124:9

**answering**
5:8,14

**Anthony**
39:3,11,23 40:17 41:18

**anticipated**
48:25

**anymore**
121:10,17

**apparently**
31:2 45:10

**appeared**
19:1 62:3

**appears**
59:23 104:3 105:5

**appellate**
91:1

**applicant**
59:20 60:1

**application**
59:21 65:17 80:15
125:6,7,8,10,18 127:21
129:11

**applications**
124:18

**applied**
124:9,11,13,16

**apply**
124:14

**appreciation**
117:13 118:17

**approval**
21:21

**approve**
130:15

**approved**
61:13 125:2,25

**approximately**
17:1 51:4

**April**
60:9 101:6,7 103:22

**argued**
78:5

**arrested**
114:8

**article**
39:3 40:1

**assessor**
74:10

**assessor's**
74:17 78:9,12

**asset**
38:22

**assign**
56:4

**assigned**
7:23 37:21 134:2

**assignee**
10:3 134:6

**assignment**
7:23 8:2,9,12 9:5,6,9
10:2 12:24 13:22 38:5
92:14

**assignor**
36:9 37:18

**Assistant**
6:10

**association**
5:4

**assuming**
31:2 135:10,11

**attempt**
20:14

**attendant**
6:19,22

**attorney**
4:13 21:19 22:6,16 48:7
57:22 84:13 91:1 123:9
128:20

**attorneys**
17:5 23:9 30:21 48:4,6
61:6,11,21 90:17 91:19
107:5,19 126:12

**attorneys'**
89:21 95:5

**August**
33:2,6,14,19,23 63:21
64:2,19,25 68:10 81:6,
9,10,14,15,22 82:18,24
83:10,12,14,24 108:6
109:12 130:7,12

**authority**
28:13 37:10,11

**avoid**
47:21,25

**aware**
22:20,21 23:2,12 34:18
35:17 63:7 137:2,8

B

**B-U-Y-S-M-A-N**
71:3

**back**
14:23 19:10 20:9 22:3,
10 23:2 24:18 26:17
39:12 45:6 47:8 53:19

54:11 55:1 56:7 67:9,13
68:4,14,18 69:21 70:17
75:20 77:21,22 78:5
79:1,24 81:17 82:7
87:14 89:12,15 91:11
94:8,24 98:17 99:21
101:13 114:17,20 115:3
117:16,17 123:22 124:3
128:4 136:6,20

**background**
56:25

**backwards**
26:22

**bad**
47:20 55:10 58:17

**balance**
16:16 17:5 100:4

**bank**
14:9,14 21:11 28:13
55:4 101:11 102:1

**bankruptcy**
4:14 29:16 72:9 74:24
75:1 86:6 93:2,15 99:22
106:20 112:15 117:3
120:23 130:24 131:17
132:14

**bar**
94:18

**barks**
91:6

**based**
72:20

**basic**
31:10

**basically**
12:24 30:5 47:24

**basis**
48:25 96:21 97:25

**battery**
52:24

**Beach**
5:1,3 7:1 14:18 54:22
93:17 95:1 123:10
126:15

**bears**
104:21

**began**
7:15

**begin**
130:20

**beginning**
4:24 66:2 95:10 101:4
102:16 129:13 131:9

**behalf**
98:8

**beige**
79:9

**belief**
32:3

**believed**
46:16 73:2 100:17
130:8 133:13,14

**belong**
95:19 96:2

**beneficiary**
50:2

**benefit**
55:13,16

**BIFS**
43:10

**big**
21:5 76:1 77:15 78:18

**biggest**
57:24

**bill**
31:10 74:18 123:11

**biological**
8:22

**Birch**
123:10

**bit**
22:14 29:17,18,19
71:10 77:2 83:10 97:3
136:10

**black**
62:9

**blank**
84:22,25

**blanks**
90:12

**blown**
112:20

**Bob**
28:16,19 69:6 112:23
113:25 116:16 117:11
118:7,8,18 119:20
121:2,25 123:23
124:15,16 130:5

**bona**
126:5

**bond**
114:6,11 122:13,14,22,
25

**bonds**
114:6,10 122:10

**book**
137:20,21

**bookkeeper**
89:22

**books**
119:17 121:1,18 122:1

**borrow**
17:18

**bottom**
77:1 81:9,15 82:6,22,24
89:25 99:7

**bought**
126:17

**Bower**
128:19

**boxes**
90:6

**boys**
107:21 108:11 109:19
113:12 120:3 121:22

**Brad**
137:18

**Bradley**
7:5,16 8:5,8,13 9:1,2
92:14

**Bradley's**
92:13

**branch**
14:9,13 15:18,22,23,24

**brand**
75:20

**break**
46:24 47:1,11 88:10,11
92:3,6 135:21,24 136:1

**Brian**
108:7,8,14,19 110:5
111:8,15,19 112:3,10,
24 120:7,19 121:2
130:13 133:5,6 134:7,
14,22 135:4,7

**bring**
68:13 117:11

**broker**
10:15 11:12,14

**brokers**
127:23,25

**Bros**
4:14 7:11 22:18,25
23:4,9 59:4 92:25
100:23 129:3,19

**brought**
59:2

**build**
127:5

**built**
127:2

**bully**
94:21,22

**bunch**
137:23

**business**
29:23 124:13

**busy**
91:7

**buyer**
10:12,22 12:6 18:19
129:8

**buyers**
12:7 129:20

**buying**
21:11

**Buysman**
70:23 71:1

———————————

**C**

**C-A-L-D-E-R-O-N**
41:25

**C-O-D-A**
35:1

**C-O-T-A**
35:2

**Calderon**
39:3 40:10,13 41:17,21,
24 42:10,14,19,21,22
45:18 46:7

**Caldron**
42:5

**California**
4:5 20:6 34:20 48:1,10
63:12

**call**
27:13,14 34:24 35:6,7,9
42:16 54:5 61:11 66:8
74:13 76:4 78:19 80:21
114:7 119:13 121:6,14
126:21 129:6

**called**
8:18 47:23 66:19 71:22
78:16 121:6 126:14,23
127:8

**calling**
66:4

**canceled**
10:19 12:8

**cans**
43:11

**Capital**
73:16 74:18

**car**
13:6,16 20:24 21:6 25:8
31:5,9,10

**car's**
32:18

**card**
28:16,20 29:5 69:1,2,4
73:16 74:7,18,22
101:12,13 102:1

**career**
6:18 98:5

**case**
90:23 92:20,22,23,25
93:5,6,9,13,25 94:5

**cases**
90:23 93:21 94:3,10

95:6

**cash**
15:12 16:6,7,15,21
26:18 28:9 89:9 99:10
101:7,10 104:5,23

**cashier's**
14:3,4,7,11 15:17,19
16:3,16 25:24,25
123:14

**Cashiers**
14:2

**Cassello**
91:1

**caught**
122:14

**caused**
23:9

**CCP**
4:7

**CD**
62:24

**cell**
31:10

**center**
107:4

**certificate**
14:24 17:24 18:5,13,16,
17,20,24 19:19 20:19
22:4 32:17 33:9 34:12,
19,24 35:4,8,12,20,24
48:18 62:12,14,21,23,
24 63:15,21 64:1,5,8
65:2 66:22 68:16 69:4,
21 71:5,20,23 72:3,22,
25 73:6 74:4,9,12 75:20
76:23,25 78:2,23 79:16
80:19,21 81:3 83:12,25
109:12,14 111:7

**certificates**
32:10,14,21,24 34:6
61:24 111:21

**Certified**
4:5

**chance**
84:23

**change**
28:3 33:11,15 42:25

43:8 46:6 62:23 66:9
72:2,3 73:4 133:17

**changed**
19:5 34:5 36:14 43:17
44:13,16 51:25 52:20
55:9,12,22 57:15 58:24
60:5 62:23 85:25 86:8,
10 88:1 97:13 107:16
109:16 113:20 120:17
137:3

**changing**
64:4

**charge**
68:20 72:11 73:16 74:1,
7,22

**charged**
122:23

**charges**
122:14

**charging**
72:12 122:15

**charity**
117:15

**Charles**
9:1

**chase**
14:9,14 15:17,19,23
54:3,4 102:2,11

**chattel**
13:17,18

**check**
14:3,4,7 16:6,19 25:25
54:10,12 99:3,4 102:20,
22 103:7,19

**checks**
14:8,10,11 15:17,19
16:3,5,16,19 90:8 99:19
102:16 123:14

**Cheryl**
12:2

**Chevy**
20:10

**children**
43:24 44:3 108:10
121:16

**chose**
125:4

**Chris**
127:24

**circle**
61:21

**circumstances**
37:9 38:13 86:10 97:12

**city**
54:21

**claim**
93:19 130:16

**claims**
135:18

**clarification**
17:6 40:21 71:21

**clarify**
5:18 12:9 39:22 89:6,16
96:9 97:24 99:11

**cleaner**
5:11

**clear**
22:15,23 31:3 41:10,13
42:18 95:2 99:22
111:14 133:18

**clearance**
71:19,22 72:21,24 73:6
74:12,17 76:23 78:2
80:19,20

**clinics**
107:15

**closed**
39:19

**closely**
54:2,3

**cluster**
58:7

**co-signer**
124:14

**Coast**
126:15

**CODA**
34:25

**code**
35:9,14

**collateral**
26:10,16 27:1 87:8

**collect**
31:18 38:1 55:5

**collector's**
74:22

**college**
6:5

**color**
79:9 126:5

**Commercial**
35:14

**Community**
18:7

**company**
12:3,4,21 30:22,24
31:11,13 45:2 66:6
84:15 102:23 122:14
126:20

**company's**
11:25

**complete**
127:21

**completed**
6:4

**completely**
51:13,23,25 52:20
61:20,21 99:9 137:5

**complicated**
44:5

**computer**
73:22 75:11

**concerned**
23:19

**concerns**
25:4

**concluded**
138:19

**conference**
84:12

**confident**
34:10

**confirm**
86:11 129:6

**confused**
99:2,17

**confusing**
82:11

**connection**
4:25 11:19 12:5,10,16
63:9 88:22

**considered**
98:22 117:15 118:18

**constitute**
78:18

**constituting**
16:12

**contact**
11:7 61:12 107:3

**contacted**
11:3 56:2 67:23 68:2
78:9 127:23

**contacts**
127:18

**contemplation**
26:5 27:5

**continue**
6:17 126:2

**continued**
60:9 99:16 105:13

**continuing**
57:22 60:7

**contract**
10:19

**contractors**
126:14

**convenient**
46:25 88:9 135:22

**conversation**
127:10

**convolute**
60:8

**convoluted**
86:5 95:16 96:5 121:17

**cool**
41:7

**cooperation**
129:2

**copies**
138:8

**copy**
79:7,22 80:4 87:20
106:9 111:25

**corner**
102:22

**correct**
6:22 7:19 10:1 11:7,8
13:5,16,19,24 14:12
15:14 16:1,2,14 17:12
18:22 20:3,4,21 21:13,
14 22:19,25 23:5 24:4,
8,20,21 25:24 26:2,9,
21,24 27:2 30:2 31:20
33:25 34:14,15 35:20,
21 36:1,12,13,16 37:24
38:3,20 39:8 40:11,24
41:1,17,22 45:12 46:1,
18,20,23 47:14,15
49:24,25 50:3 51:6 53:7
54:18 56:12 57:14
59:18 60:15 62:1,16
64:2,7,9,20,21,25 65:4,
9,18 66:16 67:1,6,11
68:13 69:12,19 70:1,9
71:7,8,18 72:7 73:1,12,
14 75:18 77:19,24 79:1,
2,5,17 83:21,22 84:1,5
86:12,17 87:2 88:7,23
89:15 91:22 93:11,12
94:4 95:7 96:11,12
97:4,9,10 100:13 103:2,
8,22,23 104:16,24,25
105:15,16,20 106:5,8,
17,21 107:1,2,12,13,17,
18 108:16 110:7,8
111:16 112:4,11 116:23
122:2 124:4,10,25
125:7,13,22,25 132:14
133:14,25 134:8 135:8,
14,18

**corrected**
63:1,2 68:23 133:15

**correction**
130:19

**correctly**
49:14 103:11

**COT**
35:4

**COTA**
34:20,24 35:2,6,7,17
63:5 64:4

**counsel**
4:8 86:15 90:22 107:14
135:21

**counselled**
47:20 48:2

**count**
122:4

**counter-sued**
94:8,24

**county**
9:9 74:10

**couple**
5:5,6,7 32:20 100:3
118:2 124:14 127:22
129:7

**court**
5:6 21:21 22:8 41:24
75:1 93:15 94:4,20
107:15 136:11 138:1

**courthouse**
17:17

**covered**
118:2

**covers**
138:10

**Covid**
48:25 67:24 97:16
101:12,21,24 106:11
112:20

**CPA**
89:23 90:6,15 91:10,11
98:7

**CPSS**
112:13

**crazy**
114:8

**credibility**
137:5

**credit**
21:11 104:4

**credited**
90:16

**creditor**
4:13 31:17 62:7 133:7,
20,23

**criminal**
91:2

**cross**
93:2

**cross-complaint**
93:3

**Cruz**
82:19

**current**
72:3 73:8

**custody**
138:2

**cycled**
83:7

**D**

**dad**
120:19

**daily**
61:12

**date**
14:20 23:19 36:18,23
39:13 44:17 48:16
50:23 63:8,9,11,14,18
65:4,5,8,10,15,19
66:13,15,25 67:8,9
69:9,11,17,18,21,23
71:15 72:6 73:18 77:8
82:21 83:10 84:25
92:10,18 110:21 134:5

**dated**
23:16,17 83:14 103:7,
22 104:21 105:6

**dates**
51:11 63:19 85:3

**day**
66:16,20 69:13,14 72:8
77:7 82:21 83:11,24
110:23 127:18 130:24
131:16 132:14

**days**
6:15 74:4 75:16 136:21
137:2

**deal**
22:3,10,11,12

**dealing**
43:1

**debt**
85:11,16,21 87:7,8 96:4

**debtor**
36:7,12 130:20 133:10

**December**
54:7 109:18 130:12,13
131:10,13,14,15 132:2,
6

**decide**
27:21

**decided**
120:4

**deciding**
24:18

**decision**
22:9 24:23

**decisions**
37:10 45:4 94:19 112:8

**deed**
7:12 9:4

**default**
48:11

**defeats**
78:4

**defendant**
93:11

**degree**
6:5,6

**Del**
103:15 105:14

**deliver**
68:17

**delivered**
68:18

**demand**
12:23

**denial**
125:13

**denied**
125:7,10,18 127:7
128:22

**department**
77:3,5

**depending**
130:1

**depends**
87:12

**deposed**
4:15,18

**deposit**
15:12 16:7,8,9 29:12
54:10,12

**deposited**
14:8,13 16:1

**deposition**
4:6 5:15 92:11,12
138:13

**deposits**
54:6 96:16

**describe**
30:17

**Development**
18:7

**difference**
25:5 72:5

**direct**
54:6

**directly**
56:21

**disability**
97:15

**disappear**
86:21

**disapproved**
125:2 126:2

**disconnect**
138:14

**discourage**
127:21

**discovered**
7:5 24:17

**discuss**
49:17

**discussed**
48:20 59:4

**discussion**
42:1 49:21 84:7

**disregarded**
107:9

**document**
7:6 9:3,7 13:2 14:23
18:7,8,12 19:6,7,8,10
21:19 40:3 45:17 47:21,
23 48:13 62:4,5 65:12
67:1,5,8,13 68:25 69:20
71:5 74:20 77:9,20,24
78:12,19,25 79:1,4
80:14 81:4,13 83:8,13,
19 116:12 134:4,21

**documents**
8:20 12:11,17,22 17:16
18:4,9,12 44:12 57:23
58:5 64:12,24 70:9,12,
17 76:8 82:21 90:3
108:18 109:6 110:23
111:10,18,21 123:18

**dog**
91:6

**dollar**
89:1

**doors**
100:3

**drag**
94:1,8,24

**dragging**
93:18

**drew**
25:25

**Drive**
53:2 125:21

**drop**
74:11

**dropped**
101:7

**drove**
19:18 68:12 81:13

**due**
48:23 50:23 97:19
134:15

**dump**
90:6

**duty**
138:2

**E**

**e-mail**
61:12 68:2,4,22 84:13,
20 85:5 111:22 136:13,
14 137:18 138:16

**e-mails**
12:23 66:1

**earlier**
25:17,19 45:21 48:20
61:23 63:8 74:6 106:15
108:23 112:9

**early**
62:6,15

**earn**
56:13

**easier**
5:10

**easily**
70:19

**easy**
102:7 109:11

**Ed**
4:12

**EDD**
101:11,25

**education**
6:4

**effect**
49:3

**effective**
65:5,15,19

**efforts**
126:9 127:16 128:19

**EJ**
112:24

**elaborate**
51:9

**Emergency**
29:7

**Emma**
112:24,25 120:11
121:3,23 134:24

**employed**
6:7,13

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1465

001433

**encumber**
116:12,14,23 117:8
118:3 123:21 134:13

**encumbrance**
63:13 114:23,24
115:10,17,20 123:20

**end**
6:12 93:18 99:25
125:19 127:15

**ended**
11:16 15:6 60:5,6 98:5

**ending**
102:2

**ends**
131:8 132:5

**entered**
61:1,16 63:1

**entire**
5:11

**entities**
43:23

**entitled**
78:22 96:18

**entity**
27:10,16 29:24 30:4

**envelope**
66:20 80:11

**equal**
128:7

**equating**
32:17

**equity**
60:17

**error**
130:21 132:16

**escrow**
11:18,22 12:3,4,11,13,
16 53:10

**Estates**
103:17

**estimate**
4:17 51:15

**eventually**
52:13 80:19 106:18,19
111:12 114:17

**everybody's**
130:9

**evidence**
135:17

**ex-husband's**
40:17

**exact**
36:18 48:16 63:18
127:7 128:21

**examination**
4:10 5:20

**excess**
17:2

**exchange**
8:1 26:13 38:5 42:5
123:25

**exclusively**
56:10 57:4,16

**executed**
21:22 25:13 26:14 39:4
83:14 110:22

**execution**
21:20 22:16 23:13 24:5
88:22

**exhausted**
97:15

**exhibit**
78:19 79:10,13,24 80:7,
15,22,24 82:2,4 83:16,
17 103:4,5,24,25
104:17,18 105:1,2,10,
11 109:25 110:2,12,13,
16,17,24 111:1

**exhibits**
76:9 78:6 81:25 82:11
102:14

**exist**
85:9

**existed**
37:14

**existence**
87:17

**exists**
85:16,21 87:24

**expenses**
30:5,7,25 31:5,7

**explain**
7:3 18:15 22:22 35:22
42:8

**explained**
107:18

**explains**
15:15 108:14

**exposed**
58:20

**extent**
122:12

**extra**
47:25 83:13

**F**

**face**
62:3 64:6 65:11

**fact**
35:23 95:17 110:9
129:5,7

**Facts**
83:11

**fair**
56:16 90:18 116:4

**familiar**
21:3 25:5,9 63:5 102:9

**family**
112:6

**fancy**
75:6

**fashion**
13:8,15

**fast**
53:13

**father**
8:22 120:20

**father's**
8:6,21

**favor**
10:2 26:8,19,20

**February**
34:2,3,4 35:16 36:18,
19,22 39:24 41:12 54:9,
14 65:3,14 66:2,15 69:9
70:23 71:6 72:20 76:25

96:12,13 97:2 98:16,21
99:1,16 100:22 101:3,5
105:14

**feeling**
128:25

**fees**
30:21 89:21 95:5

**fees'**
90:17

**fell**
12:8 53:10 55:10 97:22
128:13,14

**Fellsot**
92:11

**felt**
117:12

**fide**
126:5

**figure**
77:14 78:17 91:9 98:7
133:14

**figured**
77:12 82:19,20

**file**
44:18 47:21 57:23
63:11,19 102:17 111:25
130:3

**filed**
7:6 21:20 22:16 29:16,
20 35:23 36:2 43:21
44:12,20 45:9,17 48:13
62:14 72:8 74:24 93:3
99:21 106:20 107:8,10
108:18 112:3,17 113:15
119:9 130:2,11,14,15,
17,18,20,24 131:16

**filing**
35:13 58:5 107:7
109:18 117:2 130:8
135:4,15,17

**filings**
44:19 63:7,11 130:25
133:23

**fill**
84:24 129:11

**filling**
117:23

**finally**
54:10,12,13 63:1,2 66:4
68:4 73:1,3,4 75:16

**finances**
21:11

**find**
18:23 19:7 40:15,16
74:16 77:7 82:23
128:20 137:25

**fine**
84:16,17 88:13,15,16
113:24 136:3,5 137:21
138:9

**finish**
42:9 50:19 66:24
100:18 102:12 114:25
135:2,15 136:6

**finished**
50:18

**flight**
6:18,22

**flip**
103:18

**flipped**
137:5

**flow**
89:20

**flying**
53:12

**focused**
59:23

**folder**
110:25

**follow**
74:14

**food**
31:5

**foolishly**
126:13

**force**
52:11 127:13

**forced**
95:25

**forces**
85:15

**forget**
71:19

**form**
14:1 27:8,10,11 30:4
40:25 41:3,15 44:15,16
69:12,22 73:15 132:17

**formal**
46:9

**formation**
37:4 38:25 41:12 42:19,
23

**formed**
27:3,5,22,25 36:17,20,
24 39:3 41:6,16,18,21

**forms**
44:19,24 45:8 132:17

**forward**
24:19 32:15 84:20,21
85:4 98:22 99:1

**found**
10:22 66:8 109:5
131:18

**fourth**
68:15 132:9

**frame**
24:7

**friend**
29:3 40:16

**front**
49:20 64:13,24 66:14
76:22 78:25

**frugal**
95:18

**full**
12:22 16:13 86:12
112:20

**fully**
50:22 51:3 89:14

**fun**
121:9

**function**
42:13

**functions**
12:13

**funded**
95:5

**funds**
88:21

**future**
26:5 61:2

─────────

**G**

**Gables**
5:1,2 52:24 60:13 90:25
91:20,23 92:2,4,12,22
93:7,9,17 94:25 95:1

**Gallian**
4:1,11,15 6:3,7 14:15
17:8 19:5 40:2 42:3
59:23,24 60:2,8 67:18
78:3,13,14 84:9,23
88:20 93:13,16,23,25
96:3 98:1 99:23 100:12
102:8,24 104:14,22
119:2 130:3 133:5
138:6,14

**Gallian's**
99:3,7 128:16

**Garrels**
91:2

**gave**
5:7 15:12 21:19 26:18
37:11,15 38:8 39:13
79:19 81:13 90:3 113:4,
5 114:19,21 115:6,9,10,
16,20 126:20

**giant**
21:6

**gift**
9:16,25 30:4 43:24
44:1,3 117:15

**gifted**
9:2 30:10,16 44:8
107:19

**gifting**
8:18

**gifts**
112:10 113:23 117:7
124:7

**give**
5:6 18:5 26:13 38:4,10,
17,22 63:6 64:14 68:24
73:20 74:20 79:18
96:16 97:9 112:13

127:20 128:12

**giving**
63:12 114:22 115:3
116:4 118:3

**glad**
57:19

**goal**
129:22

**God**
28:25 34:3 62:22 90:11
97:15 107:25 123:9

**Golden**
107:3 113:5,6

**good**
4:4,11 47:16,18,19 48:9
58:17 73:24 74:4

**governing**
12:22

**Graber**
123:11

**grand**
122:11 123:3

**granddaughter**
44:4 113:1 120:11

**grandma's**
20:10

**grant**
7:12 9:4

**grateful**
124:2

**gray**
88:24

**great**
107:23 128:8,11 136:7

**greater**
127:4

**Greg**
70:23

**groceries**
117:11

**ground**
7:24 23:21 96:24,25

**guess**
16:22 39:24 42:15
54:24 71:12 79:22

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1467

**guys**
50:18

---

**H**

**Hair**
126:22

**Halloween**
10:11

**handed**
13:4 65:8 75:5

**handle**
138:5

**handled**
11:21 12:18 13:7,15

**handling**
12:11

**hands**
18:19

**handwriting**
104:12

**handwritten**
104:3 105:5

**hang**
135:23

**hanging**
60:2 123:22

**happen**
48:25 58:18 89:20
112:21 128:18

**happened**
17:3 30:9 39:11 42:12
51:14 57:21 62:17
63:16 67:19 68:14 70:4
76:2 92:5 101:12
106:18,19

**happening**
57:25 101:25

**happy**
22:3,6 76:18 100:19

**hard**
79:7 80:5

**Hatler**
4:5

**Hays**
4:9,10,12 6:1 13:13,14

17:7 24:15,16 29:1
40:23 42:2 47:1,6,8,10
51:2 58:16 63:17 71:24
79:14 81:1 82:17 83:1,
18 84:8 88:11,14,16,19
91:15 103:6 104:1,19
105:3,12 106:4,14
110:3,15,18 111:2
119:1 135:23 136:4,7,9

**HCD**
18:7,20 20:20 21:4
32:10 33:1 35:21 63:15
65:8,16 66:1 67:1,9
69:12,18,20,21 71:18
72:2 77:25 79:17 80:3,
13,16 81:13,16,21
110:10 111:8,18,20
119:10

**HCDS**
62:21

**head**
51:23 60:3 61:14
123:22

**healed**
6:16

**hear**
41:5 49:10 88:14 91:6
106:2,6

**heard**
10:11 11:1,5 19:14
41:11,16 49:13

**hearing**
41:13 89:1

**held**
5:23 42:1 47:7 88:18
115:4 136:8

**helpful**
113:25

**helping**
112:21

**Henry**
53:2

**Hey**
74:14

**High**
6:5

**higher**
11:15

**highest**
6:3

**hindsight**
34:23

**history**
42:8,9 43:6 44:22 45:7

**hit**
62:21

**HOA**
61:7 93:7,9,23

**hold**
24:12 49:22 52:3 58:11
59:11 76:13 77:14
85:19 93:5 104:10
110:4 115:14,16 131:6
132:10

**holding**
15:20

**holds**
21:12

**home**
7:8 13:7,19 14:17,21
15:3 17:1,21 19:1,20,
22,23 20:5,8,15 21:7,8,
16 22:7,12 23:14,21
25:7 26:12 27:1,6 32:11
34:7 36:21 37:7 38:2,7
39:7,17 48:18 53:1,9
54:16 56:6,11,24 57:16
58:3,4 60:3,12,20 69:15
74:11 89:4 92:12 98:19
103:16,17 107:24
126:17,25 127:2,6
128:7,13 129:24 130:16
133:20

**homeowners'**
5:4

**homes**
20:7 56:8 127:5 128:4

**honest**
90:10

**honestly**
63:17

**hope**
116:2

**horrified**
114:9

**Hosso**
93:24 94:1,17 130:14

**hour**
107:5

**hours**
68:5

**house**
25:15 52:18,19 53:17,
20,21 56:16 85:14
114:20,21 115:5,11,17,
21 116:5 117:16
118:12,15 126:13
127:12,14,16,17,25
128:3 129:24

**housekeeping**
136:10

**Houser**
4:14 7:11 21:19 22:18,
24 23:4,8 55:11 57:22
59:4,22,23 60:7 84:11,
13 87:13 92:17,25
93:13,18,23,25 94:12
97:19,21,22,23 99:9,20
100:23 126:12 127:24
128:7 129:3,19

**Houser's**
22:6,16

**Housers**
91:22,24

**Housing**
18:7

**huge**
118:6

**Huntington**
5:1,3 7:1 14:18 54:21
93:17 94:8,23,24,25
95:1 126:15

---

**I**

**idea**
40:25 41:3,15 86:24
128:8 130:23

**identification**
79:13 80:24 83:17
103:5,25 104:18 105:2,
11 110:2,13,17 111:1

**ignorance**
115:8

**immediately**
127:19

**impeach**
137:4

**implement**
119:4

**implemented**
117:21 119:15

**important**
15:24 23:24 57:19 59:2

**impossible**
126:24

**in-place**
128:3

**inactive**
47:23

**inception**
28:4

**include**
102:16

**included**
8:11 80:1 81:25

**including**
31:5,13

**income**
52:13 53:20 55:6 56:18,
20 86:8 101:14,20
117:10 124:17

**incorporator**
42:15 46:12

**incorrect**
133:8,11,12

**incorrectly**
31:2

**indifferent**
47:20 58:17

**individual**
10:3 58:15 59:8,16
133:25

**individually**
14:5 18:3 19:2 55:18
57:12 89:12 134:7

**inherit**
8:17

**inheritance**
8:4,7,11,16

**initial**
11:7 51:24 52:6,7,9
58:24 120:6 130:11

**injury**
6:16 55:9 93:17

**inked**
80:3

**inquiry**
67:14

**insurance**
12:21 30:21 31:9

**intended**
98:10 107:20 121:12

**intent**
38:12 43:14,23 44:3,7
51:13 52:1,6,7,10 59:14
76:6 85:13 89:18
106:19 108:6

**intention**
129:1

**interchangeably**
20:7

**interest**
40:5 42:6 44:23 50:5,8,
12 55:5 56:17 69:15
98:18 106:16,24
107:12,16,23 108:4
109:16 112:11 113:17
114:19,21,22 115:4,5,6,
7,8,22 117:24 130:9

**interested**
98:7

**interests**
43:8 115:9 117:4

**interfering**
22:7

**internet**
10:21

**interrupt**
50:18

**interrupted**
13:12

**interruption**
5:22

**investigate**
43:12

**invoice**
100:2

**involved**
56:1 94:15 120:21
128:1

**issue**
59:17 60:7 63:9 84:14
122:25 125:12 128:17

**issued**
18:20 32:11,19 33:9,20
64:17 65:2,4 73:6 76:23
79:17 81:2 82:24 83:20
111:7

**issuing**
111:20 124:12

**items**
31:10

---

**J**

**jail**
115:25

**Jamie**
4:1 14:15 17:8 19:5
40:2 59:23,24 60:2,8
67:18 78:3,13,14 84:3
96:2 98:1 99:3,7,23
100:11 102:23 128:16
130:2 133:5,6

**Jamie's**
41:8,9

**January**
33:5,8,12,15,21,22
34:2,12,22 63:8,20
123:13 132:2,4 134:1

**Jeanine**
94:1,17 130:14

**Jeffrey**
107:3

**job**
5:10 6:9,14 49:1 86:9
97:14 114:1 117:10

**John**
123:9,11

**joint**
110:5

**JPAD**
34:22 36:9,15,17,24
37:6,15,23,25 38:4,9,
10,17 39:1,2,7,20,24
40:2,6,25 41:1,3,5,7,12,
15,16 42:4,9 43:8,21
44:11,13,23 47:12,16
48:17 57:18 62:6,15
64:4,6,18 66:12 67:19
68:14,18 69:11 76:5
81:14 83:20 84:3,4 94:2
97:23 106:16,24
107:12,16 108:3,20
112:16,18 113:3,17
114:3 115:4,6,22 117:4,
6,24 118:8,18 119:5,12,
16,21 120:15,25 121:1,
18 122:1 123:25 133:5,
6 134:2,6,16,23 137:11

**JPad's**
113:6

**Jr**
9:1

**judge**
32:2 61:4,5,6 128:19

**judgements**
60:20 61:15

**judgment**
60:24 61:1,22

**July**
29:16 53:10 66:15,18,
25 67:9 68:2 72:6 73:2,
11,22 74:21 75:16,19
76:20 99:22 105:6
111:13

**June**
99:8 100:1 104:21,23

**Justin**
108:11,12 112:24 121:3
134:19,24

---

**K**

**kids**
107:22 113:13,20

**kind**
20:6,8 35:7 57:8 77:12
83:6 121:12

**knew**
58:3 92:10

**knowledge**
8:23 23:20 29:8 42:23

---

**L**

**L-L**
28:24

**L-L-E**
28:24

**L2**
39:4 40:1 45:19

**L2s**
108:22

**Lanais**
137:18

**land**
93:20

**landlord**
54:5 56:2 57:11 61:10

**Lane**
14:17

**language**
20:17

**law**
35:8 138:2

**lawsuit**
92:4,5 94:14

**lay**
43:2 137:18

**layperson**
44:1 61:18 107:1

**LC**
40:1

**learn**
77:8

**learned**
41:20 43:3 92:12

**lease**
7:25 53:1,5,7,23 54:1,
18 56:4 60:2,6 84:14
96:24,25 124:12 128:17

**leases**
54:20,22 91:24

**leave**
55:7 57:17 84:22 90:12
113:13 121:15

**leaves**
17:1

**leery**
25:11

**left**
95:11 102:22 114:2

**legal**
20:25 21:8,10,12 31:22,
25 32:1,22 34:16 35:11,
19 37:7 48:17 55:17
56:25 57:18 58:12,16
62:1 64:16,18 69:5
83:20 84:2,3,4 85:12,18
86:4,19,22,25 87:18
96:4 107:24 110:5
111:9,16 112:8 113:9,
21 115:5,24 131:7,8

**lender**
50:4 87:9

**letter**
104:20 127:24

**letting**
129:11

**level**
6:3

**liability**
56:23 57:12,13

**lie**
114:8

**lied**
126:12

**lien**
21:12 23:10 37:15 38:9,
20 54:16 116:4 134:3
135:17

**lienholder**
20:25 33:5 37:22 60:17,
25 62:7,13,15 64:6

**lienholders**
34:8 110:20 131:18
133:4 134:6

**liens**
60:20 116:15,21,22
118:3 132:8,13,21

**life**
37:9

**limited**
68:5

**Lisa**
21:18,21 22:1,17,19,25
23:8 25:4 55:24 57:23
59:5,17 60:9 66:21

**listed**
10:3,18,19 11:12,15
19:19 34:16 35:19 36:4,
6,8 37:6 45:20 48:17,21
53:15 108:3 110:12
112:3 121:24 127:17

**listing**
10:16,20 106:24 117:3,
23 118:7

**litigation**
5:2 22:19,24 23:5,7
60:13,23 61:16 90:21
91:18 93:14 120:21

**live**
55:19 56:22 128:10

**lives**
96:18 100:3

**living**
9:23 30:5,6,25 31:4,7
37:12 57:4,6 86:8

**LLC**
17:11 27:11 36:15,17
39:25 47:16 58:19,21
59:6 66:7 102:23

**LLCS**
47:19 55:17 58:13
59:15 60:16,24

**loan**
17:4,16 25:2,18,20 30:4
52:10,16 53:5 55:4,6
111:12 123:8,24 124:4

**loaned**
17:13 25:2,13,16 30:12,
16 89:4 114:5 122:9,12
123:6,7

**local**
70:25 126:14

**located**
6:25 14:17 20:2

**long**
4:22 6:11 16:18 17:19
47:2 67:17 73:25 74:15

75:24

**longer**
100:23 120:8,18 121:3

**looked**
55:3

**lose**
49:1

**lost**
57:8 97:14 114:1

**lot**
5:10 21:4 43:3 53:12,
18,22 57:20 129:14
130:3 137:14

**Luis**
67:25

**lump**
98:3

**lumping**
92:2

**lunch**
107:5 136:1

---

**M**

**M-C-CAPITAL**
28:24

**M-C-L**
28:22

**M-C-L-E-L-L-A-N-D**
28:25

**made**
7:10,11 9:16 14:4 24:22
25:2 30:7 48:22,24 49:2
51:8,16 54:7 58:2 63:15
67:4 69:7 89:13 90:13
94:18 99:4 124:18
133:16

**mail**
63:3 75:21 77:8 80:7

**mailed**
75:10,15 79:24 81:11,
23

**maintain**
138:2

**make**
9:20 12:25 22:15,22
23:23 32:23 37:10

**Index: knowledge—make**

41:13 42:17 45:4 49:8,
13 53:19 58:7 73:18
76:7 84:24 86:20 87:9
89:24 95:2 96:16 99:12,
21 100:9 105:13 109:21
112:8 113:9 117:21
126:10 127:16 133:18
136:22,25 137:22

**makes**
5:10,11 98:10 107:15

**making**
55:4 56:14 73:3,4 96:14
99:9 100:11 105:25
106:3 130:19 137:8

**man**
55:2

**managed**
43:15 45:2 111:20

**manager**
6:10 31:11 37:10 44:25
45:20 46:14 115:7,8

**managers**
40:4 44:18 45:4,11
108:24,25

**mandatory**
84:12

**manner**
116:7

**manufactured**
19:20,23 20:4,7,13,14
21:16 25:7 27:6 32:11
34:7 36:21 37:7 38:2
39:7,17 48:18 54:16
56:6,10 60:12 69:15
129:24

**March**
6:12 9:13,18,25 61:8
101:4,6 103:7,9 118:13

**mark**
83:15 103:3 104:17

**marked**
76:9 79:10,13 80:15,24
82:4,7 83:17 103:5,25
104:18 105:2,11 110:2,
13,17 111:1

**market**
56:16

**marriage**

**55:1,10**

**matter**
4:25

**Mclelland**
28:16,19,21 29:2

**meaning**
95:19 98:4

**means**
17:25 20:8 77:13

**meant**
53:8

**mediation**
84:11,18,25 128:6

**mediations**
85:3

**mediator**
84:15 128:8

**medical**
55:7

**meeting**
109:4,14

**member**
28:1 39:2,5,7,14,20
42:3 44:11 46:15,19
59:24 66:12 95:22
101:5 104:15 105:7

**members**
39:1 40:4,10 43:15

**membership**
40:5 42:6 43:7 44:23
115:6,9

**memo**
78:8

**mention**
57:19

**mentioned**
62:2 93:6 94:2 137:11

**mess**
94:17 136:19

**messy**
128:2

**met**
4:11 11:1 25:3

**mind**
41:8 61:4 92:10 95:22

**minds**
109:16,21

**mine**
43:23

**minute**
22:23 51:7 99:5 124:22

**minutes**
47:2,4 88:13,15,16
119:17 120:5,6,8,13
121:1 134:16,21,23
135:25 136:5 137:11,
15,19

**missing**
45:1 50:18

**misspoke**
115:9

**mistake**
99:8

**mistaken**
104:9 134:11

**MLS**
10:18

**mobile**
13:7,19 14:17,21 15:3
17:1,21 19:1,22 20:5,8
74:11 103:16,17

**modified**
65:17

**modify**
65:17

**moms**
113:12

**money**
12:12,18 13:4 15:16,25
17:3,18 23:14 25:13,16,
21 26:6,14 29:9,12,15
30:9,23 31:12,14,15,16,
19 32:5,8 38:17 42:4
49:23 50:2 53:16,19
54:17,24 56:13 72:4,10
73:7,10,21 74:3,23
95:8,13,18 97:16,25
98:8,12 101:13,21,25
103:1 105:22 106:11,12
107:25 112:10 113:2
114:4 117:14 122:10,12
123:6,19,22,24 128:12,
13

**monies**
123:7

**Monterey**
14:17

**month**
47:25 53:3 97:8 98:11
99:20

**monthly**
51:4 96:14,21 97:25

**months**
12:4 53:11 54:8 61:17,
22 62:25 66:23 97:6,13
129:7

**morning**
4:4,11 5:21 74:25

**motion**
82:11

**motivation**
117:20,22 118:20

**move**
20:11 87:13 126:13,18
127:5,6,13

**moved**
57:16 58:4 118:10
125:24 127:12

**moving**
53:13 60:6 126:3

**multiple**
10:16,20 13:10 24:11
82:14 118:23

**myriad**
30:21

---

**N**

**named**
93:10 95:6

**names**
78:4,10 111:19

**needed**
26:6 30:22,24 37:9
38:13 45:3 47:21 49:10
99:21,24 117:12,13

**negotiation**
54:11

**neighbor**
100:2

**Newport**
123:10

**Newton**
53:2

**Nickel**
10:13,22 11:1 12:6,10,
17 13:3,4 14:1 94:5,7,
12,14,22,23

**Nicole**
4:4 88:14 136:4 138:4

**nightmare**
71:20 72:1

**nodding**
138:5

**nonsense**
55:11 91:2 113:21
128:17

**normal**
6:18

**notarization**
19:11 63:22

**notarized**
70:2,7 71:9,17

**notarizing**
71:11,14

**notary**
70:8,23 71:5

**notations**
119:20 121:1,21

**note**
25:14 26:3,4,15,17,19,
20 37:20,21 38:2,6,7,9,
18 48:20,22 49:2,6,16
50:5,10,21,23 51:1
53:11 54:25 56:14,17
85:9 86:3,12,16,23 87:4
88:5,23 89:13 90:9,14,
16 104:3,11 105:5

**note's**
48:23

**notebooks**
12:22

**notice**
18:5,6,8,9 19:4,6,7,9
21:19,20 22:1,5 23:15,
16 58:1 63:6,12,20
78:15 125:17

**noticed**
76:4

**notified**
72:23

**November**
7:9,16 9:23 14:25 17:16
19:8,11,18,21 21:18
22:2,5,8 23:5,16,17,18
24:3,6 25:3 27:24 39:18
48:15 54:7 56:7,9 57:5
61:13 66:22 96:13 97:2
124:19 125:19 129:25
130:6

**nowadays**
129:8

**number**
15:9,10 34:9 61:23
89:25 93:6 94:18 99:6
102:18,20 126:21 129:6
130:23 131:1 132:17

**numbers**
70:17,18 76:11 77:4

**numerous**
107:22

**nuts**
126:16

---

**O**

**O'LAUGHLIN**
78:7

**Obisbo**
67:25

**obligation**
54:14 85:10,15,23 87:3

**obligor**
49:23

**obtained**
100:2

**occupying**
7:13 34:7

**occurred**
17:15 84:18

**October**
6:19,24 10:10 27:4
39:5,14,17,25 40:6
42:4,11,25 43:7,15
44:11 45:15,19 46:6,15,

22 47:12 101:24 113:16

**off-the-record**
42:1

**offered**
12:21

**offers**
53:14

**offhand**
109:9

**office**
7:6 8:19 67:25 68:1,21
74:17,18,22 78:9 127:8

**official**
105:24 136:11,13

**officially**
73:4

**older**
108:12

**one-hour**
136:1

**one-page**
77:20

**ongoing**
99:1

**online**
73:19,22 74:7 78:11

**open**
67:25 68:1,3,5

**opened**
11:18 53:10 66:20 80:7

**opening**
43:10

**operating**
113:6 119:13,17

**opportunity**
136:25

**opposed**
7:18 13:6 20:25 55:18
126:3 136:1

**Orange**
74:10

**order**
47:20 56:14 68:13
73:19,23,24 74:8,10,12
76:10 78:12 94:20

103:10

**ordered**
73:24

**ordinance**
54:21

**organization**
39:4 40:2

**organized**
39:23

**organizer**
40:18 42:14,22 46:12

**original**
18:13 19:19 45:6 62:12
63:3 68:6,8,9 75:5,13,
14,15,20,25 76:24
79:20 80:2 81:3 83:12
87:23 88:4 108:2 138:3,
7

**originally**
10:18 11:3 15:6 41:11
50:1 118:10 124:11

**outstanding**
132:25

**owed**
135:13

**owes**
49:23

**owned**
12:19 108:4

**owner**
6:25 7:22 9:24 10:20,24
18:25 19:1 20:20,23,24,
25 21:9,10,12,16 24:24
27:22 28:1,6 32:13,22
33:4 34:5,14,16 35:11,
19 37:7 42:19,22 44:25
45:18,22 46:4,7,10,13,
17 47:14 48:17 55:17
56:20 57:17,18 58:1,2,
12,13 59:20 60:1 62:1
64:16,18 69:5,15 83:21
84:2,3,4,10 93:19 96:4
98:22 100:24 106:17
108:3 111:9,15,16
112:16,18 113:3 117:6
118:1,8,18 119:5,21
120:16,18,24 123:25

**owner's**
58:6

**owners**
39:1 43:2 45:13,14
108:15,19,25 110:5
112:19 113:18 120:7,9
121:3,19 122:2

**ownership**
28:3 42:8,25 44:13,23
45:7,9,22 47:12 106:24
107:12,16 113:8 115:4,
21 117:4,24

**owning**
7:18

---

**P**

**P-I-E-R-P-E-O-N**
40:20

**P-I-E-R-P-O-N-T**
40:22

**p.m.**
136:8 138:19

**pad**
41:9

**pages**
78:18 79:3,10 80:8
103:18

**paid**
15:13 16:9,13 17:5
31:8,9 52:12 53:19
54:4,12 58:4 68:21
73:10 74:3,6,7,18 89:21
90:8 95:23 96:3,18
97:21 98:8,12,19 99:10,
20 114:6,10 117:16
123:8,11,14

**panicking**
130:10

**paper**
65:9 69:3 75:3,5 76:19
79:25 80:10 93:1

**papers**
90:6 94:16

**paperwork**
42:15 73:17

**parcel**
93:20

**parents**
113:12

**park**
20:9 124:10,12 127:11,
20,24 128:7 129:9

**part**
8:3,7,16 49:20 58:15
59:11 79:3 113:22

**partial**
113:3 114:22 115:4
118:18 119:5,21 120:7,
8,15,18

**participate**
129:19

**participated**
84:11

**participating**
128:6

**parties**
57:5 112:4

**party**
20:22 21:12 23:6 36:4,
5,15,20 37:6 60:13,23
92:23,24,25 93:10 95:6
134:2

**passed**
8:8

**passthrough**
29:24

**patient**
96:7

**pause**
50:19

**pay**
8:1,3 14:1 15:16 26:17
29:9 31:11 42:4 47:25
54:5,8 68:18 72:10
73:8,15 83:12 96:4,21
97:14,20 103:10 113:2
114:17,20 115:3 117:17
123:24 124:3

**payable**
14:4

**payee**
103:21

**paying**
15:6 47:21 54:25 72:3
74:22 90:22 91:19
95:21 96:10 97:22,23

112:10

**payment**
31:9 51:4 52:9 54:3,6
73:18 83:13 90:17
96:25 104:5

**payments**
31:6 48:22,24 50:11
51:8,15 56:14 89:13
90:13 96:14 98:6 99:9,
16 100:11,23 101:22
105:14 106:5

**PDF**
70:22 77:15 78:18

**pending**
93:14 94:3

**people**
43:2 94:19 121:20
127:18 129:8,14 130:3
135:23 136:2

**percent**
28:6,15,18 40:5,9
42:10,11,24 45:22,25
46:3,17 47:14 50:7
106:17 107:16 113:16,
18 114:13,15 117:5
118:1 120:24 122:11,
15,20 123:2,3

**percentage**
43:24 44:8 107:19
114:3 117:4,24 127:4

**percentages**
106:25 134:14

**perfected**
34:21,22 35:13

**period**
47:14 57:21 58:25
98:13 100:16 124:19

**periodically**
98:12 100:14

**perks**
31:14

**permission**
125:16

**person**
5:16 12:1 21:8 37:11
41:18,19 96:18 118:4
126:21

**personal**
25:6 30:1 31:23 32:3
38:12 83:6 93:17 94:12
101:18,19

**personally**
50:3 56:23 58:20
133:19

**petition**
29:16 134:5

**pharmacy**
6:10

**phone**
31:10 126:21 129:5

**phonetic**
91:1,2 92:11 93:24
126:22

**physically**
79:16 118:11

**pick**
73:19 88:12

**picked**
74:1 78:16

**piece**
65:9 69:2 75:3,5 76:19
79:25 80:10

**Pierpont**
40:20 41:17 42:20 64:4,
6 66:6,12 67:20,22 76:6

**pink**
18:18 21:5,6 32:18 76:1

**Pinon**
53:2 125:21

**pissed**
109:17

**place**
95:25 102:7 127:25
129:12

**plaintiff**
4:13 93:11

**pledging**
26:16 27:1

**plural**
85:3

**point**
7:20 10:6 23:4 32:14,21
42:17 43:21 44:14

**THE SULLIVAN GROUP OF COURT REPORTERS**
JASSO DECL. PAGES - 1473

001441

56:18 98:21 107:10,17
109:11 120:23

**policies**
21:4

**policy**
72:14,15

**poor**
94:19

**pops**
24:6

**portal**
78:12

**position**
85:22

**possibly**
60:3 74:16

**potential**
12:7 57:13 128:23
129:8,20

**potentially**
7:2,4

**precise**
44:22

**preference**
138:4

**preliminary**
12:20

**premium**
122:22

**present**
28:4 45:15 46:22 47:13
56:10 57:16 128:25

**Pretty**
98:3

**previous**
12:7 107:8

**previously**
30:25 39:16

**price**
11:9,11 15:5

**prices**
128:3

**principle**
48:21,24 50:12,13 51:8

**print**
65:11 77:2

**printed**
99:3,4

**printing**
71:2

**prior**
6:13,18 11:7

**private**
26:1

**privy**
127:10

**pro**
107:15

**problem**
57:3 85:6 95:15 128:24
130:2

**problems**
93:4 124:15

**procedurally**
18:15

**proceed**
4:8 5:21

**proceeding**
4:14

**proceedings**
138:19

**proceeds**
15:20 16:1,12 17:2

**process**
10:16

**processed**
62:25 76:5 81:18
105:17,23 106:8

**processes**
75:25

**processing**
75:17

**promise**
123:18

**promissory**
25:14 26:3,4,15,17,19,
20 38:7 48:20 85:9
86:23 88:5

**prompted**
84:9

**proper**
125:13

**property**
6:25 7:14,20,22 8:19
9:2 10:7,14 11:11,13,
14,19,21 13:25 16:24,
25 20:2 23:22 24:2 25:6
26:16 37:15 53:2 54:9,
17 57:10 58:19 60:18
61:9 89:9,12 93:19
125:24 126:3,6 129:2

**protect**
53:18 54:17 55:21
118:11

**protected**
54:23

**protecting**
60:17

**protection**
58:14 59:16 60:25

**protects**
58:20

**provide**
50:10 59:15 69:24
83:11 136:14

**provided**
12:20 66:1 69:17 70:8

**providing**
58:13 60:25

**public**
53:15 63:6,12,20

**pull**
20:10 44:24

**pulled**
102:4,5

**purchase**
7:20 14:16,20 15:5
16:25 24:19 27:5 32:19
33:8 38:17 39:19 53:9
128:7 129:3,12 138:8

**purchased**
7:9 23:13 25:10 39:16
89:4

**purchaser**
18:10 22:6 126:4,5

**purchasing**
39:6 60:11

**purpose**
27:23 38:16 51:24 52:1,
6,7,14,19 55:3,8,22
56:15 58:22,24 78:5
83:19 86:5 98:9 117:19

**purposes**
31:13 53:4 54:15 79:11

**pursuant**
4:7 90:14

**pursuing**
59:5

**put**
7:8 10:15 21:15 24:23
58:19 63:23 66:25 67:5
68:14 70:17 75:16 78:4,
10 84:16 85:22 98:4
107:20 109:16 110:4
111:11,24 113:9 119:9
128:15 130:4

**puts**
69:12 127:3

**putting**
54:15,16 55:1 58:12,14
59:8 60:16 101:13
123:25

**Q**

**qualification**
124:17

**qualify**
129:9,16

**quarter**
106:12

**question**
5:9,11,13,14,18 6:2
8:14,15 12:15 19:14
21:1 31:25 32:2,7 44:7
45:6 50:17 57:15,20,24
66:24 69:17 70:3 76:15
91:13,18 100:19 106:3
116:3 129:18 131:16
137:3

**questions**
5:16,17 102:6 107:6
136:9 138:15

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1474

001442

**quick**
50:16 69:6,7

**quickly**
52:25

**R**

**R-D-R-M-H-E**
103:13

**ramifications**
31:22 58:16 86:19,22
87:1,18 92:15

**ran**
27:16 125:16

**Rancho**
103:15 105:14

**Randall**
10:13

**Randy**
94:5,7

**rate**
50:5,9

**re-issuance**
32:12

**re-read**
49:2,6

**re-reading**
21:2

**re-sign**
22:1

**re-signed**
19:9

**read**
49:11 71:2 84:23
136:21

**readily**
10:5

**reading**
59:24 103:11

**reads**
104:15

**ready**
74:13

**real**
13:25 23:22 25:6 50:16
93:4

**realistically**
89:24

**realize**
55:9 72:10 75:24

**realized**
36:6

**realtime**
49:6 99:13 136:12

**reason**
5:20 21:25 27:12 37:2
48:8 59:5 61:14 86:7
99:25 105:18 117:5
118:1

**reasons**
24:25 29:7 36:25 49:2
53:18,22 128:5

**Rebecca**
78:6

**recall**
16:20 17:19 39:9,11,12
40:8 48:15 50:14,15,20,
24 51:11,12 62:22,25
63:3,5 64:12 84:18
89:14 115:23

**receipt**
9:25 12:11,23 26:14,15
101:8

**receive**
9:3

**received**
8:9 14:22,23,24 28:9
56:20 67:8,12 83:7
84:13

**receiving**
8:1,12

**recess**
5:23 47:7 88:18 136:8

**recipient**
38:1

**recognize**
60:8

**recollection**
51:3 64:15

**recommended**
107:3

**reconsider**

128:17

**reconvene**
47:3

**record**
4:12 5:11 22:15 47:8
78:20 84:7 95:2 131:19
132:13 133:17 137:16
138:12,18

**recorded**
9:9,12 10:2 62:20 63:19
129:23

**recorder**
9:10

**recorder's**
7:6

**recording**
63:11

**recordings**
12:12 63:10

**records**
119:18 121:2,18 122:1

**redone**
52:4

**reducing**
113:7

**refer**
34:19 93:5 109:25
127:19

**reference**
58:25 79:11

**referenced**
25:17 43:19 116:22

**referencing**
86:15

**referral**
11:24

**referred**
52:21 79:23

**referring**
13:18,21 19:25 22:24
23:2 48:14 76:8 85:5
88:5 104:5 109:22
115:18,21,22 116:15,22
132:18

**reflect**
43:10 44:13 62:13,15

64:17 108:25 121:19
122:1

**reflected**
29:25 34:13,23 35:11,
24 40:3 64:15 67:18
83:20,24 111:15 133:7,
9,23 134:15

**reflecting**
33:21 40:10 44:9,18
45:9,10 108:19 111:8
119:20 120:15 121:2

**reflects**
64:3,6 69:5

**refrain**
5:17

**refused**
100:4

**regard**
138:15

**register**
21:7

**registered**
18:25 19:1,20 20:22,23
21:16 22:12 24:23
25:12 27:22 32:13 33:4
34:5,14 55:17 57:17
58:12 59:19 60:1 62:1
64:16,18 69:15 84:3,10
100:24 111:8,15

**registration**
69:1,2,3 106:7 128:16

**regular**
48:24

**reissue**
63:15 72:24

**reissued**
18:25 20:19,20 72:18

**related**
8:5 90:24 91:20,23 92:2

**relation**
40:13

**relationship**
107:21

**relationships**
43:16 113:20

**release**

72:20 87:3 101:5

**released**
69:13,14 71:15 87:6
98:18

**releasing**
87:18

**relevant**
34:19

**relief**
97:16 106:12

**relieved**
54:13

**remain**
48:9 126:3

**remained**
33:4

**remains**
83:23

**remember**
12:1,2 16:18,21,23
20:14 23:18,20 24:13
28:10 36:18 43:1 47:23
48:4,7,8 50:17 51:22
64:23 75:12 76:3 84:19
121:24 128:21 134:12

**reminders**
5:6,7

**remove**
46:7

**removed**
34:8 36:8,11 86:1

**removing**
45:17

**rent**
52:18,19 53:20 54:4
57:10 85:14 95:21,23,
25 96:3,10,15,18,20,21,
23 97:20 98:12,16,25
99:9,16 100:14 101:7
106:11

**rental**
52:17,21 55:20 56:15
58:19 60:4 87:14

**rented**
53:1 56:20 60:3

**renter**

98:23

**renters**
55:21 56:24 57:12,13

**renting**
7:18 56:15 57:5

**rents**
128:4

**repay**
85:11,23 86:12 87:4
89:14 114:2,4 116:4,16
123:18

**repayment**
27:1

**repeat**
57:7 62:10

**repeating**
135:11

**rephrase**
11:23

**replacement**
132:16

**replenishing**
85:13

**report**
12:20

**reported**
4:6 33:1

**reporter**
4:4,5 5:7 13:11 17:6
24:12 28:23 40:21
41:24 46:24 47:2 50:16
71:21 76:18 82:15 88:9,
13,15 91:5 100:19
106:2,6 118:24 135:21
136:5,11,23 138:1,15

**represent**
127:23

**represented**
11:12

**reprint**
88:25

**Republic**
11:24 12:21

**request**
63:14 72:17

**requested**
22:1

**required**
74:23

**residency**
59:21

**resident**
59:20

**residing**
56:5

**respect**
86:16 123:23

**responded**
10:23,25

**response**
11:2 81:2 125:6

**responsibility**
98:25

**result**
37:25

**resulted**
33:7 60:23 68:15 73:5

**resume**
88:12,17

**retain**
10:15 138:7

**retired**
128:24

**retirement**
52:11

**return**
44:10 113:10 137:1

**returns**
29:20 30:1 43:10,19,21
107:20

**rewrite**
86:3

**Rey**
103:15 105:14

**Richard**
126:22

**ridiculous**
127:14

**rights**

37:22

**Riverside**
68:1

**Ron**
40:16 41:6,19 55:1 64:4
67:19,21 68:18 76:5
109:17 111:5,11
112:22,23 113:25 114:5
116:16 118:5 119:24,25
121:2,25 122:9 123:6,7,
18 124:14,15 130:5
134:10

**Ron's**
40:19 41:4,8

**room**
84:15

**rough**
113:11

**roughly**
97:8 114:11

**running**
99:24 100:4 132:23

**runs**
107:25

**Ryan**
15:3 16:13 17:20 19:9
20:20 21:18,21 22:1,17,
19,25 23:8 25:4 32:13,
25 33:21 55:24 59:5,17
60:9 66:21 126:25

**Ryan's**
57:23

**S**

**Sacramento**
68:7,25 75:9,10,24
81:18 106:8

**sale**
10:19,23 11:9,19,21
12:5,10,17 13:16 22:7
23:14 24:18 32:25
33:21 61:13 129:19

**sales**
15:20 16:1 17:2

**San**
67:25

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1476

001444

**sandcastle**
17:4,9,13,18 19:3,5,21
20:21 21:15 22:13
24:24 25:12,13,20,23
26:2,8,13,19,25 27:3,
22,25 28:8,13,17 29:6,
10,13,15,20 30:17 31:8,
19 32:13,25 33:3,22
34:13,21 36:25 37:14
41:7,9 49:23 51:16
54:16 56:13 57:17
59:19,25 60:1,8 61:25
64:15,17 69:11,14,18
78:3,14 84:2,9 85:10,
22,24 86:1,11 87:3
88:21,22 89:5,8,11,21
90:8,21 91:19 92:23
93:10 94:2 95:5,21
96:3,10,14 97:21 98:2,
6,17,20 100:12,22
102:10,22 103:1
104:21,23 105:7,13,19,
24 106:3,10 110:7
124:9,11,25 125:4,11

**Sandcastle's**
31:15,16 32:8,9 95:20
98:13 99:2,6,19

**Sandra**
7:5 92:13,14

**Sandy**
113:21

**Santa**
14:8,13 15:18,22 17:17
22:8

**satisfied**
85:15

**savings**
52:10

**scanned**
75:11

**scared**
118:12

**schedule**
112:17 113:15 120:24
121:4,5,7

**schedules**
106:21,23 107:11 108:2
112:16 117:3,23

**school**
6:5

**screen**
62:8 70:13,14 76:20
77:23 136:20

**scroll**
109:10

**scrolled**
83:9

**scrolling**
71:9

**search**
27:14,16 67:17 68:23
76:5 105:19 106:9
131:17 132:23

**searches**
67:16

**secret**
61:8

**Secretary**
44:12 47:17,18,22
108:19

**section**
71:14,15 110:20

**secure**
27:1

**secured**
21:12 25:14 27:13 36:4,
5,15,20,25 37:6 38:2,7
62:7 112:3 133:4,7,20,
23 134:1 135:3

**secures**
135:18

**security**
25:14 26:8,10,15,25
37:22 38:6 86:23 88:5

**seek**
86:15

**sell**
10:6 58:2,3 61:9 126:6,
10 127:16 128:2

**seller**
15:3 18:18

**selling**
10:14 11:16

**send**
21:22 75:9 100:4
137:24,25

**sender**
104:22

**sense**
58:7 67:4 85:10 86:20
87:10 89:24 98:10 99:4

**sentence**
19:16 135:2

**separate**
16:3 66:11,12 94:3
95:23 98:25 132:24

**separately**
85:4

**September**
112:17 124:23 130:6,7

**series**
16:16

**service**
10:16 56:14,17

**set**
50:1 51:24 57:9 89:19
97:19,20 121:18

**sets**
106:21 107:11 117:2

**setting**
52:10 53:4

**settlement**
84:12

**seventh**
122:4

**share**
70:15

**shared**
25:4

**shocked**
61:20,21

**shoes**
38:14

**short-term**
54:20,22 60:4

**Shorthand**
4:5

**show**
71:11 104:22 106:10
117:13 133:3

**showed**
121:4

**showing**
18:25

**shown**
64:24 132:21

**shows**
76:19 105:19 110:19
121:5

**sign**
8:19 53:23 78:3 137:1

**signatory**
28:16

**signature**
19:11 28:13,20 29:5
70:7 71:12 105:5,8

**signed**
13:2 17:16 22:5 26:7,
19,20 28:16,19 29:8
37:17 53:1,5,11 59:24
71:6 101:5 104:11,14
118:3

**signer**
37:16,17

**signing**
105:6

**signs**
18:18

**similar**
13:7,15 18:17 20:24
21:10

**simple**
96:7,8 116:3 129:21

**simultaneously**
13:10 24:11 82:14
118:23

**single**
78:18 80:14 99:20

**sites**
10:20

**situation**
68:6

**situations**
38:12 60:5

**skip**
104:20 105:4

Index: sandcastle–skip

**sleep**
  118:13

**slip**
  18:18 21:5,6 32:18

**slips**
  76:1

**slow**
  57:7

**smart**
  70:14

**soft**
  69:2

**SOI**
  44:15 45:4

**sold**
  16:10,24 53:18 58:4
  60:20 117:16 127:25
  129:2

**sole**
  39:14

**Solely**
  125:1

**solution**
  128:11,15

**solutions**
  128:6

**solve**
  57:3

**somebody's**
  116:1

**son**
  120:19

**sons**
  108:9 112:5,6

**sorts**
  91:24

**sound**
  69:7 102:9 103:14

**sounds**
  51:6

**space**
  14:17 20:2 23:21 96:5
  103:17

**speak**
  20:17 31:21 39:24

  59:22 75:25 86:18 87:5
  98:24 129:17

**speakers**
  13:10 24:11 82:14
  118:23

**Speaking**
  6:24

**specific**
  32:16 50:21 51:17

**specifically**
  45:13 97:19

**spell**
  28:21

**spelled**
  41:24 71:2

**spellings**
  138:16

**spend**
  95:18

**spent**
  30:5

**spoke**
  78:8 127:9

**spreadsheets**
  90:7

**squandered**
  52:12

**stamp**
  66:13,21,25 73:3 75:6,
  17 76:20 81:16

**stamped**
  66:22

**standing**
  47:16,18 48:9 74:21

**stands**
  34:25 43:14 90:9

**stapled**
  79:16

**Star**
  126:22,23

**staring**
  82:20

**start**
  5:8,13 7:13 56:5 106:12
  120:12

**started**
  9:23 34:7 55:11 65:25
  66:2 73:3,4 93:7 99:25
  101:25 130:5,7

**starting**
  104:6 116:18

**starts**
  120:24

**state**
  23:1 34:20 44:13 47:17,
  19,22 48:1 63:12 94:3
  108:19 130:25

**stated**
  50:22

**statement**
  30:8 83:11 88:24 89:16
  91:22 102:12 110:8
  114:25 116:11,13
  123:21 134:12

**statements**
  102:5 116:22 117:7
  118:3

**states**
  49:3

**stating**
  84:13

**status**
  84:10

**stay**
  53:21 82:17

**stemmed**
  91:4

**stems**
  90:25

**stenographically**
  4:6

**step**
  38:14

**Steven**
  104:22 108:7,8,14,19
  110:5 111:8,15 112:3,
  10,24 120:7 121:2
  130:13 133:5,6 134:7,
  15,22 135:7

**Steven's**
  111:19

**sticking**
  45:13

**stop**
  71:8,13 74:5 78:17 81:5
  91:5 92:1

**stopped**
  98:16 99:9

**store**
  70:25 71:4

**straight**
  100:9

**stranger**
  95:24

**street**
  91:8 95:24 123:10

**stuff**
  91:12,25 130:8 137:14,
  23

**sublessor**
  61:10

**submission**
  80:16

**submit**
  69:12 73:17

**submits**
  18:19

**submitted**
  56:2 65:16 71:18 72:17
  73:6 77:25 80:21
  110:10 111:18,21
  124:24

**submitter**
  125:11

**subsequent**
  39:3 120:8

**subsequently**
  19:5 80:20 107:2
  124:13

**subtenants**
  54:24

**successfully**
  111:19,20

**sued**
  92:4 94:19

**suggest**

47:2

**sum**
98:3

**summarize**
12:25

**summer**
53:13

**Sunday**
123:13

**support**
55:2

**supportive**
61:5,11

**supposed**
41:8 44:17 67:20,21
89:19

**surrender**
18:4 24:2

**surrendered**
14:24 17:22,23,24,25
18:2,14 22:4 86:2 87:9

**survivorship**
110:6

**sworn**
4:2

**Sylvia**
82:18

---

**T**

**takes**
62:25 69:21

**taking**
67:16 75:23 136:1

**talk**
43:2 52:5 91:16 114:25
116:18 129:10 132:10

**talked**
52:8 109:4 112:22

**talking**
5:8,9 41:11 44:1 61:23
62:3 90:23 91:17 117:8
119:2 122:9 135:1,3

**tax**
29:20 30:1 43:10,19,21
44:9 48:1 71:19,22

72:21,24 73:5 74:10,12,
17,22 76:23 78:2,9,12
80:19,20 107:20 113:9

**taxes**
72:4

**technical**
5:22

**technician**
68:22

**telling**
17:14 48:3

**ten**
47:2 88:13,15,16
106:21 136:5

**ten-minute**
135:24

**tenancy**
7:15,17 127:7 129:4,9

**tenant**
9:24 95:20 96:17 98:9,
23 100:17 125:25 126:7

**tenants**
54:23 56:21 110:6
124:10 125:7 128:23
129:16

**tender**
105:13

**tendered**
104:23

**tendering**
100:22

**term**
51:3 53:3 55:6

**terminated**
132:14

**terms**
49:16 50:21 51:25
131:18

**testified**
4:3 25:19 45:2 106:15
107:21 109:3 112:23

**testifying**
47:12

**testimony**
122:19 135:12 136:23

**thankful**
115:25 116:1

**thing**
18:1 19:25 34:21 35:8
38:22 52:4 58:6 82:25
87:12 93:8 94:16 97:22
100:21 108:13 114:2,15
120:11 126:9 130:11

**things**
20:8 30:21 37:13 43:3,
17 53:14 55:11 57:21
58:24 59:6,18 83:7 86:9
89:8 90:16 91:10 93:13
94:20 100:6 113:13
118:2 121:16 123:24
124:8 132:24 138:5

**thinking**
57:10 61:19 88:12
102:5 108:15 117:5,25
118:8,9

**thought**
35:7 41:7 45:8 59:15
60:21 65:13 74:6 75:23
94:21 104:8 112:1
113:8 126:16 128:8
133:12,16,19

**thoughts**
61:14

**three-year**
52:16,21 53:1,3,5,23
54:14,18 55:25 56:4
60:2

**time**
5:10,24 6:24 9:16 10:12
13:3 14:16 17:19 21:3,4
22:20,22 24:6,13,23
27:11,25 28:23 32:21,
25 34:17,18 35:19
36:14 37:8 38:13 39:2,
6,19 40:4 43:12,21
44:14,18 45:10,11,19
46:25 59:21 60:11
62:23 63:17 68:24 70:4
72:9 73:25 74:2,15,16
79:19 80:6 82:16 88:12
98:14 107:17 112:20
113:11,19 114:1 115:23
120:23 124:19 127:19
132:25 133:13 136:21

**timeframe**
133:21

**times**
4:12,17 45:14 47:13
51:11 106:16 124:14
126:11

**timing**
65:21

**tiny**
65:11 77:2

**title**
9:7,8 12:19,20,21 13:2
14:25 17:20,24 18:2,5
21:13 22:4 23:10 24:23
32:10,14,18,24 33:9
34:6,13,19,24 35:4,8,
12,20,25 48:18 54:15
55:17 57:11 60:16,25
61:24 62:12,14,22,24
63:15,21 64:1,5,9 65:2,
17,18 66:14 67:16,17
68:16,23 69:4,22 71:6
72:3,17,24 75:20 76:4,
22,25 77:17 78:23 81:3
83:20,23,25 86:2 87:6,
18 88:20 89:8,11 92:17
98:17 101:6 105:15,17,
19,23 106:9 109:14
111:7,14 132:20

**today**
5:16 74:16 102:5 137:3,
10

**told**
8:4,15 41:6,19 42:10
43:25 47:19 48:11 68:5
84:15 107:2 112:13
126:13,19,20,23 127:8
128:19,20

**tons**
66:1

**top**
78:23 102:22 115:1
116:19 119:2 130:3,4
132:10

**Torrance**
69:5

**total**
99:24

**totalling**
16:16

**touched**
59:19

**traditional**
11:18 12:13

**traditionally**
31:6 138:1

**transaction**
37:25 66:2 89:3

**transactions**
89:3,7

**transcribed**
136:23

**transcript**
49:6 84:22,24 90:12
128:22 136:12,13,22
138:3

**transfer**
13:2 18:9 19:4,9 21:19
23:16 29:9 65:15,16,19
84:10 98:1 105:15,23

**transferred**
17:20,25 30:3 88:20,21
89:11 92:13 98:17

**transferring**
98:12

**transparent**
61:4

**treat**
96:20 98:10

**triggered**
8:11,16

**true**
60:12 61:15 106:23
113:10 126:1

**Trulia**
10:21

**trust**
7:10,11 8:19 37:13
92:13,15

**trustee**
119:14 137:13,14

**turn**
87:13

**turned**
66:21

**type**
74:11 136:11

**typed**
105:5

**types**
10:21 43:3

**typo**
63:22

---

**U**

**UC-5**
133:16

**UCC**
34:22 36:5 62:2,13
63:6,11 109:18 111:17
130:25 131:17 132:23
134:11,20 135:15,17

**UCC1**
35:23 36:2 115:21
116:9 135:4

**UCC1S**
129:23 133:3

**UCC5S**
130:16

**UCCS**
63:19 111:11 112:2
130:11,14 134:15

**UD**
97:1

**uh-huh**
41:14 69:10 72:19 75:4
77:16 78:24 79:12
80:17 89:10 90:24
102:15 103:20 106:22
137:12

**ultimately**
24:19 53:25 71:18

**unavailable**
112:6

**unclear**
130:10

**underneath**
77:3,5 102:23

**understand**
13:1 20:12 21:1 23:24
32:19,23 58:23 65:20,
21 76:7 81:25 83:2
99:12 101:1 112:12,15
117:20,21 118:20

**understanding**
119:3,16 122:17

**understanding**
9:20 31:23 40:24 46:9

**Understood**
11:17

**unencumbered**
12:20 60:21

**Uniform**
35:13

**uninhabitable**
127:6

**union**
21:11

**unit**
7:1,24 96:19

**United**
98:5 101:24 128:4

**unknown**
42:11,24 45:23

**unpack**
22:14 43:18

**updated**
44:16 45:5

**UPS**
70:25 71:4

**upside**
55:5

**utilities**
31:5 54:8

**utility**
54:13

---

**V**

**variety**
49:1

**varying**
107:11 117:3,24

**vehicle**
20:24 21:11

**vehicle's**
18:18

**versus**
94:7,23

**view**
60:24

**vis-a-vis**
59:17

**VISA**
73:16 74:18

---

**W**

**wait**
50:17 68:8 76:3 99:5
102:4 124:22 135:6

**waiting**
74:15

**Walgreens**
6:10,11,14

**wanted**
44:22 49:13 52:25
54:22,24 56:4 76:11
109:15,17 113:14,22
116:3 118:19 119:3
120:21 127:12 128:12

**waste**
127:19

**week**
69:8

**weeks**
66:3 69:8

**wet**
79:22 80:3

**whatever's**
107:4

**wheels**
20:11

**white**
69:2 109:7,20 111:23

**whited**
19:8 111:24

**wife**
8:6,22 10:25 11:3,5

**withdraw**
29:9

**WJC**
33:17

**woman**
114:8

**THE SULLIVAN GROUP OF COURT REPORTERS**
JASSO DECL. PAGES - 1480

001448

**word**
7:3 17:9 18:1 49:14
63:2 77:3,5 131:9

**words**
17:9 127:7 128:21

**work**
77:9 82:20 83:5 89:20
127:10 136:4

**workday**
68:10,11

**worked**
6:11,15,20 101:24

**working**
11:24 12:1,3 121:16

**works**
18:21 87:13 136:1

**worms**
43:11

**worry**
107:7

**writ**
21:20,24 22:2,16 23:2,
3,13,15,17,19,20 24:5

**write**
103:3

**writing**
28:13 48:21 103:11
119:9 130:2

**written**
123:17

**wrong**
36:23 128:9

**wrongfully**
128:23

**wrote**
127:24

---

Y

**year**
9:14 44:2,4,9 48:1
63:24 72:4 73:8 100:16
112:13 131:11 135:12

**years**
5:5 11:13 28:11 30:20
43:3 49:12 51:1,12,14
52:1,8 72:13 74:1 96:8

97:3,5 121:22 134:17
135:12

**yes/no**
137:2

**yesterday**
70:17

**you-know-what**
58:7

---

Z

**Zillow**
10:20,21 11:4

**Zoom**
84:15

THE SULLIVAN GROUP OF COURT REPORTERS
JASSO DECL. PAGES - 1481

001449

1                    UNITED STATES BANKRUPTCY COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3                              --oOo--

4   In Re:                       ) Case No. 8:21-bk-11710-ES
                                  )
5   JAMIE LYNN GALLIAN,          ) Chapter 7
                                  )
6          Debtor.               ) Santa Ana, California
    _____ ) Thursday, July 21, 2022
7                                     10:30 a.m.

8                                 CONT'D HEARING RE: CREDITOR
                                  HOUSER BROS. CO. DBA RANCHO
9                                 DEL REY MOBILE HOME ESTATES
                                  MOTION OBJECTING TO DEBTOR'S
10                                CLAIMED HOMESTEAD EXEMPTION

11                   TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE ERITHE SMITH
12               UNITED STATES BANKRUPTCY JUDGE

13  APPEARANCES:

14  For the Debtor:              JAMIE LYNN GALLIAN, PRO PER
                                 16222 Monterey Lane
15                               Unit 376
                                 Huntington Beach, California
16                                 92649

17  For the Houser Bros. Co.:    D. EDWARD HAYS, ESQ.
                                 Marshack Hays LLP
18                               870 Roosevelt
                                 Irvine, California 92620
19                               (949) 333-7777

20  For the United States        AARON E. DE LEEST, ESQ.
      Trustee:                   Danning, Gill, Israel &
21                                 Krasnoff, LLP
                                 1901 Avenue of the Stars
22                               Suite 450
                                 Los Angeles, California 90067

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

```
                                                                          ii

 1  APPEARANCES:  (Cont'd.)

 2  For Huntington Beach Gable        ROBERT GOE, ESQ.
      HOA:                            Goe Forsythe & Hodges, LLP
 3                                    18101 Von Karman
                                      Suite 1200
 4                                    Irvine, California 92612

 5  United States Trustee:           JEFFREY I. GOLDEN, ESQ.
                                      Weiland Golden Goodrich, LLP
 6                                    Post Office Box 2470
                                      Costa Mesa, California 92628
 7
    Court Recorder:                   Tamika Law
 8                                    United States Bankruptcy Court
                                      411 West Fourth Street
 9                                    Suite 2030
                                      Santa Ana, California 92701
10
    Transcriber:                      Dee Gregory
11                                    Echo Reporting, Inc.
                                      9711 Cactus Street, Suite B
12                                    Lakeside, California 92040
                                      (858) 453-7590
13

14

15

16

17

18

19

20

21

22

23

24

25
```

*Echo Reporting, Inc.*

1

1    SANTA ANA, CALIFORNIA THURSDAY, JULY 21, 2022 10:30 A.M.

2                        --oOo--

3         THE COURT:  Moving on to number 32 on today's

4    calendar, In the Matter of Jamie Lynn Gallian.  I'll take

5    the appearance of the moving party.

6         MR. HAYS (via Zoom):  Good morning, your Honor.

7    For the moving party, this is Ed Hays of Marshack Hayes.

8         THE COURT:  All right.  And the debtor?

9         Ms. Gallian?

10        I see that she's on.

11        Ms. Gallian, I'm not sure if you can hear me.

12        MS. GALLIAN (via Zoom):  Yes.  Yes, your Honor.

13   Can you hear me?

14        THE COURT:  Yes, I can hear you now.  Go ahead.

15        MS. GALLIAN:  Okay.  Jamie Gallian, debtor.

16        THE COURT:  All right.  And Ms. Jasso?

17        MS. JASSO (via Zoom):  Janine Jasso, observing.

18        THE COURT:  All right.  Thank you.  I apologize

19   for the mispronunciation.

20        Anyone else appearing?

21        MR. DE LEEST (via Zoom):  Yes, your Honor.  Aaron

22   de Leest, Danning, Gill, Israel and Krasnoff, for the

23   trustee.  The trustee I believe is also online.

24        MR. GOLDEN (via Zoom):  Yes, your Honor.  Jeff

25   Golden, trustee.  Good morning.

*Echo Reporting, Inc.*

2

1          THE COURT:  All right.  Thank you.  Anyone else?

2          MR. GOE (via Zoom):  Yes.  Rob Goe for the

3   Huntington Beach Gable HOA.  We're just joining in and I

4   won't be arguing.

5          THE COURT:  All right.  Thank you.  So the --

6          MS. GALLIAN:  Your Honor, may I just --

7          THE COURT:  Hold on.  Since today's ruling is in

8   favor the moving party, Ms. Gallian will be allowed to

9   address the Court first.

10          Go ahead, Ms. Gallian.

11          MS. GALLIAN:  I just want to make sure that you

12   can see me.

13          THE COURT:  I cannot.  Oh, now I can.

14          MS. GALLIAN:  Okay.  Great.

15          THE COURT:  I can see you now.

16          MS. GALLIAN:  All right.  Your Honor, I just

17   dropped in the dropbox a proof of a real-time screen capture

18   from the Orange County Tax Assessor's Office indicating the

19   effective date taken from HCD's certificate of title.  The

20   effective date of the exemption was 2/25/21 and I was

21   wondering if -- and I have sent it to all counsel -- Mr.

22   Golden's counsel, Mr. Hays, Mr. Goe.  And I beg the Court to

23   please consider the document on its face.

24          THE COURT:  Mr. Hays?

25          MR. HAYS:  Your Honor, this is new evidence that

3

1 was not provided prior to the hearing.  It was something

2 that Ms. Gallian emailed after your Honor took the bench

3 this morning but before getting to this matter.  It wasn't

4 attached to the debtor's opposition, and there is no

5 foundation for the authenticity of this document.

6      And this document does seem to be at odds with

7 what Ms. Gallian's own evidence says attached to the

8 opposition and what's on the Orange County Tax Assessor's

9 website, which I've run a search on since receiving Ms.

10 Gallian's email.

11      We would object to consideration of this late

12 filed purported evidence as having no foundation or

13 authenticity and not something that was timely provided.

14 And the Court was very specific in its last order continuing

15 this matter that no further pleadings would be considered,

16 or evidence, and so we would object.

17      And even if this was a valid and genuine and

18 authentic document, which we have no indication that it is,

19 it only goes to the issue of burden of proof.  And for the

20 reasons set forth in the tentative, we still think that the

21 debtor has failed to -- or we would have carried our burden

22 of proof even if the Court says the burden of proof is on

23 us.

24      MS. GALLIAN:  I would just respectfully disagree

25 with Mr. Hays.  Referring to the 522(f) motion that is

*Echo Reporting, Inc.*

4

1  currently pending, if the Court would pull up part two, page

2  seven and eight.  It is a copy of the homestead -- or the

3  home exemption application for the tax assessor's office.

4  And I have been informed, and it says right at the bottom of

5  it, "This is not a public document."  It is not available.

6       I, your Honor, have spent two months.  I was

7  crying hysterically with the assessor's office, trying to

8  get something for your Honor.  This is not readily available

9  to the public.  I said -- I have been -- they know me by

10 name there now.

11      THE COURT:  Well, let me just say this.

12      MS. GALLIAN:  Yes, ma'am.

13      THE COURT:  You should have realized by now, this

14 is not how we operate.  Hold on.  If the trustee -- if the

15 situation was reversed and the trustee said, "We just filed

16 something this morning that we believe supports our motion,"

17 I would not consider it.  And there's a reason for it, and

18 it's called due process.

19      MS. GALLIAN:  Yes, ma'am.

20      THE COURT:  I'm not going to look at it either

21 because everyone is supposed to be on a fair playing field,

22 on an equal playing field.

23      The only reason, by the way, that we're having

24 this hearing at all --

25      MS. GALLIAN:  Yes, ma'am.

*Echo Reporting, Inc.*

5

1        THE COURT:  -- is because you had filed your

2   opposition one day before the hearing.  And I was very clear

3   on that.  There are rules that need to be followed.

4        But I gave you some leeway on that and I continued

5   the hearing to today --

6        MS. GALLIAN:  Yes, ma'am.

7        THE COURT:  -- so that a proper reply could be

8   filed as provided under the local rules.

9        So it's not fair to the other side to file

10  something on the day of the hearing and expect to have it

11  reviewed by the Court.  And I'm not going to continue this

12  hearing.

13        If you think you've got sufficient evidence to

14  justify a motion for reconsideration under Federal Rule of

15  Civil Procedure 59 or 60(b), you can do that.  But I'm not

16  going to continue this hearing again because it is

17  perpetuating, oh, you can process something at the last

18  minute and the Court will just continue it.  And that's not

19  fair to the parties who have appeared today.

20        MS. GALLIAN:  And, respectfully, I hear your Honor

21  very well.  However, I would add that in closer -- in

22  closely looking at the movant's document that he claims to

23  have gotten from the tax assessor's office, in very, very

24  fine print on the left it says that the taxes were already

25  paid and it -- and it -- I'm so nervous right now.  But it

*Echo Reporting, Inc.*

6

1  clearly says right on the left-hand side.  When he just says

2  that he searched the tax assessor's office, it's there right

3  down in real-time.

4          So I'm not an attorney.  I've done the best I can.

5  So if a motion for reconsideration or appeal is my next

6  step, then I respect your Honor in allowing me to make the

7  record as I have today.

8          THE COURT:  Thank you.

9          The tentative ruling will stand.

10          And, Mr. Hays, if you would submit an order.  And

11  you can attach my tentative ruling.  I'm not going to read

12  it into the record except to incorporate it by reference,

13  and it should be attached as an exhibit to the order.  That

14  will be sufficient.

15          MS. GALLIAN:  Thank you, your Honor.

16          MR. HAYS:  Your Honor, if I may just inquire.

17  Given that the documents that Ms. Gallian is discussing,

18  which still at this moment have not been filed with the

19  Court as part of these proceedings, if the Court were to

20  consider it and accept it, it only goes to the burden of

21  proof.  And would your Honor be in a position based on the

22  very detailed tentative to say that even if the burden of

23  proof was on my client --

24          THE COURT:  No, I can't do that unless I review

25  the document.  And I don't have time during this hearing.  I

*Echo Reporting, Inc.*

7

1  still have another calendar to prepare for.

2        MR. HAYS:  I understand, your Honor.

3        THE COURT:  I don't have time to look at that

4  document and I'm not going to make a statement when I

5  haven't reviewed the document.

6        MR. HAYS:  I understand, your Honor.  The document

7  just says an exemption is or has not been filed, and that's

8  all it would say.  And so -- but I understand your Honor's

9  comment that you're not in a position to make that ruling

10 and determination today and we will lodge the proposed

11 order.

12        THE COURT:  Okay.

13        MR. HAYS:  Thank you.

14        THE COURT:  Very well.  Thank you.

15        MS. GALLIAN:  Thank you, your Honor.

16        MR. DE LEEST:  Thank you, your Honor.

17        MR. GOLDEN:  Thank you, your Honor.

18     (Proceedings concluded.)

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

8

1         I certify that the foregoing is a correct

2   transcript from the electronic sound recording of the

3   proceedings in the above-entitled matter.

4

5   /s/Dee Gregory                    8/21/22
    Transcriber                       Date
6

7   FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

8

9   /s/L.L. Francisco
    L.L. Francisco, President
10  Echo Reporting, Inc.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*